**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**                    Interim Approval
Tracy L. Klestadt                                            Hearing Date: **December 8, 2016 at 10:00 a.m.**
Stephanie R. Sweeney
200 West 41st Street, 17th Floor                    Bid Procedures Hearing Date:  **TBD**
New York, New York 10036
Tel. (212) 972-3000                                        Final Hearing Date: **TBD**
Fax (212) 972-2245

*Proposed Counsel to the Debtor and*
*Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re                                                      :          Chapter 11
                                                            :
CHOXI.COM, INC., a/k/a NOMORERACK.COM,  :          Case No. 16-13131 (SCC)
INC.
                                                            :
                             Debtor.          :
----------------------------------------------------------------x

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 332 AND 363 OF THE**
**BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004 (A) FOR AN**
**ORDER (i) APPROVING LICENSE AGREEMENT WITH STALKING HORSE**
**BIDDER ON AN INTERIM BASIS, (ii) SCHEDULING BID PROCEDURES**
**HEARING AND (iii) DIRECTING THE APPOINTMENT OF A CONSUMER**
**PRIVACY OMBUDSMAN, (B) FOR AN ORDER (i) APPROVING BID**
**PROTECTIONS, (ii) APPROVING BID PROCEDURES, (iii) SCHEDULING AN**
**AUCTION AND FINAL HEARING AND (iv) APPROVING  THE FORM AND**
**MANNER OF NOTICE  THEREOF AND (C) FOR AN ORDER APPROVING**
**LICENSE AGREEMENT ON A FINAL BASIS OR SALE TO SUCCESSFUL**
**<u>BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES</u>**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

        Choxi.com, Inc.  (the "<u>Debtor</u>"), the debtor and debtor-in-possession in the above-

captioned chapter 11 case (this "<u>Case</u>"), submits this motion (this "<u>Motion</u>"), pursuant to

Sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and

Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy</u>

Rules") (A) for an order (the "Interim Order") (i) approving the License Agreement between

the Debtor, on the one hand, and N.D. Gems Inc. and 9th LLC (together, the "Stalking Horse

Bidder"), on the other hand, annexed hereto as Exhibit A (the "License Agreement") on an

interim basis, subject to higher and better offers as may emerge at an auction for the sale or

license of the Licensed Property (as defined in the License Agreement) (the "Auction"); (ii)

scheduling the Bid Procedures Hearing (as defined below); and (iii) directing the

appointment of a consumer privacy ombudsman under Section 332 of the Bankruptcy Code;

(B) for an order (the "Bid Procedures Order") (i) approving the Bid Protections (as defined

below) for the Stalking Horse Bidder; (ii) approving the proposed bid procedures annexed

hereto as Exhibit B (the "Bid Procedures"); (iii) scheduling an auction and hearing for

approval of the License Agreement on a final basis or the sale or license of the Licensed

Property to the successful bidder at Auction (the "Purchaser"); and (iv) approving the form

and manner of notice thereof in the form annexed hereto as Exhibit C; and (C) for an order

(the "Final Order") approving the License Agreement on a final basis or authorizing the

license or sale of the Licensed Property to the Purchaser, free and clear of all liens, claims

and encumbrances, and in support of the Motion respectfully represents as follows:[1]

## JURISDICTION

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This

is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding within this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

---

[1] In the event of any discrepancy between the provisions of this Motion and the provisions of the Bid Procedures
or the License Agreement, the provisions of the Bid Procedures or the License Agreement, as applicable, shall
control.

relief requested herein are Sections 105(a), 332 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

## SUMMARY OF RELIEF REQUESTED

2.      By this Motion, the Debtor seeks this Court's authority to enter into the License Agreement with the Stalking Horse Bidder on an interim basis, subject to higher and better offers as may be received at an Auction for the sale or license of the Licensed Property pursuant to Section 363(f) of the Bankruptcy Code (such sale or license hereinafter referred to as a "Sale"). The Debtor additionally requests that the Court schedule a later hearing (the "Bid Procedures Hearing") for approval of the Bid Procedures and the Bid Protections (as defined below) within two weeks from the date of the hearing on this Motion in order to allow the Debtor to provide parties in interest with additional notice while remaining in compliance with the Debtor's milestones under the License Agreement. Finally, as the Licensed Property subject to the Sale may include "Personally Identifiable Information" within the meaning of Sections 363(b)(1)(B) and 101(41A) of the Bankruptcy Code, the Debtor requests, as required pursuant to Bankruptcy Rule 6004(g), that the Court direct the United States Trustee to appoint a consumer privacy ombudsman under Section 332 of the Bankruptcy Code.

