HALPERIN BATTAGLIA BENZIJA, LLC
40 Wall Street, 37th Floor
New York, NY 10005
(212) 765-9100
Alan D. Halperin, Esq.
Debra J. Cohen, Esq.
*Counsel for TVII Corp., Bhungalia Family, LLC and Ronak Khichadia*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
In re:

                                              Chapter 11
                                              Case No. 16-13131 (SCC)

**CHOXI.COM, INC., a/k/a NOMORERACK.COM,**
**INC.,**                                     Hearing Date: January 19, 2017

                 Debtor.
-------------------------------------------------------------X

**OBJECTION OF TVII CORP., BHUNGALIA FAMILY, LLC AND RONAK
KHICHADIA TO APPROVAL OF A PROPOSED LICENSE AGREEMENT
BETWEEN THE DEBTOR AND THE DECLARED SUCCESSFUL BIDDER
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES**

      TVII Corp., Bhungalia Family, LLC d/b/a Bhungalia, LLC and Ronak Khichadia (collectively, the "Secured Creditor"), hereby object to entry of an order approving a proposed license agreement (the "CE Agreement") between Choxi.com, Inc. a/k/a Nomorerack.com, Inc. (the "Debtor") and Creek Equity Partners, LLC ("Creek Equity"), the declared successful bidder at an auction held on January 13, 2017 (the "Auction"), free and clear of all liens, claims and encumbrances, and respectfully represent as follows:

**Preliminary Statement**

      1.    In order to be selected as the successful bidder at the Auction, sound business judgment required the bidder to present the highest *and best* offer. Unfortunately, Creek Equity has not demonstrated its ability to close and perform under the transaction contemplated by the

CE Agreement. Indeed, its financial information indicates that it is unlikely it could satisfy its obligations under the CE Agreement and that the transaction could well be nothing more than a hope-certificate. In selecting Creek Equity as the winning bidder at the Auction without adequate information to justify the decision, the Debtor and the Committee failed to account for a glaring credit risk that presents a grave risk to the recovery of all creditors.

## Background

2. On December 5, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (this "Court").

3. On December 14, 2016, the Office of the United States Trustee appointed a committee of unsecured creditors in this case (the "Committee").

4. Prior to the Petition Date, the Secured Creditor made certain loans and other financial accommodations to the Debtor, as evidenced by those certain Secured Notes dated as of September 2, 2016 and October 25, 2016 executed by the Debtor in favor of the Secured Creditor in the original aggregate principal amount of $2,200,000 (as amended from time to time, the "Notes"). Payment and performance under the Notes was secured by a fully perfected lien upon all of the Debtor's assets (the "Collateral") pursuant to that certain Security Agreement dated as of September 1, 2016 (as amended from time to time, the "Security Agreement" and with the Note and related agreements and documents, the "Security Documents") between the Debtor and Secured Creditor. UCC-1 financing statements were duly filed with the appropriate governing body evidencing its properly perfected lien on the Collateral.

5. Also prior to the Petition Date, the Debtor duly executed and delivered those

certain *pari passu* Secured Demand Promissory Notes, each dated on or about August 10, 2016, in favor of N.D. Gems Inc. and 9th LLC (together, the "Stalking Horse"), which are secured by a lien and security interest held by the Stalking Horse in the Collateral.

6. Pursuant to a certain Limited Subordination under Secured Demand Promissory Notes agreement dated as of September 1, 2016, the Stalking Horse subordinated its liens and security interests in the Collateral to the liens and security interests of the Secured Creditor in the Collateral so that Secured Creditor holds a first priority security interest in and continuing lien on all the Collateral.

7. On December 5, 2016, the Debtor filed with this Court the *Debtor's Motion Pursuant to Sections 105(A), 332 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (A) Order (i) Approving License Agreement with Stalking Horse Bidder on an Interim Basis, (ii) Scheduling Bid Procedures Hearing and (iii) Directing the Appointment of a Consumer Privacy Ombudsman, (B) for an Order (i) Approving Bid Protections, (ii) Approving Bid Procedures, (iii) Scheduling an Auction and Final Hearing and (iv) Approving the Form and Manner of Notice Thereof and (C) for an Order Approving License Agreement on a Final Basis or Sale To Successful Bidder Free and Clear of all Liens, Claims and Encumbrances* (the "Motion") [Dkt # 11], seeking, among other things, approval of a license agreement between the Debtor and the Stalking Horse subject to higher and better offers that may be made at an auction for the sale or license of the licensed property, which comprises the Collateral (the "Assets").

8. Thereafter, an interim hearing on the Motion was held before this Court on December 19, 2016 during which this Court determined that an auction should be held that day to select the highest and best stalking horse bidder for the Assets (the "Pre-Auction"). Following a long Pre-Auction with several parties vying for the Assets, the Stalking Horse

ultimately raised its initial offer fourfold, was declared the highest and best offer for the Assets and was selected as the stalking horse bidder. As a result, by *Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (i) Approving Bid Procedures, (ii) Scheduling an Auction and Final Hearing and (iii) Approving the Form and Manner of Notice Thereof* dated December 21, 2016 [Dkt # 42] (the "Procedures Order"), this Court approved the License Agreement with the Stalking Horse on an interim basis, scheduled the Auction for the Assets on a final basis, established bidding procedures for the Auction (the "Bidding Procedures") and scheduled a final hearing on the Motion for January 19, 2017.

