Rubin LLC                                              Hearing Date: January 19, 2017
345 Seventh Avenue, 21st Floor                         Time:  1:30 p.m.
New York, New York 10001
Tel: 212. 390.8054
Fax: 212.390.8064
E-mail:  prubin@rubinlawllc.com
Paul A. Rubin

*Counsel for N.D. Gems Inc., 9th LLC and Lucent Jewelers Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re:                                            :
                                                  :
                                                  :    Chapter 11
                                                  :
       CHOXI.COM, INC., a/k/a                     :
       NOMORERACK.COM, INC.                       :
                                                  :    Case No. 16-13131 (SCC)
                                                  :
                                                  :
                    Debtor.                       :
------------------------------------------------------x

### OBJECTION OF N.D. GEMS, INC., 9TH LLC AND LUCENT JEWELERS INC. TO SELECTION OF CREEK EQUITY PARTNERS LLC'S OFFER AS HIGHEST AND BEST BID IN CONNECTION WITH DEBTOR'S MOTION FOR FINAL APPROVAL OF LICENSE AGREEMENT

N.D. Gems, Inc., 9th LLC and Lucent Jewelers Inc., by their undersigned counsel, hereby object to the Debtor's motion for approval of license agreement dated December 5, 2016 [Dkt. No. 11] to the extent that it now seeks approval of the Debtor's selection of the bid of the newly-formed Creek Equity Partners, LLC, submitted at the January 12, 2017 auction, as the "highest and best" offer for the five-year license of assets of Choxi.com, Inc. (the "Debtor" or "Choxi"), consisting primarily of the Debtor's customer list.  In support thereof, N.D. Gems, 9th LLC and Lucent Jewelers Inc. respectfully represent as follows:

## PRELIMINARY STATEMENT

1. A debtor is supposed to accept the "highest and best" offer it receives for its assets, not the highest dollar amount that is bid at auction. The bid of Creek Equity Partners LLC ("Creek") should not be approved because it is simply too good to be true. Creek is a newly-formed shell entity that has not demonstrated financial wherewithal to make the sky-high minimum monthly royalty payments that it cavalierly bid at the auction. The Debtor is going to have just one opportunity to monetize its customer list. Given the facts and circumstances described below, it is respectfully submitted that acceptance of Creek's bid would not simply be an imprudent exercise of Debtor's business judgment, but would be an unfortunate, self-inflicted injury harmful to the interests of all concerned.

## FACTUAL BACKGROUND

### A. Events Preceding the Debtor's Bankruptcy Filing

2. Until it terminated operations on or about October 22, 2016, the Debtor was an online retailer of various consumer goods and products. N.D. Gems, 9th LLC and Lucent Jewelers Inc. ("Lucent") were all prepetition vendors to the Debtor (N.D. Gems and 9th LLC are referred to collectively hereinafter as the "Stalking Horse Bidder").

3. N.D. Gems and Lucent are operating companies that sell diamonds, jewelry and precious gems to well-known national retailers such as Zale's, Kay Jewelers, QVC, Wal-Mart, Sam's Club, Macy's, J.C. Penney, and others. N.D. Gems and Lucent are drop-ship suppliers who also sell directly to consumers on-line. 9th LLC sells apparel, home goods, electronics, watches and other consumer goods via Amazon.com, Groupon, and other on-line platforms.

4. As of the commencement of this case, the Debtor owed N.D. Gems approximately $1,305,812, 9th LLC approximately $683,591, and Lucent approximately $69,885.

2

5. Starting in May 2016, a principal of these three companies, Mr. Harry Savalia, contacted the Debtor seeking payment on overdue amounts that Choxi had failed to pay them. During the spring and summer of 2016, as Mr. Savalia negotiated for repayment with Deepak Agarwal, who was then the chief executive officer of Choxi, various other Choxi creditors took aggressive collection action against it, and some entered into settlements to accept payments of reduced amounts on their claims. Without the assistance of any other creditors, the three creditors owned or controlled by Mr. Savalia could have filed an involuntary bankruptcy petition against the Debtor. But rather than do that, in August 2016, N.D. Gems and 9th LLC agreed to accept security interests in the assets of Choxi.