3.      To effectuate the Sale, the Debtor seeks entry of three orders. The first, to be presented at the initial hearing on this Motion (the "Interim Hearing"), approves the License Agreement on an interim basis, schedules the Bid Procedures Hearing and directs appointment of a consumer privacy ombudsman. The second order, to be presented at the Bid Procedures Hearing, approves the Bid Procedures, schedules the Auction and the hearing (the "Final Hearing") for approval of the License Agreement on a final basis or, if the Auction results in a third party Purchaser, approval of the Sale to the Purchaser, and approves the

form and manner of notice of the Auction and Sale. The third order, to be presented at the Final Hearing, approves the License Agreement on a final basis or approves the Sale to the Purchaser.

4.      As further set forth in the *Declaration of Tracy L. Klestadt Pursuant to Local Bankruptcy Rule 9077-1 in Support of Order to Show Cause Scheduling Hearing on Shortened Notice* (the "Klestadt Declaration") filed contemporaneously herewith, the Debtor is seeking approval of the Interim Order on shortened notice in order to comply with its obligations under the License Agreement. The License Agreement requires satisfaction of certain milestones, including entry of the Interim Order on or before December 8, 2016 and entry of the Final Order on or before February 16, 2017.   In addition, the Debtor's entering into the License Agreement now, rather than after the Debtor fully markets the Licensed Property in bankruptcy and completes the auction process, will allow the Stalking Horse Bidder to reengage the Debtor's customers in time to capitalize on what remains of the peak season for the retail e-commerce industry, benefiting the Stalking Horse Bidder and maximizing the value of the Licensed Property for the Debtor and its estate.

## FACTUAL BACKGROUND

### I.    Procedural History

5.      On November 14, 2016, an involuntary chapter 7 petition (the "Involuntary Petition") was filed by creditors of the Debtor.

6.      On December 6, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code before this Court.

7.      The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No trustee, examiner or official committee of unsecured creditors has been appointed in this chapter 11 Case.

9.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Affidavit of Eddy Friedfeld, Chief Restructuring Officer of the Debtor, Pursuant to Local Bankruptcy Rule 1007-2* (the "Friedfeld Affidavit").  The Debtor respectfully refers the Court and interested parties to the Friedfeld Affidavit for a detailed description of the Debtor's business and events leading to the commencement of the Chapter 11 Case.

**II.   The License Agreement**

**a.   Negotiation of and Entry into the License Agreement**

10.     Prior to the filing of the Involuntary Petition, in October 2016, the Debtor was forced to cease operating its business as a result of sustained operating losses and prepetition fraudulent activity. Also in or around October 2016, as further set forth in the Friedfeld Affidavit, the Debtor, through its chief restructuring officer ("CRO"), began discussions and negotiations with potential purchasers or licensees of the Debtor's business and assets in an effort to continue the Debtor's business and maximize its going concern value.  Specifically, the CRO invited potential interested parties to submit term sheets for the license or purchase of the Debtor's assets. The CRO received three (3) such term sheets, including from the Stalking Horse Bidder and two (2) other established e-commerce retailers. The Debtor determined, in its business judgment, that the Stalking Horse Bidder would facilitate the license more quickly than any other interested party and would be best able to maximize the value of the Debtor's assets. In addition to the economic terms of the License Agreement, the Debtor considered that, unlike other parties in interest, the Stalking Horse Bidder had

5

familiarity with the Debtor's business, assets and employees and had existing relationships with a majority of the Debtor's significant vendors. As a result, the Debtor determined that the License Agreement with the Stalking Horse Bidder represented the highest and best offer for the Debtor's assets.

11.     The Stalking Horse Bidder is comprised of two entities, 9th LLC and N.D. Gems Inc. (collectively, the "Savalia Lender Group"), which comprise one of the Debtor's two groups of prepetition secured lenders, as further described in the Friedfeld Affidavit.  The two entities comprising the Stalking Horse Bidder are 100% owned by Harry Savalia, who indirectly holds a small (less than 1%) equity interest in the Debtor. Mr. Savalia has never held a title with or been on the board of directors of the Debtor.

12.     The Stalking Horse Bidder and the Debtor engaged in lengthy, good faith discussions and negotiations from on or about October 2016 through the Petition Date, culminating in the License Agreement currently before the Court. The License Agreement provides for the Licensed Property, consisting of the Debtor's domain name and related websites, database of customer information, and technology used in the operation of the business, representing all or substantially all of the Debtor's assets (other than causes of action), to be licensed to the Stalking Horse Bidder for a term of five years.