9.  The Bid Procedures approved by the Procedures Order expressly provides, among other things, that all potential bidders must provide financial information that fairly and reasonably demonstrates the bidder's ability (and the sources of the Potential Bidder's ability) to close on its license or purchase of the Assets in an amount at least as much as its bid, and must be financially able to close on the transaction (the "Wherewithal Requirement").

10.  Creek Equity had failed to deliver to the Debtor any meaningful information to demonstrate that it satisfies the Wherewithal Requirement. Nonetheless, the Debtor designated Creek Equity as a qualified bidder. There were no other qualified bidders besides the Stalking Horse and Creek Equity.

11.  The Auction was held on January 12, 2017 and Creek Equity was ultimately declared by the Debtor, with the recommendation and consent of the Committee, to be the highest and best offer for the Assets, having submitted an offer with greater cash consideration than the Stalking Horse. At the Auction, the Secured Creditor expressly stated that it did not agree with the determination and reserved all of its rights.

**The Objection**

12. The Secured Creditor objects to the selection of Creek Equity as the highest and best offer for the Assets and approval of the CE Agreement, and submits that the Debtor has failed to exercise reasonable business judgment in doing so. While Creek Equity did submit a bid of higher minimum guaranteed cash consideration than the Stalking Horse, Creek Equity has not demonstrated that it will have the financial ability to satisfy its obligations under the CE Agreement (the "Obligations"). Moreover, other than its initial down payment, which represents only 8.5% of the Obligations, 91.5% of the purchase prices is to be paid over five years. As structured, after the transaction closes, Creek Equity could default within the first month and the estate and its creditors, including the Secured Creditor, would receive virtually nothing for the Assets. Thus, Creek Equity's financial capability to operate its business and satisfy the Obligations as they come due over the next 5 years is crucial.

13. Creek Equity was formed on January 5, 2017, only one week prior to the Auction and failed to provide any documentation regarding its capitalization or ability to meet the Obligations. Creek Equity attempted to remedy its inability to satisfy the Wherewithal Requirement by offering the guaranty of its affiliate, The Source Force, LLC ("The Source Force"). However, The Source Force itself is a fairly new entity, having been formed in April of 2014, and its financial ability to satisfy the Obligations is questionable at best. The only documentation provided in an effort to satisfy the Wherewithal Requirement was an informal balance sheet and tax return of The Source Force, both of which fail to provide any comfort that

Creek Equity and/or The Source Force will be able to satisfy the Obligations.[1]

14.     At the Auction, in response to concerns regarding Creek Equity's ability to satisfy the Obligations, Creek Equity agreed to secure all of the Obligations with a lien upon all of its assets (of which there currently do not appear to be any) and The Source Force agreed to secure its guaranty for the first year of Obligations with a lien on all of its assets.  However, it appears that both companies' asset base combined, and The Source Force's revenue, is woefully insufficient to cover the Obligations.

15.     The Secured Creditor did not raise any objection to the selection of Creek Equity as a qualified bidder, instead, reserving judgment until it reviewed the bids offered during the Auction in their totality, as well as any additional financial information.  For example, had an offer been made for upfront cash sufficient to satisfy its secured claim, the Secured Creditor would have less concern about Creek Equity's viability down the road.  However, the vast majority of the Obligations are payable over five years and neither Creek Equity nor The Source Force have demonstrated that they have the financial wherewithal to satisfy the Obligations and operate the business over time.

16.     The transaction represented by Creek Equity is, therefore, fatally flawed and cannot support a finding of the Debtor's sound business justification.

17.     Under § 363(f) of the Bankruptcy Code, assets subject to a lien cannot be sold free and clear of the lien without the secured party's consent unless the secured claim will be

---

[1] Despite the requirements of the Procedures Order, prior to the Auction, the Secured Creditor only received The Source Force balance sheet.  Secured Creditor first received The Source Force tax return and a disclosure regarding the members of Creek Equity after the Auction and the selection of Creek Equity as the successful bidder.  As these documents were provided in confidence in connection with the bidding process, the Secured Creditors do not address their contents in these papers, but are prepared to do so for the Court at the sale hearing.

{00264738.2 / 1148-001 }

6

paid in full.  Here, Secured Party has a lien on the Assets, which comprise its Collateral, and the limited financial information provided in connection with the Wherewithal Requirement gives the Secured Creditors grave concerns about Creek Equity and The Source Force's ability to satisfy the Obligations that are necessity to satisfy the secured obligations under the Security Documents.

      WHEREFORE, the Secured Creditor submits that this Court should not approve Creek Equity as the successful bidder at the Action or the CE License Agreement and grant to it such other and further relief as is just and proper.

Dated: January 17, 2017

                              TVII CORP.,
                              BHUNGALIA FAMILY, LLC, AND
                              RONAK KHICHADIA,
                              By their Counsel,
                              HALPERIN BATTAGLIA BENZIJA, LLC

By:   */s/ Alan D. Halperin*
       Alan D. Halperin
       Debra J. Cohen
       40 Wall Street, 37th Floor
       New York, NY 10005
       (212) 765-9100
       ahalperin@halperinlaw.net
       dcohen@halperinlaw.net