6. The negotiations for those security interests took place over a period of months between Mr. Savalia and Mr. Agarwal. Mr. Savalia had no prior relationship with or business connection to Mr. Agarwal outside of their business dealings concerning Choxi. Those negotiations were delayed because for a time Choxi disputed portions of the amounts of the Stalking Horse Bidder's claims. The Stalking Horse Bidder decided to accept secured promissory notes from the Debtor in the reduced principal amounts of $1,104,769.88 (N.D. Gems) and $603,742.51 (9th LLC), without waiving their rights to the full amount of the receivables owed to them. Financing statements for N.D. Gems and 9th LLC were filed on August 10, 2016.

7. Thereafter, certain major shareholders of the Debtor informed Mr. Savalia that they were willing to infuse at least $2,000,000 in cash into the Debtor to help fund a turnaround effort for the company, but they would first require N.D. Gems and 9th to agree to subordinate their secured claims to their claims for the new cash infusions. A subordination agreement dated as of September 1, 2016 was entered into between the Stalking Horse Bidder and three parties, Mr.

3

Ronak Khichadia of Connecticut, TVII Corp. from Ohio, and Bhungalia Family LLC from Virginia, who now assert first lien claims against the Debtor.[1]

8. N.D. Gems then entered into an Amendment to Supplier Agreement dated as of September 8, 2016 with the Debtor, pursuant to which N.D. Gems agreed to resume shipment of goods to the Debtor. This agreement stipulated, among other things, that the amount of N.D. Gems' receivable from the Debtor was $1,415,731.

9. Similarly, 9th LLC entered into an Amendment to Supplier Agreement dated as of September 8, 2016 with the Debtor, pursuant to which 9th LLC agreed to resume shipment of goods to the Debtor. This agreement stipulated, among other things, that the amount of 9th LLC's receivable from the Debtor was $678,485.

10. In connection with Choxi's turnaround effort, Mr. Agarwal was replaced as chief executive officer of Choxi, and Eddy Friedfeld (the "CRO") was retained to serve as Choxi's chief restructuring officer.

11. During the months of September and October, 2016, N.D. Gems, 9th LLC and Lucent shipped in the aggregate an additional $80,000 in goods to Choxi for which they did never received payment. In contrast, we are advised that some other creditors of Choxi were paid during the same time frame.

12. Unfortunately, Choxi's board of directors decided terminate their restructuring efforts and to shut down the company. Choxi closed its web site and terminated all of its employees on or about October 24, 2016. Mr. Savalia was never an officer or director of the

---

[1] Upon information and belief, an American Express entity asserts a secured claim against the Debtor senior to that of this first lien group in the approximate amount of $57,000.

Debtor, he never held a title or position with Choxi, and he did not participate in the decision to close down Choxi.[2]

**B.    The Stalking Horse Bidder is Selected – Multiple Times**

13.    As N.D. Gems, 9th LLC and Lucent had sold over $20 million in product through the Choxi platform since 2012, Mr. Savalia had grown familiar with its business, including aspects that he thought favorably distinguished the company. Accordingly, after Choxi was shutdown, Mr. Savalia submitted a proposal to the company for the acquisition of an exclusive license of Choxi's assets.

14.    But on November 10, 2016, an involuntary petition for relief under chapter 7 of the Bankruptcy Code was filed against Choxi. That filing derailed Mr. Savalia's discussions with Choxi regarding a potential transaction, as Choxi was forced to decide how to respond to it.

15.    In the meantime, jClub.com, the e-commerce company that Mr. Savalia also owns, hired some former employees of the Debtor, including personnel familiar with technical aspects of the Debtor's operations. To be clear, jClub.com retained the services of these former employees for the benefit of its business regardless of whether it is the successful bidder for assets of the Debtor.

16.    The negotiations between the Stalking Horse Bidder and Choxi were resumed once Choxi decided to file a voluntary chapter 11 petition in response to the involuntary petition. Those discussions did not take place in a vacuum. The CRO and his counsel advised the Stalking Horse

---

[2] Four years earlier, in or about October 2012, Mr. Savalia invested the sum of $225,000 in the Debtor, for which he received less than 2% of the then-outstanding equity in the Debtor. As a result of later rounds of Debtor's fundraising, Mr. Savalia's ownership was diluted down to less than 1% of the equity in the Debtor.

5

Bidder and his counsel that Choxi was in discussions with other parties interested in licensing Choxi's customer list.