13.     The Debtor's prepetition secured lenders, who hold liens and security interests on substantially all of the Debtor's assets, including the Licensed Property, support the Debtor's entry into the License Agreement.[2]  In addition to the Savalia Lender Group, which is under common ownership with the Stalking Horse Bidder, the Debtor consulted with its

---

[2] Nothing in this Motion is intended or should be deemed to constitute an admission by the Debtor as to the amount, validity or priority of any secured claims or liens filed or otherwise alleged to exist against the Licensed Property or any other assets of the Debtor.

second group of prepetition secured lenders, comprised of TVII Corp., Bhungalia, LLC and Ronak Khichadia (collectively, the "Khichadia Lender Group" and, together with the Savalia Lender Group, the "Prepetition Secured Lenders"), who support the License Agreement.[3]

14.    By this Motion and the License Agreement, the Debtor is seeking to license or sell the Licensed Property free and clear of all liens, claims and encumbrances under Section 363(f) of the Bankruptcy Code, with all such liens, claims and encumbrances, including the liens and security interests of the Debtor's Prepetition Secured Lenders, to attach to the proceeds of the Sale. The Debtor will utilize the proceeds of Sale to repay the Prepetition Secured Lenders in part in accordance with their respective priorities, to finance the administration of the Chapter 11 Case, to fund investigation and prosecution of potential avoidance actions for the benefit of creditors, and/or to fund recoveries to unsecured creditors.

   **b.    Terms of the License Agreement**

15.    Pursuant to the terms of the License Agreement, the Stalking Horse Bidder will pay the Debtor (i) a one-time administration fee of $120,000, payable in cash in the amount of $60,000 and as a credit bid (voluntary secured claim reduction) reducing the Stalking Horse Bidder's allowed secured claim in the amount of $60,000 and (ii) a monthly royalty payment of 8% of the Stalking Horse Bidder's monthly net revenue in year one of the License Agreement, gradually reducing to a minimum of 5% of the monthly net revenue in years four and five of the License Agreement. The License Agreement provides for a guaranteed minimum royalty payment ("GMRP") of $15,000 per month in year one and $5,000 per

---

[3] Pursuant to the terms of an Intercreditor Agreement, dated on or about December 5, 2016, the Khichadia Lender Group has agreed to subordinate its liens and security interests in the Debtor's assets to the liens and security interests of the Savalia Lender Group in the Debtor's assets, solely if and to the extent that the Savalia Lender Group exercises its right to credit bid certain upfront payments for the license in accordance with the terms of the License Agreement and the Bid Procedures. The Intercreditor Agreement is available for review by the Court upon request.

month in years two through five of the License Agreement. The GMRP guarantees the Debtor and its estate income from the License Agreement of at least $35,000, regardless of the revenue actually generated, which is particularly advantageous to the Debtor during the early stages of the license when revenues are uncertain. The License Agreement provides the Stalking Horse Bidder with an option to purchase the Licensed Property at the end of the five-year term, subject to the conditions set forth in the License Agreement, for a purchase price of five (5) times the Stalking Horse Bidder's average monthly net revenue during the last year of the License Agreement.

### c. **Extraordinary Provisions**

16.      In accordance with General Order M-383, In the Matter of: Adoption of Amended Guidelines for the Conduct of Asset Sales, dated November 18, 2009, the Debtor addresses the following Extraordinary Provisions provided for in the License Agreement:

> (i) Sale to Insider. The Debtor believes that the Stalking Horse Bidder is not an insider within the meaning of Section 101(31) of the Bankruptcy Code, as the Stalking Horse Bidder has never held a title with the Debtor or served on the Debtor's board of directors. However, even if the Stalking Horse Bidder were deemed an insider, the Debtor has ensured the fairness of the License Agreement by entering into discussions and negotiations with third parties in an attempt to obtain the terms most favorable to the estate, negotiating with the Stalking Horse Bidder at arms' length, in good faith and without collusion, and marketing the Licensed Property and subjecting the License Agreement to higher and better offers in bankruptcy before final approval thereof, as further set forth herein.

> (ii) Deadlines that Effectively Limit Notice. The License Agreement requires the Debtor to obtain entry of the Interim Order on or before December 8, 2016 and entry of the Final Order by February 16, 2017. The Debtor submits that shortened notice as required to comply with these deadlines is warranted for the reasons set forth in the Klestadt Declaration, including that entry into the License Agreement now, prior to the close of the Debtor's peak retail season, will benefit the estate by allowing the Debtor to realize revenue from the Licensed Property that is otherwise lying dormant, and the deadlines were a material inducement and necessary to the Stalking Horse Bidder's entry into the License Agreement.

(iii) <u>Relief from Bankruptcy Rule 6004(h)</u>. The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtor submits such relief is appropriate under the circumstances, as further set forth herein.

## **RELIEF REQUESTED**

### I.    **Interim Approval of the License Agreement and Scheduling of the Bid Procedures Hearing**

17.    As further set forth in the Klestadt Declaration, the Debtor believes that it is in the best interests of all of the Debtor's creditors and interest holders that the Debtor proceed expeditiously with approval of the License Agreement, subject to better and higher offers at the Auction. The Debtor is currently not operating and is therefore losing valuable time and revenue each day that the Licensed Property remains unused during this peak holiday season, which is quickly coming to a close. Entry into the License Agreement will allow the Debtor to resume generating value from the Licensed Property now, during the height of the market, while still preserving its ability to market the Licensed Property to third parties on even more favorable terms prior to the Final Hearing. As a result, the Debtor believes entry into the License Agreement is consistent with sound business judgment and is in the best interests of the estate.