17. During the period preceding the bankruptcy filing, there were intense negotiations among the Stalking Horse Bidder and its attorneys, Debtor's proposed counsel (the Klestadt Winters firm), the CRO (Mr. Friedfeld), and counsel for the first lien creditor group (the Halperin Battalia firm) who advised that they were receiving comments to documents from their clients. Major and minor term of the license agreement that was ultimately signed by the Stalking Horse Bidder and the Debtor (the "License Agreement"), and a new subordination agreement between the Stalking Horse Bidder and the first lien creditor group, were negotiated and re-negotiated. Negotiations broke off at one point, and were then restarted. The Stalking Horse Bidder did not know that the Debtor would support its bid until shortly before the Debtor's voluntary chapter 11 filing.

18. On December 5, 2016, the Debtor filed with its voluntary petition the motion seeking approval of the License Agreement on an interim and final basis. [ECF Dkt. No. 11].

19. On December 7, 2016, another vendor of the Debtor, U.S.A. Dawgs, Inc. ("Dawgs") filed an objection to the Debtor's sale motion. [ECF Dkt. No. 19]. In that objection, Dawgs disclosed that in August 2016, it "did a deal to license a small portion of [Choxi's] customer list" and that this successful test enabled Dawgs to generate positive revenue. *See Id.* at ¶¶ 5-6.

20. Dawgs alleged in its objection that in early November 2016, it reached out to the CRO attempting to work out a deal to license the Debtor's assets, and that it was wrongly informed that Choxi.com was not entertaining offers for them. *See Id.* at ¶¶ 8-9. Dawgs expressly alleged that it was being denied the ability to bid for these assets. *See id.* at ¶ 11. The CRO informed the Stalking Horse Bidder that he vehemently denies the allegations contained in ¶¶9 and 11 of Dawgs' objection.

6

21. On December 8, 2017, at the initial hearing held with respect to the motion in the morning that day, three potential bidders--Dawgs, The Source Force LLC, and Open Sky LLC—plus the Stalking Horse appeared. The Court directed that an auction take place forthwith for the right to serve as the stalking horse bidder under the License Agreement. There followed in the courthouse that day extensive private meetings between the counsel for the Debtor, the CRO, counsel for the U.S. Trustee, counsel for various unsecured creditors (now proposed creditors' committee counsel) and each potential bidder. Those meetings were followed by several hours of rounds of competitive bidding, in what can only fairly be described as an open and robust auction.

22. The Debtor announced at the conclusion of this all-day process that it had accepted the final bid of the Stalking Horse Bidder to serve as the stalking horse bid in this case.

C. **The Court Enters the Interim Order and the Bid Procedures Order**

23. On December 9, 2017, at the continued hearing held the next morning, the Debtor made a proffer regarding its selection of the Stalking Horse Bidder's bid, and the terms of a revised license agreement and a proposed order approving the License Agreement on an interim basis were discussed. It was agreed that a hearing to consider an order approving revised bidding procedures would be held on December 19, 2016, and that the hearing to consider the Debtor's sale motion and approval of the License Agreement on a final basis would be held on January 19, 2017.

24. On December 9, 2016, the Court entered an order for relief in this chapter 11 case. [ECF Dkt. No. 25].

25. Later on December 9, 2016, the Court entered an order approving the License Agreement between the Debtor and the Stalking Horse Bidder on an interim basis "subject to higher and better qualified offers as may be received at the Auction" and scheduling the hearing to consider approval of proposed bid procedures for December 19, 2016. [ECF Dkt. No. 27, ¶¶ 2, 10].

26.     On December 12, 2016, Lucy Thomson (the "Ombudsman") was appointed to serve as the consumer privacy ombudsman in this case.

27.     On December 15, 2016, the Office of the United States Trustee appointed a three-member official committee of unsecured creditors in this case.

28.     On December 19, 2016, the Court conducted a hearing to consider the approval of revised bid procedures. On December 21, 2016, the Court entered an order approving revised bid procedures (the "Bid Procedures"). [ECF Dkt. No. 42-1].

29.     The Bid Procedures provide, among other things, that, on or before January 9, 2017, any potential bidder who wishes to become a "Qualified Bidder" for the Debtor's assets must deliver a complete "Bid Package" to various parties, including proposed counsel for the Debtor, the Committee, the first lien creditor group and the Stalking Horse Bidder. The Bid Package must:

(i)     fully disclose the identity of the persons or entities participating in connection with the potential bidder's bid (Bid Procedures, ¶3(a));

(ii)    include financial information fairly and reasonably demonstrating the potential bidder's ability to close on the license of the Debtor's assets and the source(s) of that ability (Bid Procedures, ¶3(b)); and

(iii)   confirm that the potential bidder has agreed to comply with the Debtor's privacy policy and/or any related order of the Court to the extent that it is seeking to use or acquire personally identifiable information within the meaning of 11 U.S.C. § 101(41A) (Bid Procedures, ¶3(f)(ix)).