18.    Further, use of the Licensed Property during the holiday season was a material factor in the Stalking Horse Bidder's willingness to enter into the License Agreement.  This Court's approval of the License Agreement and entry of the Interim Order on or before December 8, 2016 are conditions to the effectiveness of the License Agreement as negotiated by the Stalking Horse Bidder.

19.    The Debtor requests, subject to the Court's calendar, that the Bid Procedures Hearing take place on or about December 20, 2016. Scheduling the Bid Procedures Hearing

approximately two weeks after the Interim Hearing will give parties in interest additional time to consider entry of the Bid Procedures Order and allow the Debtor to comply with Section 332(b)(1) of the Bankruptcy Code (as discussed below), while still enabling the Debtor to comply with its obligation to obtain entry of a Final Order on or before February 16, 2017.

## II.    Request for Appointment of a Consumer Privacy Ombudsman

20.    The Bankruptcy Code defines "Personally Identifiable Information" to include the names, addresses, e-mail addresses, telephone numbers and other information of individuals, if such information is provided by such individuals to the debtor in connection with obtaining a product or service for personal, family or household use. *See* 11 U.S.C. § 101(41A). Under Section 363(b)(1) of the Bankruptcy Code, a debtor may sell or lease Personally Identifiable Information (A) if the sale or lease complies with the debtor's privacy policy or (B) a consumer ombudsman is appointed and, after notice and a hearing, the court approves the sale or lease "giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law." 11 U.S.C. § 363(b)(1)(A)-(B).  Pursuant to Bankruptcy Rule 6004(g), "a motion for authority to sell or lease personally identifiable information under §363(b)(1)(B) shall include a request for an order directing the United States trustee to appoint a consumer privacy ombudsman under § 332." FED. R. BANKR. P. 6004(g).

21.    Where the sale or lease does not comply with the debtor's privacy policy, Section 332 governs the required appointment of a consumer privacy ombudsman. It provides, *inter alia*, that "the court shall order the United States trustee to appoint, not later than 7 days before the commencement of the hearing, 1 disinterested person (other than the United States

trustee) to serve as the consumer privacy ombudsman in the case." 11 U.S.C. § 332(a). The

consumer privacy ombudsman may be heard at the sale hearing and provide information,

which may include, among other things, the debtor's privacy policy, as well as the costs and

benefits to consumers of the sale, to assist the court in determining whether to approve the

sale. *See* 11 U.S.C. §332(b).

22.     As the Licensed Property proposed to be licensed or sold hereby may include

Personally Identifiable Information, and such sale may be inconsistent with the terms of the

Debtor's privacy policy, the Debtor hereby requests appointment of a consumer privacy

ombudsman. The Debtor submits that appointment of such consumer privacy ombudsman

prior to entry of the Bid Procedures Order or the Final Order will comport with Section 332 of

the Bankruptcy Code by allowing the ombudsman to review the facts of the case and assist the

Court in making a determination with respect to the Sale at both the Bid Procedures Hearing

and the Final Hearing, before the License Agreement or Sale to the Purchaser is finally

approved and effective.

### III.   Approval of the Bid Procedures

23.     The Debtor believes that the Bid Procedures, annexed hereto as <u>Exhibit B</u>, are

the procedures most likely to maximize the value of the Licensed Property for the Debtor's

estate, its creditors and other interested parties. The principal terms of the Bid Procedures are

outlined below. Any person or entity interested in bidding for the Licensed Property (a

"<u>Potential Bidder</u>") will be required to execute an appropriate confidentiality agreement with

the Debtor.

24.     Potential Bidders may be "qualified" to participate in the bidding process by

performing the following:

i. <u>Bid Deadline</u>. The Debtor suggests that each bid package must be delivered by the Bid Deadline of **February 1, 2016, at 12:00 p.m. (Prevailing Eastern Time)** (the "<u>Bid Deadline</u>") to: (a) counsel to the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn: Tracy L. Klestadt, tklestadt@klestadt.com; (b) the Stalking Horse Bidder, N.D. Gems Inc. and 9th LLC, 1200 Avenue of the Americas, 5th Floor, New York, NY 10036; and (c) counsel to the Stalking Horse Bidder, Rubin LLC, 345 Seventh Avenue, 21st Floor, New York, NY 10001, Attn: Paul Rubin, prubin@rubinlawllc.com.

ii. <u>Bid Package</u>. In summary, each bid must be a written and signed irrevocable and binding offer (collectively, the "<u>Bid Package</u>") that:

(a) Fully discloses the identity of the Potential Bidder. The Potential Bidder must fully disclose the identity of each person or entity that will be bidding for the Licensed Property or otherwise participating in connection with such bid, the terms of any such participation (including, if the Potential Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by the bid, the equity holder or other financial backer), the Potential Bidder's address, telephone number and email address where the bidder may be contacted, and sufficient evidence that the Potential Bidder is legally empowered by power of attorney or otherwise to complete the transaction on the terms contemplated by its bid;

(b) Is accompanied by financial information which fairly and reasonably demonstrates the Potential Bidder's ability (and the source of the Potential Bidder's ability) to close on its purchase of the Licensed Property if the Potential Bidder should be the successful bidder in an amount at least as much as its bid;

(c) Is accompanied by evidence that a good faith deposit in the amount of at least Two Hundred Forty-Five Thousand ($245,000) Dollars (the "<u>Deposit</u>") in immediately available funds has been

made (or is concurrently being made) by wire transfer to the Debtor, pursuant to wire instructions to be provided by the Debtor, to be held by the Debtor's counsel as escrow agent;

(d)  Attaches an executed license agreement for the license of the Licensed Property in substantially the same form as the License Agreement executed by the Stalking Horse Bidder, marked to show proposed changes thereto, or an executed purchase agreement for the purchase of the Licensed Property, provided that the potential changes may not be materially more burdensome to the Debtor or inconsistent with the Bid Procedures (the "Modified Agreement");

(e)  Includes an executed original of the Bid Procedures acknowledging and agreeing to the Bid Procedures, and includes confirmation of the following:

(i) (x) the Potential Bidder is not a partner, officer, director, stockholder, or employee of the Debtor, the Debtor's principals, Klestadt Winters Jureller Southard & Stevens, LLP, or any relative of any of the foregoing; (y) the Potential Bidder relied solely on its own independent investigation, analysis, appraisal and evaluation of the Licensed Property and it did not rely upon and did not receive any written or oral statements, representations, warranties, promises or guarantees whatsoever, whether express or implied or by operation of law or otherwise, with respect to the Licensed Property; and (z) the Potential Bidder agrees to be bound by the confidentiality agreement to be executed by and between the Debtor and the Potential Bidder;

(ii) the Potential Bidder is financially able and interested in licensing or acquiring the Licensed Property for aggregate consideration at least as great as that set forth in the License Agreement, and on terms, as a whole, at least as favorable to the Debtor as those set forth in the License Agreement, and states that the offer is without any contingencies as to financing, shareholder, board of directors or other

approval or regulatory contingencies of any kind;

(iii) the Potential Bidder's bid is irrevocable until 48 hours after the closing of the license or sale of the Licensed Property or until its bid is affirmatively rejected in a written communication from the Debtor to the Potential Bidder;

(iv) the Potential Bidder's offer shall not be binding upon the Debtor prior to the time that the Auction is conducted and the license or sale of the Licensed Property is approved by the Bankruptcy Court on a final basis;

(v) if the Potential Bidder is the successful bidder, it shall, within two (2) business days after the Auction, increase the Deposit as necessary to an amount equal to ten (10%) percent of its final bid at the Auction, time being of the essence to increase the Deposit;

(vi) if the Potential Bidder is the Successful Bidder, it shall close on the license or purchase of the Licensed Property within seven (7) days after entry by the Bankruptcy Court of the Final Order, or on such other date as the Debtor shall otherwise agree to in writing, or may otherwise be directed by Bankruptcy Court order, time being of the essence;

(vii) if the Potential Bidder is the determined by the Debtor to have submitted the second highest or best bid at the Auction (the "Back-up Bid") and, therefore, to be designated the back-up bidder (the "Back- up Bidder") and is notified in writing that the Debtor has determined to proceed with the Back-up Bid after default by the successful bidder, it shall close on the purchase of the Licensed Property on the back-up closing date, with time being of the essence to the Back-up Bidder's obligation to close on the back-up closing date and to pay the balance of the purchase price at Closing;

(viii) if such Potential Bidder is the successful bidder, the Deposit shall become non-refundable

14

and shall be forfeited by such successful bidder as liquidated damages if that bidder fails to close the purchase for any reason whatsoever on the closing date, and the same shall be true with respect to the Back-up Bidder if the Debtor decides to proceed with the Back-up Bid;

(ix) the Potential Bidder has agreed to comply with the Debtor's privacy policy and/or any related order of the Bankruptcy Court to the extent that the Potential Bidder is seeking to use or acquire any "Personally Identifiable Information" as that term is defined in Section 101(41A) of the Bankruptcy Code; and

(x) the Potential Bidder consents to the jurisdiction of the Bankruptcy Court.

iii.    <u>Financial Contingencies</u>. The bid must not contain any financing contingencies of any kind, and must affirmatively acknowledge that the Potential Bidder (i) has relied solely upon its own independent review, investigation and inspection of any documents and the Licensed Property in making its bid; and (ii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Licensed Property, or the completeness of any information provided in connection therewith.