[Bid Procedures ECF Dkt. No. 42-1].

### D. Creek Submits its Competing Bid With Dawgs and an Auction is Held

30.     On January 8, 2017, a competing bid was submitted on behalf of Creek.

31.     On January 9, 2017, proposed counsel for the Debtor and the CRO (Messrs. Klestadt and Friedfeld) informed the undersigned counsel for the Stalking Horse that they were expressly told by counsel for Creek that Dawgs was participating in Creek's bid, teaming up together with The Source Force. The Stalking Horse Bidder's counsel pointed out to proposed

8

Debtor's counsel that it had not received any financial information regarding Creek's ability to comply with the terms of its bid, and that it had been publicly announced, to the bidders at the December 8, 2017 impromptu auction to select the stalking horse, that Dawgs had admitted to receiving over 100,000 names on Choxi's customer list, in violation of Choxi's privacy policy governing disclosure of personally identifiable information concerning Debtor's customers.

32. On January 10, 2017, proposed counsel for the Debtor (Ms. Sweeney) confirmed to the Stalking Horse Bidder's counsel that she was advised that Dawgs was participating in Creek's bid. Later that day, she wrote the following in an email to the Ombudsman regarding Dawg's apparent violation of Debtor's personal privacy policy:

> Lucy,
>
> We wanted to let you know that one bid was received in addition to the stalking horse bid, from Creek Equity Partners, and we anticipate having an auction on Thursday at 10 am. We will let you know the outcome of the auction.
>
> We also wanted to let you know that we were made aware that **not less than 125,000 e-mail addresses were released to a third party** prior to the filing of the Debtor's bankruptcy case in violation of the Debtor's privacy policy. The potential bidders who signed an NDA were made aware of this. **The recipient of the emails is one of the members or owners of Creek Equity Partners.** . . . .
>
> Best,
>
> Stephanie Sweeney
> Klestadt Winters Jureller
> Southard & Stevens, LLP

See Exhibit A hereto (emphasis added).

33. On January 11, 2017 at approximately 9 p.m., proposed counsel for the Debtor forwarded to the Stalking Horse Bidders counsel: (i) a 2015 tax return for the Source Force LLC, but no balance sheet or income statement, and (ii) an unsigned letter dated January 11, 2017

advising that Creek was formed on or about January 4, 2017 "for the sole purpose of being the holding company for the proposed Choxi assets."

34. The auction was conducted on January 12, 2017. At the outset of the auction, representatives of Creek in attendance denied that Dawgs was a participant in Creek's bid.

35. The terms of the last bids submitted by the Stalking Horse and Creek are as follows:

|  | N.D. Gems/9th LLC | Creek |
|---|---|---|
| Upfront Payment | $250,000 | $500,000 |
| Minimum Monthly Royalty Payments | Year 1: $60,000<br>Year 2: $60,000<br>Year 3: $60,000<br>Year 4: $50,000<br>Year 5: $50,000 | Year 1: $125,000<br>Year 2: $80,000<br>Year 3: $80,000<br>Year 4: $80,000<br>Year 5: $80,000 |
| Subordination | Yes, to extent of $1.5 million for benefit of all pre-petition unsecured claims. | N/A |
| Corporate Guarantees | Lucent Jewelers (formed 1999)<br>N.D. Gems (formed 2003)<br>9th LLC (formed 2013) | Source Force (formed 2014) |
| Security Interest | N/A | (i) In assets of Source Force to secure only payments of Year 1 minimum monthly royalties;<br>(ii) In assets of Creek. |
| Total Monetary Consideration | $5,110,000 | $5,840,000 |

36. Under the Stalking Horse Bidder's offer--assuming conservatively that the first lien creditor group is owed $2.3 million and that the Stalking Horse Bidder's claim were only $1.5 million--by virtue of the claim subordination, the estate and unsecured creditors would share in $2,810,000 of the royalty payments (i.e., $5,110,000 minus $1,500,000). Under the Creek offer,

10

the estate and unsecured creditors would share in only $2,040,000 of the royalty payments ($5,840,000 minus $2,300,000 minus $1,500,000).