The above, together with such other information and documents as are requested by the Debtor, constitutes the "Bid Package". The Bid Package must be delivered with the items described above by the Bid Deadline to the parties listed above in Section 24(i).

25.    Prior to the Auction, the Debtor shall evaluate each Bid Package submitted in accordance with the foregoing paragraphs and may then identify a person, persons, entity or entities from among those who submitted a Bid Package and deem such as "Qualified Bidders" with respect to their offers to purchase the Licensed Property.

26.     The Debtor has the right to determine whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids as soon as possible prior to the Auction.

**IV.  Form and Manner of Notice of the Auction Sale and Bid Procedures**

27.     Full copies of this Motion and all exhibits hereto have been filed electronically with the Clerk of the United States Bankruptcy Court for the Southern District of New York, and may be reviewed by all registered users of the Court's website at http://www.nysb.uscourts.gov or obtained by telephonic or e- mail request to the undersigned counsel for the Debtor, Attn: Tracy L. Klestadt, tklestadt@klestadt.com. Notice of the Motion will be served by first class mail upon: (i) the Office of the United States Trustee; (ii) counsel to the Prepetition Secured Lenders; (iii) counsel to the Stalking Horse Bidder; (iv) all persons who made their interest in the Licensed Property known to the Debtor or its counsel or asserted any liens against or interests in the Licensed Property; (v) the Internal Revenue Service; (vi) the Office of the United States Attorney; (vii) any consumer privacy ombudsman appointed herein; (viii) the Office of the New York State Attorney General; (ix) all known creditors and parties-in-interest; and (x) all entities having filed a notice of appearance and all others who are entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

28.     Upon entry of the Interim Order, the Bid Procedures Order and approved from of Notice of Auction and Sale and Bid Procedures, the Debtor shall cause those documents to be served by first class mail upon the Notice Parties.

29.     The Debtor submits that the foregoing notice is sufficient to provide effective notice of the relief requested in the Motion and of the Auction to all parties entitled to notice

and Potential Bidders in a manner designed to maximize the chance of obtaining the broadest possible participation in the Auction process while minimizing costs to the estate. Accordingly, the Debtor requests that the Court find this manner of notice sufficient and that no further notice of the License Agreement, the Bid Procedures, the Auction, and the hearing on this Motion is necessary.

## V.  **Auction**

30.    In the event that the Debtor timely receives more than one Qualified Bid, the Debtor shall conduct an Auction of the Licensed Property.

31.    The Debtor suggests that the Auction take place on **February 9, 2016, at 10:00 a.m. (Prevailing Eastern Time)** at the law offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, and must be attended in person by each Qualified Bidder or their legal designee with full authority to bind such bidder legally. The Auction will be transcribed by a court reporter.

32.     The Auction will be conducted by the Debtor as a traditional "English" auction, whereby Qualified Bidders make competing bids to purchase or license the Licensed Property, bidding openly against one another, with each bid being higher than the previous bid and consistent with the bidding terms detailed below.

33.    Only the Qualified Bidders that have delivered the full amount of their Deposit to the Debtor will be entitled to participate in the Auction. During the Auction, bidding will begin with the then best Qualified Bid, which shall be for aggregate consideration of at least One Hundred Twenty-Five Thousand ($125,000) Dollars greater than the aggregate consideration of the bid of the Stalking Horse Bidder (the "Minimum Overbid"). Any subsequent bid shall be at least Twenty-Five Thousand ($25,000) Dollars greater than the

Minimum Overbid. Thereafter, bidding shall continue in minimum increments of at least Twenty-Five Thousand ($25,000) Dollars higher than the previous Qualified Bid.

34.    The Auction shall continue until there is only one offer that the Debtor determines, in its sole discretion, is the highest or otherwise best offer from among the Qualified Bids submitted at the   Auction (the "Successful Bid"). The Qualified Bidder submitting such Successful Bid (the "Successful Bidder") shall have the rights and responsibilities of the Stalking Horse Bidder, as set forth in License Agreement, together with any changes made thereto by the Successful Bidder at the Auction or in the Modified Agreement and agreed to by the Debtor.

35.    At the conclusion of the Auction, the second highest bidder will be announced and confirmed at the Sale Hearing as the Back-up Bidder, whose Back-up Bid shall become the Successful Bid should the Successful Bidder at Auction fail to consummate the Sale of the Licensed Property. Otherwise, the Deposit of the Back-up Bidder shall be  returned upon the earlier of (i) the closing of the Sale to the Successful Bidder, and (ii) forty-five (45) calendar days after the Auction.