37. Significantly, the Debtor's own unease with Creek's offer is reflected by the fact that the Debtor and its professionals, and others, interrupted the auction and coaxed Creek to change its offer by adding a security interest in the assets of Source Force to secure the $2 million that Creek promised to pay in the first year of its proposed license. Creek's offer is not supported by a letter of credit, certificate of deposit, or similar credit support. Nevertheless, the Debtor announced at the conclusion of the auction that it deemed the final bid of Creek to be the highest and best offer for the license to the Debtor's assets.

38. The Stalking Horse Bidder has been advised that Source Force provided a balance sheet to counsel for the Debtor. But none has been provided to the Stalking Horse Bidder despite its outstanding requests.

## ARGUMENT

### I.    As a Threshold Matter, Creek Equity Partners Is Not a Qualified Bidder

39. Creek violated Section 3(b) of the Bid Procedures as it did not provide to the Stalking Horse Bidder, on or before the January 9 bid deadline, <u>any</u> financial information, purporting to demonstrate Creek's alleged ability to make the minimum royalty payments required under the terms of its bid. This is important because, as discussed below, the Debtor's estate is at significant risk of wasting the only significant opportunity it is expected to have to monetize its customer list, should the bid of a brand new shell entity be accepted without adequate proof of sufficient capitalization, its ability to perform, or the value of assets allegedly supporting or securing its bid.

11

40. It is troubling that Creek simply elected to unilaterally chose to ignore the requirement to provide proof of financial wherewithal to the Stalking Horse Bidder set forth in the Bid Procedures, acting as if it has the prerogative to comply or refuse to comply as it sees fit.

41. Creek further violated Section 3(a) of the Bid Procedures because its bid package submitted to the Stalking Horse Bidder included the disclosure that Dawgs was participating in Creek's bid—information that was clearly communicated to Debtor's counsel. Given Dawgs' admitted acquisition of 125,000 names from Debtor's customer list without complying with the Debtor's privacy policy, as reported by Debtor's proposed counsel to the privacy ombudsman, it is no wonder that Creek disavowed at the auction Dawgs' participation in its bid.

42. The Stalking Horse Bidder respectfully submits that there must be full and honest disclosure as to why Debtor's proposed counsel and the CRO were told that Dawgs was participating in Creek's bid, whereas a different story was told after it was pointed out that potential bidders cannot run roughshod over the Debtor's stated policy for handling personally identifiable information of its customers (Bid Procedures, §3(ix)). As the court stated in *In re Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989): "Open, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process." That statement should apply to a bidder for a debtor's assets that is seeking a Court finding that it has acted in good faith as much as it applies to other participants in a chapter 11 case.

**II.    Creek Equity Partner's Bid Is Detached From
Reality and Is Not The Highest and Best Offer**

43. When considering whether to grant approval of a transaction under section 363(b) of the Bankruptcy Code, the bankruptcy judge must consider all of the salient factors pertaining to the proceeding, and act to further the interests of the debtor, creditors and equity holders alike. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

12

1983). In making its findings, the bankruptcy judge "must not blindly follow the hue and cry of the most vocal special interest groups." *Id.; see also In re Flour City Bagels*, 557 B.R. 53, 77 (Bankr. W.D.N.Y. 2016) (same).

44.     In conducting an auction sale, a debtor has a fiduciary duty to maximize the value of its estate. *Flour City Bagels*, 557 B.R. at 78; *In re Family Christian LLC*, 533 B.R. 60, 626 (Bankr. W.D.Mich. 2015); *see also In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009)("it is the overarching objective of sales in bankruptcy to maximize value to the estate"); *In re Reading Broad, Inc.*, 386 B.R. 562, 575 (Bankr. E.D.Pa. 2008)(noting that "the purpose of a bankruptcy sale is to obtain the highest and best price for the estate and thus for its creditors and equity holders.").

45.     This fiduciary duty does not mandate that the debtor "mechanically accept" the bid with the highest dollar amount. *See In re Flour City Bagels*, 557 B.R. at 78; *Lawsky v. Condor Capital Corp.*, No. 14 Civ. 2863 (CM), 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015) (sale by receiver); *see also In re United Healthcare System, Inc.*, Civ. Action No. 97-1159, 1997 WL 176574, *5 (D.N.J. March 26, 1997)( The law allows the bankruptcy court to entertain higher and better offers, which means that the bankruptcy court may not focus solely on price). Rather, a fiduciary should weigh other facts, "such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Flour City Bagels*, 557 B.R. at 78 (quoting *Family Christian LLC,* 533 B.R. at 622).