36.    All Qualified Bidders shall be bound by their bids until the conclusion of the Auction, subject to their rights under their respective Modified Agreements and applicable law. Additionally, the Successful Bidder and the Back-up Bidder shall be bound by their respective bids until the closing of the Sale of the Licensed Property.  If the Successful Bidder is unable or unwilling to close the Sale, subject to the Successful Bidder's rights under its License Agreement or the Modified Agreement, the Successful Bidder shall forfeit its Deposit to the Debtor, and the Debtor may close the Sale with the Back-up Bidder, without further notice or hearing, who shall then be obligated to close the Sale on the terms of the Back-up

Bidder's Modified Agreement upon ten (10) business days' prior written notice of the Successful Bidder's default, time being of the essence. If the Back-up Bidder is unable or unwilling to close the Sale in the time permitted, subject to the Back-up Bidder's rights under its Modified Agreement, the Back-up Bidder shall forfeit its Deposit to the Debtor.

37.    In the event that the Debtor fails to receive a Qualified Bid, the Debtor reserves the right to cancel the Auction and to proceed with the Final Hearing to seek approval of the License Agreement with the Stalking Horse Bidder on a final basis.

38.    If the Licensed Property is sold or licensed to a Purchaser other than the Stalking Horse Bidder following the Auction conducted in accordance with the Bid Procedures, the Interim Order and the Bid Procedures Order, then (provided the Stalking Horse Bidder is not in default under the License Agreement), the Stalking Horse Bidder shall be entitled to receive a break-up fee in the amount of $75,000 (the "Break-up Fee") and reimbursement of all out-of-pocket costs and expenses incurred by the Stalking Horse Bidder to the date of entry of the Final Order in an amount of up to $25,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"), to be paid to the Stalking Horse Bidder from the proceeds of the Sale to the Purchaser.

39.    Bidding incentives such as the Bid Protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992

("Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers.").

40.     The Debtor submits that (a) approval of the Bid Protections is an integral part of the License Agreement, (b) in the absence thereof, the Stalking Horse Bidder will not enter into the License Agreement, (c) entry in entry into the License Agreement is necessary for the preservation of the Debtor's estate and beneficial to the Debtor and its creditors, and (d) the Bid Protections were reasonably calculated to compensate the Stalking Horse Bidder for (i) committing the time to perform due diligence, (ii) opportunity costs of being bound to a transaction that could be topped in a competitive bidding process, (iii) risks of investing in and starting a business based on the license of the Licensed Property where such license could be revoked as a result of the competitive bidding process, (iv) and serving as a stalking horse to encourage the submission of other bids. Accordingly, the Debtor believes that the Bid Protections are fair and reasonable and should be approved.

**VI.   Approval of the Sale Following Auction**

**a.     The Sale of the Licensed Property is Supported by Legitimate Business Justifications**

41.     Section 363(b)(1) provides that the "[t]he debtor, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The decision to use, sell or lease property of the estate is subject to the exercise of a debtor's business judgment. *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). Further, to obtain court approval to sell property under Section 363(b) of the Bankruptcy Code, a debtor need only show a legitimate business justification for the proposed action. *See id*. at 1070 ("Where the

20

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

42.     The Debtor believes that the Sale of the Licensed Property, as outlined herein, is the estate's best opportunity to achieve the highest and best offer and to recover the maximum value from the Licensed Property for the benefit of the estate and its creditors.

**b.     The Sale of the Licensed Property is Permitted Free and Clear of All Liens**

43.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell property free and clear of any interest in such property of an entity other than the estate only if:

> (i)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
> (ii)    such entity consents;
> (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (iv)    such interest is in bone fide dispute; or
> (v)     such entity should be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) is drafted in the disjunctive, and satisfaction of any one of its five requirements will suffice to permit the sale "free and clear" of liens.  *See Michigan Employment Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991).

44.     Several courts have held that, notwithstanding the use of the term "interest" in the statutory language of Section 363(f), such section grants bankruptcy courts the power to convey assets free and clear of claims. *See, e.g., In re Trans World Airlines., Inc.*, 322 F.3d 283, 290 (3rd Cir. 2003); *In re Medical Software Solutions*, 286 B.R. 431, 446 (Bankr. D.

Utah 2002); *In re Trans World Airlines, Inc.*, Case No. 01-0056, 2001 WL 1820325 at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of section 363 [of the Bankruptcy Code] intended by Congress."). Section 105(a) of the Bankruptcy Code provides additional support for a court's authority to convey assets free and clear of claims. *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of Title 11). *See also, Equity Broadcasting Corp. v. Winstar New Media Co., Inc. (In re Winstar Communications, Inc.)*, 284 B.R. 40, 48 (Bankr. D. Del 2002) (approving a sale order transferring the debtor's securities free and clear of all encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code).