46.     Thus, the debtor must demonstrate not that the purchase price is merely the highest dollar amount bid, but the highest and best offer. *See Flour City Bagels*, 557 B.R. at 78; *Family Christian LLC,* 533 B.R. at 626; *Lawsky*, 2015 WL 4470332, at *9.

47.     It is plain that unusual situations may "justif[y] the exercise of the judge's discretion to refuse to confirmation of" the highest auction bid. *In re Financial News Network*, 980 F.2d 165

(2d Cir. 1992)(quoting *The East Hampton*, 48 F.2d 542, 545 (2d Cir. 1931)(Hand, J.); *See also In re After Six Inc.*, 154 B.R. 876, 882 (E.D.Pa. 1993)(acknowledging that a lower bid may be better when other factors are taken into account).

48.    This is, without a doubt, an unusual situation that requires careful consideration of important factors other than the dollar amount of Creek Equity Partner's bid.

49.    Creek admits that it is a holding company formed on or about January 4, 2017. No evidence of its capitalization was submitted, other than a January 11, 2017 letter claiming that Creek "commits to have a balance of no less than $500,000 upon the successful bid of the above reference [sic] Choxi assets." Even assuming such funds materialize immediately, the $500,000 initial capitalization would be consumed by the immediate payment of the $500,000 administration fee due at closing, leaving Creek without sufficient capital to acquire inventory needed to generate hoped-for sales. Moreover, Source Force would likely not be "financeable" in Year 1 of the license, given the blanket security interest in its assets that it promised to secure all payments due in Year 1 under its proposed license agreement. Thus, there is real risk that Creek could fall quickly into default, long before the secured claim of the first lien creditor group is paid off.

50.    As shown above, it is unclear whether Dawgs is supporting Creek's bid, and if so, to what extent Dawgs has promised to provide financial support for the $5,840,000 bid Creek submitted.

51.    At the auction, Creek submitted an opening bid of $4,040,000, its next bid was in the amount of $5,000,000, and it then bid $5,840,000. Each bid was submitted in haste in response to a request from Debtor's counsel for Creek's next bid, without taking any time for contemplation or reflection.

52.    As mentioned above, it was manifest that the Debtor was hesitant to accept Creek's winning bid. After closed door meetings—and apparent prodding—Creek added to its bid (i) a

14

security interest in its assets (as of now, it is not known to have any), and (ii) a security interest in the assets of Source Force that will secure only the obligation of Creek to pay a $500,000 administration fee and minimum monthly royalty payment in the amount of $125,000 during the first year of the license.

53. But there is no evidence regarding the inventory held by Source Force, including its liquidation value. Upon information and belief, Source Force's inventory consists of "low-end" goods that do not have inherent value as opposed to diamonds and gems, but are goods which fall precipitously in value when sold in distress.

54. The undersigned is mindful that the financial information disclosed in the 2015 tax return produced by Source Force is not public information, and believes it should not disclose its figures in the context of a public filing. But at the hearing on this motion, N.D. Gems, 9th LLC and Lucent intend to address the prior disclosed performance of Source Force, which show that its bid constitutes a "pie in the sky" promise that is not reasonably grounded in reality.

55. Furthermore, there is also no indication that Creek or Source Force has personnel with the requisite skill and training to capitalize upon the Debtor's customer list so as to generate the volume of sales that would be needed to sustain Creek's business, given the steep royalty payments it hopes to be able to pay the Debtor.

56. It is evident that Debtor has not demonstrated that Creek and Source Force have the financial, technical and logistical wherewithal to convert Choxi's customer list into revenues sufficient to pay operating costs plus the lofty royalty targets it has promised to hit.

57. In contrast, the CRO has fully vetted N.D. Gems and 9th LLC, who have added a corporate guaranty by Lucent as additional credit support for the full amount of the Stalking Horse Bidder's bid. The CRO is well aware that all three of Mr. Savalia's companies are well-established companies having valuable inventory, with no secured debt, litigation or tax issues.