45.    Here, the Prepetition Secured Lenders consent to the Debtor's entry into the License Agreement and the Sale contemplated hereby, and the License Agreement provides that all liens, including the liens of the Prepetition Secured Lenders, will attach to the proceeds of the license or Sale in accordance with their respective priorities, and subject to the same defenses and avoidability, if any, as existed before the closing of the Sale.

46.    For all of the foregoing reasons, the Debtor submits that the Sale of the Licensed Property should be permitted, upon the terms set forth herein, free and clear of all liens, claims and encumbrances, with any such liens, claims and encumbrances, including the liens of the Prepetition Secured Lenders, to attach to the proceeds of the Sale in accordance with their respective priorities.

c.    **The Purchaser is a Good Faith Purchaser Pursuant to Bankruptcy Code Section 363(m)**

47.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals has held that:

The "good faith" component of the test under § 363(m) speaks to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) (quoting *In re Rock Industries*

*Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (internal quotations omitted).

48.    The Debtor requests that this Court find that the Successful Bidder, which may

be the Stalking Horse Bidder, constitutes a good faith purchaser of the Licensed Property

pursuant to Section 363(m) of the Bankruptcy Code, such that the reversal or modification on

any appeal of the Sale of the Licensed Property to the Successful Bidder shall not affect the

validity of the Sale to the Successful Bidder, whether or not the Successful Bidder knew of the

pendency of the appeal. Such relief will ensure the finality of the Sale and garner the highest

value for the Licensed Property.

49.    As set forth above, the Stalking Horse Bidder was selected by the Debtor after

engaging in extensive negotiations and determining that the terms of the Stalking Horse

Bidder's bid were the most favorable option.  The Stalking Horse Bidder, or any Successful

Bidder designated after the Auction, has and will be required to represent to the Debtor that it

is undertaking the proposed transaction with the Debtor at arm's-length, for value and in good

faith, without engaging in fraud or collusion of any kind, in accordance with Section 363(m) of the Bankruptcy Code.

### d.    The Fourteen-Day Stay Period Required by Bankruptcy Rules 6004(h) Should be Waived

50.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, an order authorizing the use, sale or lease of property pursuant to Section 363 of the Bankruptcy Code is automatically stayed for 14 days after entry of the order. FED. R. BANKR. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to FED. R. BANKR. P. 6004(h).

51.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests, and courts have agreed, that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., 6004.09 (L. King, 15th rev. ed. 2005); *see also In re Grubb & Ellis Co.,* No. 12-10685 MG, 2012 WL 1036071, at *10 (Bankr. S.D.N.Y. Mar. 27, 2012), *aff'd,* 523 B.R. 423 (S.D.N.Y. 2014) ("[T]he court should eliminate the fourteen-day stay period and allow the sale or other transaction to close immediately where there has been no objection to the procedure."). Furthermore, if an objection is overruled, "the court should eliminate or reduce the fourteen-day stay period upon a showing that there is a sufficient business need to close the transaction within the 14–day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected." *In re Grubb & Ellis Co.*, No. 12-10685 MG, 2012 WL 1036071, at *10.

52.     To preserve the value of the Licensed Property and generate revenue for the estate as soon as possible, it is critical that the Debtor close the Sale immediately after all conditions thereto have been met or waived. Immediate enforceability of the Final Order and License Agreement is required by the Stalking Horse Bidder, and parties in interest will have had notice of the License Agreement and time to determine whether to appeal entry of the Final Order during the interim period. Accordingly, the Debtor requests that the Court waive the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

53.     Contemporaneously with the filing of the Motion, the Debtor filed with the Court and served by first class mail a notice of the relief requested in this Motion upon each of the Notice Parties. The Debtor respectfully submits that notice of this Motion is compliant with Bankruptcy Rules 2002 and 6004 and is otherwise reasonable and appropriate, and that no other or further notice of the relief requested herein is warranted or required.

## **No Prior Relief**

54.     Except as specifically set forth at length above, no prior motion for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that: (i) the Motion be granted; (ii) the proposed Interim Order in substantially the form annexed hereto as Exhibit D be entered; (iii) the proposed Bid Procedures Order to be submitted at the Bid Procedure Hearing, subject to the Bid Procedures Hearing, be entered; (iv) the Final Order to be submitted following the designation of the Successful Bidder, subject to the Final Hearing, be entered; and (v) the Debtor be granted such other and further relief as is just and proper.

Dated:      New York, New York
            December 5, 2016

KLESTADT      WINTERS      JURELLER
SOUTHARD & STEVENS LLP
*Attorneys for the Debtor and*
*Debtor-in- Possession*

By:    /s/ Tracy L. Klestadt
       Tracy L. Klestadt
       Stephanie R. Sweeney
       200 West 41st Street, 17th Floor
       New York, NY 10036
       Tel. (212) 972-3000
       Fax (212) 972-2245