15

58. The CRO previously advised the Stalking Horse Bidder and its counsel that he is fully satisfied that they and their affiliates have the working knowledge that he feels would be needed to monetize the Debtor's customer list, and that they and the personnel they have hired are well-suited to do so. The Stalking Horse Bidder's affiliate, jClub.com, is already operating an e-commerce website and business similar to that which Choxi had, and is well-qualified to serve as a strong platform for generating revenues by incorporating Choxi's customer list into its business. It is not surprising that the principal of Creek/Source Force, Mr. Spinder, did not leave the conference room in which the auction was held without making multiple efforts to convince Mr. Savalia to discuss potential joint business efforts using the Choxi list. (To be clear Mr. Savalia has rebuffed such efforts).

59. The Stalking Horse Bid provides the added comfort to the estate of including subordination of the secured claim of the Stalking Horse Bidder, to the extent of $1.5 million, to the claims of all pre-petition unsecured creditors. As described above, this feature of the Stalking Horse Bidder's offer would enable unsecured creditors to be "in the money" sooner without the need of having to try to challenge the secured claims of the Stalking Horse Bidder.

60. In sum, accepting Creek's offer is not the highest and best offer for Choxi's assets The Stalking Horse Bidder's offer is more reliable, more realistic, and would not needlessly put the estate at risk.

### Reservation of Rights

61. At the conclusion of the auction, the Stalking Horse Bidder requested a copy of any proposed order providing for approval of license agreement between the Debtor and Creek and designating the Stalking Horse Bidder as the back-up bidder for its review and comment, but none has been provided. The Stalking Horse Bidder reserves the right to provide comments or to object to terms of such an order that may be submitted or circulated.

## Conclusion

62. For the foregoing reasons, it is respectfully submitted that the Court should not approve Creek's offer as the highest and best bid submitted to the Debtor, and that the Court grant such other and further relief as is just and proper.

Dated: New York, New York
       January 17, 2017

                              RUBIN LLC

                              By: /s/ Paul A. Rubin
                                    Paul A. Rubin

                              345 Seventh Avenue, 21st Floor
                              New York, New York 10001
                              Tel: 212.390.8054
                              Fax: 212.390.8064
                              prubin@rubinlawllc.com

                              *Counsel for N.D. Gems Inc., 9th LLC and Lucent Jewelers*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:                                                   :
                                                         :
                                                         :    Chapter 11
                                                         :
    CHOXI.COM, INC., a/k/a                               :
    NOMORERACK.COM, INC.                                 :
                                                         :    Case No. 16-13131 (SCC)
                                                         :
                    Debtor.                              :
---------------------------------------------------------x

## VERIFICATION

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )

Harry Savalia deposes and says under penalty of perjury, as follows:

1. I am an individual over 18 years of age and am an officer of N.D. Gems, Inc., the managing member of 9th LLC, and the President of Lucent Jewelers, Inc.

2. I submit this statement in support of the foregoing Objection of N.D. Gems, Inc., 9th LLC and Lucent Jewelers, Inc. to Selection of Creek Equity Partners LLC's Offer as Highest and Best Bid in Connection with Debtor's Motion for Final Approval of License Agreement (the "Objection").

3. The facts set forth in the Objection are true and correct to the best of my knowledge, information and belief.

_____

Sworn to before me this
17th day of January, 2017

_____
Notary Public

PAUL A. RUBIN
Notary Public, State of New York
No. 02RU5071222
Qualified in New York County
Commission Expires January 6, 20_19_

18

# EXHIBIT A

**Paul Rubin**

| | |
|---|---|
| **From:** | Stephanie Sweeney <SSweeney@Klestadt.com> |
| **Sent:** | Tuesday, January 10, 2017 7:20 PM |
| **To:** | Lucy Thomson |
| **Cc:** | Tracy Klestadt; Paul Rubin |
| **Subject:** | Choxi Auction |

Lucy,

We wanted to let you know that one bid was received in addition to the stalking horse bid, from Creek Equity Partners, and we anticipate having an auction on Thursday at 10 am. We will let you know the outcome of the auction.

We also wanted to let you know that we were made aware that not less than 125,000 e-mail addresses were released to a third party prior to the filing of the Debtor's bankruptcy case in violation of the Debtor's privacy policy. The potential bidders who signed an NDA were made aware of this. The recipient of the emails is one of the members or owners of Creek Equity Partners.

Let us know if you have any questions.

Best,

Stephanie Sweeney
Klestadt Winters Jureller
Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
(212) 972-3000

1