**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|   |   |   |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| CHOXI.COM, INC., a/k/a | : | Case No. 16-13131 (SCC) |
| NOMORERACK.COM, INC., | : | |
| | : | |
| Debtor. | : | |
| ----------------------------------------------------------- | : | |

## CORRECTED DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION OF CHOXI.COM, INC., A/K/A NOMORERACK.COM, INC. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

| IMPORTANT DATES | |
|---|---|
| Date by which Objections to Confirmation of the Plan Must be Filed and Served: | November 20, 2017 at 12:00 p.m. |
| Date by which Ballots Must be Received: | November 16, 2017 at 4:00 p.m. |
| Hearing on Confirmation of the Plan: | December 12, 2017 at 2:00 p.m. |

Klestadt Winters Jureller
Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245

*Attorneys for the Debtor and Debtor in Possession*

Dated: New York, New York
October 9, 2017

# TABLE OF CONTENTS

I.      PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT ................1

      A.     Purpose of Disclosure Statement.................................................................1

      B.     Definitions and Exhibits...........................................................................1

      C.     Enclosures .................................................................................................2

      D.     Representations and Limitations ...............................................................2

      E.     Important Dates .........................................................................................3

      F.     Solicitation Procedures.............................................................................3

      G.     Recommendation.......................................................................................4

      H.     Inquiries ....................................................................................................5

II.     BACKGROUND.......................................................................................................5

      A.     Organizational Structure...........................................................................5

      B.     Nature of the Debtor's Business................................................................5

      C.     Circumstances Leading to Filing...............................................................5

      D.     Potential Estate Causes of Action ............................................................6

      E.     The Bankruptcy Case ...............................................................................7

III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE...........................7

      A.     The Appointment of the Creditors' Committee .........................................7

      B.     Retention of Professionals; Appointment of Claims and Noticing
               Agent; Appointment of Consumer Privacy Ombusman.............................8

      C.     Schedule of Assets and Liabilities, Statement of Financial Affairs ...........8

      D.     Bar Date for Filing of Claims Arising Prior to the Petition Date...............8

      E.     The Sale Process........................................................................................9

      F.     Cash Collateral Use ................................................................................11

G.      Settlement with Paysafe ........................................................................ 11

IV.    SUMMARY OF THE PLAN OF LIQUIDATION ............................................. 12

    A.      General Plan Objectives ........................................................................... 12

    B.      Provisions Governing Order and Method for Distributions Under the Plan ..................................................................................................... 12

    C.      Classes of Claims ..................................................................................... 12

        1.    Professional Fee Claims ................................................................ 14

        2.    Administrative Expense Claims ..................................................... 15

        3.    Priority Tax Claims ....................................................................... 15

        4.    Class 1A (Allowed Secured Claim of American Express) ................. 15

        5.    Class 1B (Allowed Secured Claim of the First Lien Creditor) .......... 15

        6.    Class 1C (Allowed Secured Claim of the Second Lien Creditor) ...... 16

        7.    Class 2 (Non-Tax Priority Claims) ................................................ 16

        8.    Class 3 (General Unsecured Claims) .............................................. 17

        9.    Class 4 (Allowed Subordinated Claims) ........................................ 17

        10.  Class 5 (Interests) ......................................................................... 17

V.     MEANS OF IMPLEMENTING THE PLAN ...................................................... 17

    A.      Appointment of Plan Administrator ......................................................... 17

    B.      Plan Administrator Reports ...................................................................... 18

    C.      Fees and Expenses of Plan Administrator ................................................ 18

    D.      Causes of Action ...................................................................................... 18

    E.      Employment of Professionals by Plan Administrator ............................... 19

    F.      Oversight Committee ................................................................................ 19

    G.      Establishment of Reserves and Funds ...................................................... 19

H.     Plan Distributions ........................................................................20

I.      Preservation and Abandonment of Records .............................................20

J.      General Disposition of Assets ............................................................20

K.     Administrative Claims Bar Date ........................................................21

L.      Deadline for Filing Applications Seeking Payment of Professional
Fee Claims ..............................................................................21

M.    Execution of Documents to Effectuate Plan ...........................................21

N.     Disallowance of Claims without Further Order of the Court ...................21

O.     Continued Existence of Debtor Until Closing of the Case ......................21

P.      Post-Effective Date Reports and Fees .................................................22

Q.     Cancellation of Interests ..................................................................22

R.      Creditors' Committee .......................................................................22

S.      Insurance Preservation .....................................................................22

T.      Preservation of Causes of Action .......................................................22

VI.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................22

VII.    CONDITIONS PRECEDENT ...............................................................23

A.     Conditions to Confirmation ...............................................................23

B.      Conditions to Effective Date .............................................................23

C.      Waiver of Conditions ......................................................................24

VIII.   INJUNCTIONS; STAYS; RELEASE; EXCULPATIONS ...............................24

A.     General Injunctions ........................................................................24

1.    Injunctions Against Interference with Consummation or
Implementation of Plan .......................................................24

2.    Injunction Against Prosecution of Causes of Action ..................24

3. No Bar To Claims Against Third Parties ...............................................24

B. All Distributions Received in Full and Final Satisfaction........................24

C. No Modification of Res Judicata Effect ....................................................25

D. Exculpation for Debtor and Estate Professionals .....................................25

E. Exculpation for Plan Administrator and his
Professionals..............................................................................................25

IX. PROCEDURES FOR DISTRUBTIONS UNDER PLAN ...................................26

A. Payments in U.S. Dollars .........................................................................26

B. Distributions Only on Business Days........................................................26

C. Unclaimed Distributions...........................................................................26

D. Timing of Distributions on Disputed Claims Subsequently Allowed.......27

E. No Payment or Distribution of Disputed Claims ......................................27

F. Disputed Distribution ...............................................................................27

G. Transmittal of Payments and Notices.......................................................27

H. Record Date for Distributions ..................................................................27

I. Claims Administration Responsibility ......................................................28

J. Disputed Claims .......................................................................................28

K. No Payments of Fractional Cents or Distributions of Less Than
Thirty-Five ($35) Dollars ..........................................................................29

L. Setoff and Recoupment ............................................................................29

M. Payment of Taxes on Distributions Received Pursuant to Plan ...............29

N. Compliance With Tax Withholding and Reporting Requirements ..........29

X. PLAN INTERPRETATION, CONFIRMATION AND VOTING......................31

A. Procedures Regarding Objections to Designation of Classes as

Impaired or Unimpaired ........................................................................31

B.     Withdrawal and Modification of Plan ......................................................31

C.     Governing Law .............................................................................................31

D.     Voting of Claims ..........................................................................................31

E.     Acceptance by Impaired Class ...................................................................31

F.     Presumed Acceptances of Plan...................................................................31

G.     Presumed Rejections of Plan ......................................................................32

H.     Cram Down ....................................................................................................32

XI.     RETENTION OF JURISDICTION BY BANKRUPTCY COURT ....................32

XII.     CERTAIN TAX CONSEQUENCES OF THE PLAN........................................33

A.     General ...........................................................................................................33

B.     Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally ...............................................................................................34

(i)     Recognition of Gain or Loss ................................................34

(ii)     Bad Debt or Worthless Security Deduction.......................34

XIII.     CONFIRMATION OF THE PLAN - REQUIREMENTS....................................34

A.     Absolute Priority Rule..................................................................................35

B.     Best Interest of Creditors Test; Liquidation Analysis ..............................35

XIV.     PROCEDURES FOR VOTING ON PLAN.........................................................36

XV.     CONFIRMATION HEARING .............................................................................38

XVI.     RECOMMENDATION.........................................................................................38

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN, WHICH IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTOR.**

Choxi.com, Inc. a/k/a Nomorerack.com, Inc. (the "Debtor") submits this disclosure statement (the "Disclosure Statement") pursuant to § 1125 of the Bankruptcy Code to accompany their *Plan of Liquidation of Choxi.com, Inc. a/k/a Nomorerack.com, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* dated as of September 14, 2017 and corrected as of October 9, 2017 (the "Plan"), which has been filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). A copy of the Plan is annexed as **Exhibit A** hereto.

## I.  PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.  Purpose of Disclosure Statement

The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Interests of their rights under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

You are urged to read the Disclosure Statement in order to determine what rights you may have to vote on or object to the Plan and before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of this Bankruptcy Case. Please note, however, that this Disclosure Statement cannot tell you everything about your rights. For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtor, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by creditors and other parties in interest. You are also encouraged to consult with your lawyers and/or advisors as you review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

### B.  Definitions and Exhibits

| | |
|---|---|
| Definitions | Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan. |
| Exhibits | The following exhibits are annexed hereto and expressly incorporated herein: |

| | |
|---|---|
| Exhibit A: | A copy of the Plan |
| Exhibit B: | Liquidation Analysis |

**C.  Enclosures**

The following materials are included with this Disclosure Statement:

1.   A copy of the Plan and a copy of the Liquidation Analysis;

2.  A copy of an order approving the Disclosure Statement (the "<u>Disclosure Statement</u> <u>Order</u>"), which states: (a) the date by which objections to confirmation of the Plan must be served and filed, (b) the date by which all votes with respect to the Plan must be cast, (c) the date of the hearing in the Bankruptcy Court to consider confirmation of the Plan, and (d) other relevant information;

3.  A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the hearing to consider confirmation of the Plan and the deadline for filing objections to confirmation of the Plan;

4.  A ballot (and return envelope) for voting to accept or reject the Plan, unless you are not entitled to vote because you are (i) to receive no Distribution under the Plan and are deemed to reject the Plan or (ii) not impaired under the Plan and are deemed to accept the Plan;

5.  A notice of non-voting status if you are not impaired under the Plan and are deemed to accept the Plan or if you are not receiving a Distribution under the Plan and are deemed to reject the Plan, as applicable; and

6.  Internal Revenue Service Form W-9, Request for Taxpayer Identification Number and Certification.

**D.  Representations and Limitations**

**NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.**

**NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN.  ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.**

**THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE**

DEBTOR IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE TO THE DEBTOR AS OF THE DATE HEREOF. ALTHOUGH THE DEBTOR HAS USED ITS BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED. THE DEBTOR BELIEVES THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND/OR THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR AND INTEREST HOLDER IS ENCOURAGED TO READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN PROVIDE FOR INJUNCTIVE RELIEF AS TO THE DEBTOR. THE PERMANENT INJUNCTIONS SET FORTH IN THE PLAN WILL APPLY TO HOLDERS OF ANY CLAIM, INTEREST, LIEN, ENCUMBRANCE OR DEBT, WHETHER SECURED OR UNSECURED, GRANTED PRIORITY STATUS, INCLUDING PRIORITY TAX (FEDERAL OR STATE), NON-PRIORITY UNSECURED CLAIM OR ANY INTEREST IN THE DEBTOR. CREDITORS AND INTEREST HOLDERS WILL BE BOUND BY THIS INJUNCTIVE RELIEF UNLESS CREDITORS TIMELY FILE OBJECTIONS IN ACCORDANCE WITH THE PROVISIONS SET FORTH IN THE DISCLOSURE STATEMENT ORDER OR HEREIN AND APPEAR AT THE CONFIRMATION HEARING, TO PROSECUTE ANY OBJECTION.

E. <u>Important Dates</u>

The Bankruptcy Court approved this Disclosure Statement by and through the Disclosure Statement Order entered on October 13, 2017 after notice and hearing and in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Court found that the information contained

herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the class being solicited to make an informed judgment concerning the Plan. **HOWEVER, THE BANKRUPTCY COURT HAS NOT CONFIRMED THE PLAN, NOR IS THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

As stated in the Disclosure Statement Order, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for December 12, 2017 at 2:00 p.m. (the "Confirmation Hearing"). Holders of Claims and Interests and other parties in interest may attend this hearing. Objections to confirmation of the Plan must be filed on or before November 20, 2017 at 12:00 p.m. as set forth in the Disclosure Statement Order.

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of the votes and must be received by Rust Consulting/Omni Bankruptcy ("Voting Agent") no later than 4:00 p.m. on November 16, 2017.

Completed and signed Ballots should be returned by first class mail to the Voting Agent at the below address in the enclosed self-addressed return envelope, or by overnight mail or hand delivery to:

Choxi.com, Inc. Balloting
c/o Rust Consulting/Omni Bankruptcy
5955 DeSoto Avenue, Suite 100
Woodland Hills, CA 91367

**F. Solicitation Procedures**

Creditors holding Claims that are impaired have the right to vote to accept or reject the Plan. Generally speaking, a Claim or Interest is impaired if the Plan alters the legal, contractual or equitable rights of the holder of the Claim or Interest. A Class of creditors accepts the Plan when creditors holding two-thirds in amount of such class and more than one-half in number of the Claims in such class who actually cast their ballots vote to accept the Plan.

In this Bankruptcy Case, the Plan contains six (6) Classes of Claims and one (1) Class of Interests. The Plan provides that holders of Class 1B, 3, 4 and 5 Claims are impaired in that the Plan alters the legal, contractual and equitable rights of the holders of such Claims. Holders of Class 4 Claims and Class 5 Interests receive no Distribution under the Plan on account of their claim and equity interests in the Debtor and are therefore deemed to reject the Plan. **Accordingly, votes on the Plan will be solicited from Classes 1Band 3 only.**

**G. Recommendation**

In the opinion of the Debtor, the treatment of creditors and interest holders under the Plan contemplates a greater recovery than that which is likely to be achieved under any other alternative for the liquidation of the Debtor's assets under chapter 11 or chapter 7 of the Bankruptcy Code.

Accordingly, the Debtor submits that confirmation of the Plan is in the best interests of the Debtor's creditors and interest holders and recommends that all holders of Claims entitled to vote on the Plan vote to accept the Plan.

### H. Inquiries

If you have any questions about the packet of materials that you have received, please contact the Voting Agent, Rust Consulting/Omni Bankruptcy by telephone at (818) 906-8300 during normal business hours.

## II. BACKGROUND

### A. Organizational Structure

Choxi.com, Inc. (f/k/a Nomorerack.com, Inc.) is a Delaware corporation incorporated on April 23, 2012. On September 19, 2012, Nomorerack.com Canada, Inc., a Canadian subsidiary wholly owned by the Debtor, was formed. In or around April of 2015, the names of Nomorerack.com, Inc. and Nomorerack.com Canada, Inc. were changed to Choxi.com, Inc. and Choxi.com Canada, Inc., respectively.

### B. Nature of the Debtor's Business

The Debtor operated as an online retailer offering discount brand name and non-brand name merchandise, including bed-and-bath goods, home décor, kitchenware, furniture, watches and jewelry, apparel, electronics and computers, sporting goods, and designer accessories, among other products. The Debtor sold these products through its internet website located at www.choxi.com.

### C. Circumstances Leading to Filing

In October 2016, the Debtor was forced to cease operations as a result of, among other things, sustained operating losses. The Debtor's management team, led by Deepak Agarwal, Co-founder and CEO, and his now wife and Chief Merchandising Officer Co-Founder Melina Ash, ran the business with a major focus on generating top-line gross revenue, with a lesser regard to the underlying profitability of the Debtor. While gross margins averaged as high as 25% to 30% over the operating lifespan of the Debtor, substantially all of the profits were undercut by heavier spending on advertising to generate revenue, high refund and return rates, chargebacks and similar costs. Net losses ranging from $7.4 million to as high as $21 million were incurred every year the business was in operation.

In addition, management never hired a permanent Chief Financial Officer to help steer the Debtor towards a cash-flow positive business structure. This contributed to management doubling down on financially unsound strategies to increase gross revenue with the hopes of having the Debtor acquired, even after the Debtor's outstanding preferred stock net financing of approximately $41 million had been exhausted.

In order to increase sales promotions on its website, management sought and obtained Series B financing at aggressively high levels. For instance, the Debtor's largest investor, Oak Investment Partners, invested $25 million in the Debtor.

As the Debtor's Series B financing was depleted without profitability and with revenue decreasing, the Debtor sought additional financing, but was only able to obtain merchant cash advances at exceedingly high interest rates.

By August 2016, the Debtor ceased making all payments, the vendors stopped shipping merchandise to customers, and the website was still taking orders with an inability to fulfill them due to unpaid suppliers' refusal to ship orders until payment was received.

On or about August 10, 2016, the Debtor issued certain *pari passu* Secured Demand Promissory Notes to 9th LLC and N.D. Gems Inc. (collectively, the "Second Lien Creditor") in the original aggregate principal amount of $1,708,512.30, which are secured by a lien and security interest on substantially all of the Debtor's assets, and the Second Lien Creditor filed UCC-1 financing statements evidencing its properly perfected lien.

In August 2016, negotiations began for bridge loan financing. In September 2016, the Debtor obtained $2 million in secured bridge loan financing from TVII Corp., Bhungalia Family, LLC d/b/a Bhungalia, LLC ("Bhungalia") and Ronak Khichadia (collectively, the "First Lien Creditor"). The loan was secured by all of the Debtor's assets and the First Lien Creditor filed UCC-1 financing statements evidencing its properly perfected lien. Pursuant to a Limited Subordination under Secured Demand Promissory Notes agreement, dated as of September 1, 2016, the Second Lien Creditor subordinated its liens and security interests in the Debtor's assets to the liens and security interests of the First Lien Creditor. Heresh Bhungalia, a member of Bhungalia, and Ronak Khichadia were former (and are at present time again) directors of the Debtor. As a condition of the loan, the Debtor retained Eddy Friedfeld as its Chief Restructuring Officer vested with all power, authority and responsibility as is customary for chief restructuring officers, including powers vested in the President of the Debtor. As a result, Mr. Agarwal resigned as CEO. With the help of Mr. Friedfeld, the Debtor's operations continued with some success but there was a realization that "the engine was extremely damaged" as a result of erosion of consumer and supplier confidence and lack of funds to advertise. As such, when cash ran out and no additional capital was available, in October 2016, the Debtor terminated its employees and ceased operations permanently.

### D. Potential Estate Causes of Action

Upon information and belief, a contributing factor to the Debtor's pre-bankruptcy decline may have been potentially fraudulent or otherwise avoidable transactions facilitated by the Debtor's former management prior to the Petition Date.

(a) Upon information and belief, in the years leading up to the Petition Date, Iftikhar Ahmed ("Ahmed"), who was a director of the Debtor and a general partner of the Debtor's largest investor, Oak Investment Partners ("Oak"), falsely represented to the Debtor that Oak could not make its investment unless the Debtor repurchased its Series A stock. The Series A

stock was owned by an Asian e-commerce entity in which Oak was invested and on whose board Ahmed sat. Upon information and belief, the Debtor transferred repurchase funds of nearly $11 million to the Asian e-commerce entity, but such funds were diverted to Ahmed's personal account. Ahmed has since fled to India and was indicted by the Securities and Exchange Commission in connection with unrelated securities fraud.

(b) Separately, the Debtor has reason to believe, based on a preliminary investigation, that approximately $4 million in Debtor funds were fraudulently diverted from the Debtor as part of an invoice skimming scheme run through the Debtor's outsourced customer service operations in the Philippines.

(c) Post-petition, during the process for selection of a stalking horse bidder to license or purchase the Debtor's assets in bankruptcy as discussed below, a principal of USA Dawgs, Inc., a former vendor of the Debtor who expressed interest in becoming the stalking horse bidder, notified the Debtor that, prior to the Petition Date and prior to the retention of the Chief Restructuring Officer, he had received 125,000 email addresses from the Debtor in exchange for a reduction of pre-petition amounts owed the Debtor to USA Dawgs, Inc. Upon information and belief, this transaction was conducted unilaterally by the Debtor's former CEO in violation of the Debtor's privacy policy and without the Debtor's consent and after soliciting advice from and being cautioned by the Debtor's former General Counsel that such a transaction was explicitly prohibited. Subject to further investigating, the Debtor may have claims or causes of action against any party involved in such transaction. While USA Dawgs, Inc. received the email list for a $125,000 credit, it did not adjust its proof of claim accordingly.

### E. The Bankruptcy Case

On November 10, 2016, following the cessation of the Debtor's business in October 2016, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against the Debtor by petitioning creditors Sanders Collection, Inc., Consumer Shopping, Inc. and Elite Brands, Inc., thereby commencing a Chapter 7 bankruptcy case in the Bankruptcy Court.

On December 5, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

On December 9, 2016, the Bankruptcy Court entered an order granting the Debtor relief under chapter 11 of the Bankruptcy Code effective as of the Petition Date.

Following entry of the order for relief, the Debtor resumed operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## III. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A. The Appointment of the Creditors' Committee

On December 14, 2016, the Office of the United States Trustee appointed Elite Brand

Inc., Pearl Enterprises LLC d/b/a JR Trading Company and Shamrock Industries LLC to the Official Committee of Unsecured Creditors (the "<u>Committee</u>") pursuant to 11 U.S.C. § 1102.

## B. <u>Retention of Professionals; Appointment of Claims and Noticing Agent; Appointment of Consumer Privacy Ombudsman</u>

On December 9, 2016, the Bankruptcy Court entered an order authorizing the Debtor to retain Rust Consulting/Omni Bankruptcy as claims and noticing agent.

Also on December 9, 2016, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint a consumer privacy ombudsman in the Bankruptcy Case. On December 12, 2016, the U.S. Trustee filed its Notice of Appointment of Consumer Privacy Ombudsman, appointing Lucy Thomson as Consumer Privacy Ombudsman in the Bankruptcy Case.

On January 24, 2017, the Bankruptcy Court entered an order authorizing the Debtor to retain Klestadt Winters Jureller Southard & Stevens, LLP as bankruptcy counsel *nunc pro tunc* to the Petition Date.

On January 24, 2017, the Bankruptcy Court entered an order authorizing the retention of CBIZ Accounting, Tax & Advisory of New York and CBIZ Valuation Group, LLC ("<u>CBIZ</u>"), as joint financial advisor to the Debtor and the Committee *nunc pro tunc* to December 14, 2016.

On January 24, 2017, the Bankruptcy Court entered an order authorizing the Committee to retain Nutovic & Associates as counsel to the Committee.

On February 27, 2017, Nutovic & Associates and Fox Rothschild LLP filed a Notice of Substitution of Counsel substituting Fox Rothschild LLP for Nutovic & Associates as counsel to the Committee.

On March 24, 2017, the Bankruptcy Court entered an order authorizing the Committee to retain Fox Rothschild LLP as counsel to the Committee.

## C. <u>Schedules of Assets and Liabilities, Statement of Financial Affairs</u>

On the Petition Date, the Debtor filed its schedules of assets and liabilities and a statement of financial affairs (collectively the "<u>Schedules</u>").

## D. <u>Bar Date for Filing of Claims Arising Prior to the Petition Date</u>

On January 20, 2017, the Bankruptcy Court entered an order (the "<u>Bar Date Order</u>") (i) setting a deadline (the "<u>Bar Date</u>") for filing proofs of claim against the Debtor and its Estate pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3); (ii) approving the form of notice of the Bar Date (the "<u>Bar Date Notice</u>") to be sent to Creditors and parties in interest; and (iii) approving as adequate and sufficient the service of the Bar Date Notice by first class mail and publication of the Bar Date in Crain's New York. The Bar Date Order fixed March 3, 2017 at 5:00 P.M., or with respect to Governmental Units, June 5, 2017 at 5:00 p.m., as applicable, as the

Bar Date by which all Claims against the Debtor which arose prior to the Petition Date, other than those types of Claims specifically excepted, had to be filed.

The Bar Date Notice was served by first class regular mail upon (a) the U.S. Trustee; (b) counsel for the Committee; (c) all persons or entities that requested notice of the proceedings in the Bankruptcy Case; (d) all known creditors of the Debtor, including as set forth on the Debtor's Schedules; (e) all parties to executory contracts and unexpired leases of the Debtor; (f) all required Governmental Units and state and local taxing authorities; and (g) holders of membership interests in the Debtor. Notice of the Bar Date was also published in Crain's New York on January 30, 2017. Except for the holders of certain specifically excluded Claims, every Creditor was required to file a proof of claim on or before the Bar Date so that the Debtor could ascertain with certainty the total amount of pre-petition Claims outstanding.

In accordance with Federal Rule of Bankruptcy Procedure 3003(c)(2), holders of Claims who failed to comply with the terms of the Bar Date Order are forever barred from (i) filing a proof of claim with respect to such Claim, (ii) asserting such Claims against the Debtor or its Estate and/or property, (iii) voting on any plan filed in this Bankruptcy Case and (iv) participating in any Distribution in the Bankruptcy Case on account of such Claims.

### E. Licensing the Debtor's Intellectual Property Assets

On the Petition Date, the Debtor filed its *Motion Pursuant to Sections 105(a), 332 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (A) for an Order (i) Approving License Agreement with Stalking Horse Bidder on an Interim Basis, (ii) Scheduling Bid Procedures Hearing and (iii) Directing the Appointment of a Consumer Privacy Ombudsman, (B) for an Order (i) Approving Bid Protections, (ii) Approving Bid Procedures, (iii) Scheduling an Auction and Final Hearing and (iv) Approving the Form and Manner of Notice Thereof and (C) for an Order Approving License Agreement on a Final Basis or Sale to Successful Bidder Free and Clear of all Liens, Claims and Encumbrances* (the "Sale Motion") to, among other things, enter into an exclusive, worldwide, irrevocable license and right to use and exploit the Debtor's intellectual property Assets (the "License") with the Second Lien Creditor subject to higher and better bids made at an auction (the "Auction").

An interim hearing with respect to the Sale Motion (the "Interim Hearing") was held on December 8, 2016. After multiple expressions of interest were received to act as stalking horse bidder for the License, at the Interim Hearing, the Debtor, in consultation with the Committee, entertained bids in the style of an open auction for the purpose of selecting a stalking horse bidder. At the conclusion of the bidding, the Second Lien Creditor (in such capacity, collectively, the "Stalking Horse Bidder") was ultimately selected as the Stalking Horse Bidder.

The Interim Hearing was continued on December 9, 2016. On the same date, the Bankruptcy Court entered its *Interim Order (i) Approving License Agreement with Stalking Horse Bidder on an Interim Basis and (ii) Scheduling Bid Procedures Hearing* (the "Interim Order"). The Interim Order approved a License agreement with the Stalking Horse Bidder (the "Interim License Agreement") on an interim basis, subject to higher and better offers as may be received at the Auction. As further described in the Interim License Agreement, in consideration

for the interim License, the Stalking Horse Bidder provided to the Estate an administrative fee of $250,000 and monthly Royalties with a guaranteed minimum of $60,000 per month for year one and $40,000 per month for years two through four of the Interim License Agreement. In addition, the Stalking Horse Bidder agreed to subordinate the first $1,000,000 of its Secured Claim against the Debtor to all Allowed General Unsecured Claims. Lucent Jewelers, Inc., an affiliate of the Stalking Horse Bidder issued a guarantee of the minimum Royalties under the Interim License Agreement, and Hasmukh Savalia, the Stalking Horse Bidder's principal, provided a personal guarantee of the guaranteed minimum Royalties under the Interim License Agreement for the first year of the Interim License Agreement.

On December 21, 2016, the Bankruptcy Court entered an *Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (i) Approving Bid Procedures, (ii) Scheduling an Auction and Final Hearing and (iii) Approving the Form and Manner of Notice Thereof* (the "Bid Procedures Order").

Pursuant to the Bid Procedures Order, the Debtor solicited competing bids through and including January 9, 2017 (the "Bid Deadline"). One bidder submitted a qualified bid by the Bid Deadline.

In accordance with the Bid Procedures Order, the Debtor conducted the Auction on January 12, 2017. The Auction was very successful and resulted in bids substantially greater than the initial offer approved under the Interim Order. At the conclusion of the Auction, the Debtor, in consultation with the Committee and CBIZ, determined that the bid submitted by Creek Equity Partners, LLC was the highest and best bid. On January 17, 2017, the Debtor filed a Notice of Auction Results announcing Creek Equity Partners, LLC as the successful bidder.

Objections to the approval of the sale to Creek Equity Partners, LLC were filed by the Stalking Horse Bidder, who had enhanced its initial offer substantially, and the First Lien Creditor. At a hearing held on January 19, 2017 (the "Final Hearing"), the Bankruptcy Court directed Creek Equity Partners, LLC and the Stalking Horse Bidder to provide the Debtor with supplemental financial information and any credit enhancements in support of their respective bids.

After receipt and review of the various supplemental financial documents and credit enhancements submitted by the bidders, the Debtor, in consultation with the Committee and CBIZ, determined that the bid submitted by the Stalking Horse Bidder was the highest and best bid. On January 31, 2017, the Debtor filed its Supplemental Notice of Auction Results announcing the Stalking Horse Bidder as the successful bidder.

The Final Hearing continued on February 2, 2017, at which time the Bankruptcy Court approved the license to J Club, Inc. (the "Licensee"), designee of the Stalking Horse Bidder, as the successful bidder for the License.

On February 13, 2017, the Bankruptcy Court entered its *Final Order Approving License Agreement with J Club, Inc.* upon the terms set forth in the License Agreement attached as Exhibit A thereto (the "License Agreement"). As further described in the License Agreement, in

consideration for the License, the Licensee provided an administrative fee of $250,000 and monthly Royalties with guaranteed minimums of $60,000 per month for years one through three of the License Agreement and $50,000 per month for years four and five of the License Agreement. In addition, the Second Lien Creditor agreed to (i) subordinate the first $1,500,000 of its Secured Claims to all Allowed General Unsecured Claims, and (ii) provided a joint and several guarantee of the Licensee's obligations under the License Agreement. Lucent Jewelers, Inc. provided a security interest on all its inventory to secure the Licensee's obligations under the License Agreement and Hasmukh Savalia provided a personal guarantee of the Licensee's first year obligations under the License Agreement.

### F. Cash Collateral Use

On March 21, 2017, the Bankruptcy Court entered a *Stipulation and Order (I) Authorizing Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 4001 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363* (the "Cash Collateral Order"). Pursuant to the Cash Collateral Order, the Debtor was granted authority to use the Secured Creditors' cash collateral (within the meaning of section 363 of the Bankruptcy Code) through March 31, 2017 for the limited purposes and up to the amounts set forth in the Budget attached as Exhibit A to the Cash Collateral Order, as such budget may be modified from time to time at the request of the Debtor and upon the prior written approval of the Secured Creditors and prior written notice to counsel for the Committee. In accordance with paragraph 3 of the Cash Collateral Order, on April 27, 2017, the Budget was modified and extended to permit the Debtor's continued use of cash collateral through May 30, 2017.

Also pursuant to the Cash Collateral Stipulation, the Debtor set aside a reserve of $57,682.03 to be held pending a final determination of the Court regarding the validity and priority of the liens of American Express on the Debtor's assets. American Express asserts a first priority Secured Claim against the Debtor in such amount, representing the balance as of the Petition Date of merchant cash advances made by American Express to the Debtor under that certain Business Loan and Security Agreement, dated as of November 13, 2015, between the Debtor and American Express.

### G. Settlement with Paysafe

On or about July 25, 2012, the Debtor entered into a Bank Card Merchant Agreement (the "Merchant Agreement") with Paysafe Merchant Services Corp. (f/k/a NBX Merchant Services Corp.) ("Paysafe"), under which Paysafe processed credit and debit card transactions for the Debtor.

As of March 28, 2017, Paysafe held approximately $738,708.38 in reserve (the "Reserve Funds") for chargebacks and other costs under the Merchant Agreement. Both the Debtor and Paysafe alleged that they had certain rights to the Reserve Funds.

On March 28, 2017, the Debtor entered into a Stipulation of Settlement with Paysafe (the "Paysafe Stipulation") with respect to the Reserve Funds. Under the Paysafe Stipulation, Paysafe agreed to release the Reserve Funds, less chargebacks and other costs, to the Debtor in

installments pursuant to the terms and conditions of the Paysafe Stipulation, with the last installment due by May 3, 2017.

On April 27, 2017, the Bankruptcy Court entered an order approving the Paysafe Settlement.

## IV.     SUMMARY OF THE PLAN OF LIQUIDATION

### A.     General Plan Objectives

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  Asset sales, stock sales, and other liquidation efforts, however, can also be conducted during a chapter 11 case or pursuant to a chapter 11 plan.  Under chapter 11, a company endeavors to restructure its finances such that it maximizes recovery to its creditors.

Formulation and confirmation of a chapter 11 plan is the primary goal of a debtor in a chapter 11 case.  A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and shareholders with respect to their claims against and equity interests in the debtor.  According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited by the proponent of a plan only after a written disclosure statement has been provided to each creditor or shareholder who is entitled to vote on the plan.

The Plan is a plan of liquidation.  In general, a chapter 11 plan of liquidation (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the Plan.

Generally, the Plan establishes a mechanism by which assets of the Debtor's Estate will be distributed to holders of Claims and Interests, in the order set forth in the Plan.

### B.     Provisions Governing Order and Method for Distributions Under the Plan

The Plan divides Claims against and Interests in the Debtor into seven (7) categories or "Classes" according to the underlying basis and subsequent treatment for each.  Claims within the same Class are treated identically.

Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims are not classified but are treated in the manner set forth in Article 2 of the Plan and summarized below.

### C.     Classes of Claims

The following classes of Claims and Interests are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

| Class | Class Description | Estimated Amount of Allowed Claims in Class | Treatment Under Plan and Estimated Recovery Under Plan |
|---|---|---|---|
| Unclassified | Professional Fee Claims | $904,072[1] | Unimpaired. Estimated Recovery: 100% |
| Unclassified | Administrative Expense Claims (other than professional fees and expenses) | $58,366 | Unimpaired. Estimated Recovery: 100% |
| Unclassified | Priority Tax Claims | $617,501.86[2] | Unimpaired. Estimated Recovery: 100% |
| Class 1A | Allowed Secured Claim of American Express | $57,682.03 | Unimpaired. Holders of Class 1A Claims shall be paid the proceeds of collateral, if any, pledged to secure their claim. Deemed to Accept. |
| Class 1B | Allowed Secured Claim of the First Lien Creditor ($2,211,768.23) and the First Lien Creditor Supplemental Secured Claim ($75,000) | $2,286,768.23 | Impaired. The Secured Claim of the Holders of Class 1B Claims is reduced and allowed as follows: the Allowed Secured Claim of the First Lien Creditor in the amount of $2,211,768.23[3], including prepetition interest and fees, and the First Lien Creditor Supplemental Secured Claim in the amount of $75,000 in |

---

[1] Several parties dispute the Professional Fee Claims of Nutovic & Associates in this class.

[2] The Debtor disputes the Claims in this class. A reserve in the full amount of these Claims will be established pursuant to Section (IV)(C)(3) below.

[3] On September 18, 2017 the Debtor made a payment of $700,000 on account of the Allowed Secured Claim of the First Lien Creditor. As a result, the total amount outstanding as of the filing of this Disclosure Statement is $1,511,768.23.

| | | | accordance with Article 4 of the Plan. Estimated Recovery: 97% to 100%. Entitled to Vote. |
|---|---|---|---|
| Class 1C | Allowed Secured Claim of the Second Lien Creditor | $8,512.39 | Unimpaired. Holders of Class 1C Claims shall be paid the proceeds of collateral, if any, pledged to secure their claim. Deemed to Accept. |
| Class 2 | Non-Tax Priority Claims | $118,027.27[4] | Unimpaired. Estimated Recovery: 100%. Deemed to Accept. |
| Class 3 | General Unsecured Claims | $33,000,000 | Impaired. Estimated Recovery: 0% to 2%. Entitled to Vote. |
| Class 4 | Allowed Subordinated Claims | $1,650,000 | Impaired. Estimated Recovery: 0%. Deemed to Reject. |
| Class 5 | Interests | $0.00 | Impaired. Estimated Recovery: 0%. Deemed to Reject. |

1. <u>Professional Fee Claims</u>

The Plan Administrator shall pay all Professional Fee Claims in an amount not to exceed the Estate Reserve as soon as practicable after the later of the Effective Date or a Final Order has awarded such compensation and reimbursement of expenses pursuant to proper application to the Court in accordance with Section 5.13 of the Plan or such later date as may be agreed upon by the holder of any such Professional Fee Claim and the Debtor. All Professional Fee Claims in excess of the Estate Reserve shall be paid as soon as practicable from the UC Funds. In the event any Disputed Professional Fee Claims exist on the Distribution Date, the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to the pro rata share of all outstanding Disputed Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.

---

[4] The Debtor disputes the Claims in this class. A reserve in the full amount of these Claims will be established pursuant to Section (IV)(C)(7) below.

2. <u>Administrative Expense Claims</u>

All Allowed Administrative Expense Claims set forth in a budget approved by the First Lien and Second Lien Creditors shall be paid in full, in Cash, in such amounts as are incurred in the ordinary course of the liquidation of the Debtor, or in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's liquidation or (c) as may be agreed upon between the holder of any such Administrative Expense Claim and the Debtor. In the event there exists any Disputed Administrative Expense Claims on the Effective Date, the Debtor or the Plan Administrator shall at all times hold and maintain Cash in an amount equal to that portion of the Disputed Claims Reserve attributable to all Disputed Administrative Expense Claims.

3. <u>Priority Tax Claims</u>

Unless otherwise agreed to by the parties, each holder of an Allowed Priority Tax Claim will receive from the UC Funds regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim over a period ending not later than five (5) years after the Petition Date, which treatment is not less favorable than that provided to the General Unsecured Creditors, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. In the event any Disputed Priority Tax Claims exist on the Distribution Date, the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to all outstanding Disputed Priority Tax Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.

4. <u>Class 1A (Allowed Secured Claim of American Express)</u>

American Express shall receive on account of its Allowed Secured Claim, in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, (i) all of the American Express Reserve, (i) such other, less favorable treatment as may be agreed to in writing by American Express and the Debtor, or (iii) such other treatment as may be determined by order of the Bankruptcy Court. Any Deficiency Claim that may arise on account of the present lack of collateral or otherwise resulting from the aforesaid treatment shall be included in and treated as a Class 3 General Unsecured Claim. Except as otherwise determined by order of the Bankruptcy Court, the Secured Claim of American Express is Allowed in the amount of $57,682.03.

5. <u>Class 1B (Allowed Secured Claim of the First Lien Creditor and the First Lien Creditor Supplemental Secured Claim)</u>

The First Lien Creditor shall receive on account of its Allowed Secured Claim (i) on the Effective Date, or as soon thereafter as is reasonably practical, all of the Effective Date Cash net of the Estate Reserve after payment of the Allowed Administrative Expense Claims set forth in Cash Collateral budget approved by the First Lien and Second Lien Creditors, and (ii) within five (5) Business Days after receipt by the Plan Administrator, all of the proceeds of the

Remaining Assets recovered from and after the Effective Date, including, without limitation, the Royalties, but except for the Estate Monthly Reserve and the net proceeds from Avoidance Actions and Causes of Action, until the Allowed Secured Claim of the First Lien Creditor is paid in full, or (iii) such other, less favorable treatment as may be agreed to in writing by the First Lien Creditor and the Debtor. In the event the Distributions to the Holders of Allowed General Unsecured Claims aggregate the sum of one million dollars ($1,000,000) (the "Threshold") or more, the First Lien Creditor shall receive fifty (50%) percent of the Royalties each month within five (5) business days after the Royalties are received commencing the month after the Threshold is reached until the First Lien Creditor Supplemental Secured Claim is paid in full. Any Deficiency Claim that may arise on account of the present lack of collateral or otherwise resulting from the aforesaid treatment shall be included in and treated as a Class 3 General Unsecured Claim. The Secured Claim of the First Lien Creditor is reduced and Allowed as follows: the Allowed Secured Claim of the First Lien Creditor in the amount of $2,211,768.23[5], including prepetition interest and fees, and the First Lien Creditor Supplemental Secured Claim in the amount of $75,000.

### 6. Class 1C (Allowed Secured Claim of the Second Lien Creditor)

The Second Lien Creditor shall receive on account of its Allowed Secured Claim, after the Allowed Secured Claim of the First Lien Creditor is paid in full in accordance with Section 4.2 of the Plan, (i) within five (5) Business Days after receipt by the Plan Administrator, all of the proceeds of the Remaining Assets, including, without limitation, the Royalties, but except for the net proceeds from Avoidance Actions and Causes of Action, until the Allowed Secured Claim of the Second Lien Creditor is paid in full; or (ii) such other, less favorable treatment as may be agreed to in writing by the Second Lien Creditor and the Debtor. The Subordinated 2nd Lien Claim shall be paid from any Remaining Assets after payment of the Class 3 General Unsecured Claim in accordance with Section 4.6 of the Plan. Any Deficiency Claim which may arise on account of the present lack of collateral or otherwise resulting from the aforesaid treatment shall be included in and treated as a Class 3 General Unsecured Claim. The Secured Claim of the Second Lien Creditor is Allowed in the amount of $8,512.39.

### 7. Class 2 (Non-Tax Priority Claims)

As soon as is reasonably practical after the Effective Date, in full satisfaction of such Allowed Non-Tax Priority Claim, each holder of an Allowed Non-Tax Priority Claim shall receive from the UC Funds (a) an amount in Cash equal to the Allowed amount of such Non-Tax Priority Claim, or (b) such other treatment as to which the Debtor and the holder of such Allowed Non-Tax Priority Claim shall have agreed upon in writing. In the event any Disputed Non-Tax Priority Claims exist on the Distribution Date, the Debtor or the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to all Disputed Non-Tax Priority Claims until such dispute is resolved consensually or by order of the

---

[5] On September 18, 2017 the Debtor made a payment of $700,000 on account of the Allowed Secured Claim of the First Lien Creditor. As a result, the total amount outstanding as of the filing of this Disclosure Statement is $1,511,768.23.

Bankruptcy Court.

### 8. Class 3 (General Unsecured Claims)

In full satisfaction of such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive one or more Distributions equal to its *Pro Rata* share of the UC Funds as such funds become available as is reasonably practical in the reasonable discretion of the Plan Administrator. In the event any Disputed General Unsecured Claims exist on a Distribution Date, the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to all outstanding Disputed General Unsecured Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.

The Debtor estimates that holders of Allowed General Unsecured Claims shall receive a Distribution of between 0% and 2% on account of such Allowed General Unsecured Claims. The actual distribution that will be made will be determined based upon revenue due under the License Agreement, the net proceeds from Avoidance Actions and Causes of Action, and Claims that have been Allowed or Disallowed.

### 9. Class 4 (Allowed Subordinated Claims)

On the date upon which all General Unsecured Claims have been satisfied in full, or as soon thereafter as is reasonably practical, in full satisfaction of such Allowed Subordinated Claims, the holders of the Allowed Subordinated Claims shall receive one or more *pro rata* Distributions from the Subordinated Creditor Fund in the aggregate amount of the lesser of (a) the Allowed amount of the Allowed Subordinated Claims and (b) the amount of the Subordinated Creditor Fund.

### 10. Class 5 (Interests)

No holder of an Interest shall be entitled to a Distribution under the Plan on account of such Interest. On the Effective Date, all Interests shall be cancelled and extinguished.

## V. MEANS OF IMPLEMENTING THE PLAN

### A. Appointment of Plan Administrator

(a) _Appointment_. On the Effective Date, the Plan Administrator Agreement shall be executed by the Debtor, the Creditors' Committee, and by the Plan Administrator. The Plan Administrator shall be deemed appointed upon execution of the Plan Administrator Agreement. A copy of the proposed form of Plan Administrator Agreement will be filed with the court not later than ten (10) days before the hearing on confirmation of the Plan. Notice of the selection of the Plan Administrator shall be provided in a Plan Supplement to be filed with the Court prior to the Confirmation Hearing.

(b) _General Powers, Rights and Responsibilities of Plan Administrator._ On the Effective Date, subject to the direction of the Oversight Committee, the Plan Administrator shall become the exclusive representative of the Estate. The powers, rights and responsibilities of the

Plan Administrator, shall include, but are not be limited to (i) receive, manage, invest, supervise, and protect the Remaining Assets; (ii) pay taxes or other obligations incurred by the Estate; (iii) retain and compensate, without further order of the Bankruptcy Court, the services of professionals to advise and assist in the administration, prosecution and Distribution of the Remaining Assets; (iv) calculate and implement Distributions of the Remaining Assets; (v) prosecute, compromise and settle all Disputed Claims and Causes of Action; (vi) pay Professional Fees of professionals retained in the Bankruptcy Case and Allowed pursuant to any order of the Court, whether such Professional Fees were incurred before or after the Effective Date; (vii) make Distributions in accordance with the provisions of the Plan; (viii) make payments related to Post-Confirmation Expenses from the Post-Confirmation Reserve in accordance with the provisions of the Plan; (ix) assume responsibility for all rights, obligations and liabilities of the Debtor under the License Agreement and take any and all actions which the Debtor under the License Agreement is entitled to take; and (x) retain ownership of and oversee the Personally Identifiable Information, including by executing the Data Breach Protocol in the event of any breach of such Personally Identifiable Information known to the Plan Administrator.

## B.  Plan Administrator Reports

The Plan Administrator shall file with the Court (and provide to the First Lien Holder) quarterly reports, beginning with the first full calendar quarter after the Effective Date, regarding the liquidation or other administration of the Remaining Assets, Royalty Payments received from the Licensee under the License Agreement, Distributions made by the Plan Administrator, the status of the prosecution or settlement of any Claims and Causes of Action and any other matters required to be included in such report.  The Plan Administrator shall pay fees of the U.S. Trustee as provided in Section 5.17 of the Plan.

## C.  Fees and Expenses

Except as otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, the amount of any fees and expenses incurred by the Plan Administrator on or after the Effective Date (including, without limitation, taxes) and any compensation and expense reimbursement claims (including, without limitation, reasonable fees and expenses of counsel) of the Plan Administrator arising out of the liquidation of the Remaining Assets, the making of Distributions under the Plan, and the performance of any other duties given to it shall be paid in accordance with the Plan Administrator Agreement.

## D.  Causes of Action

During the Post-Confirmation Period, the Plan Administrator shall have the authority to assert, prosecute, and settle all Claims and Causes of Action that belong to the Debtor's Estate, and, in connection therewith, shall have the right to assert and enforce all defenses belonging to the Debtor and its Estate, including, without limitation, setoff, recoupment and any rights under Bankruptcy Code section 502(d). The Plan Administrator and the First Lien Creditor shall confer in good faith in connection with the prosecution, settlement and disposition of any recoveries from any tort Causes of Action that either of them may commence after the Effective Date against any of the former officers, directors, shareholders and/or investors of/in the Debtor.

### E. Employment of Professionals by Plan Administrator

The Plan Administrator may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties hereunder and may compensate and reimburse the expenses of those professionals without further order of the Bankruptcy Court; provided, however, that any such compensation and reimbursement may be made only out of the Post-Confirmation Reserve.

### F. Oversight Committee

An Oversight Committee comprised of no more than three current members of the Creditors Committee (the "Oversight Committee") shall be appointed on the Effective Date for the purpose of providing advice and consent to the Plan Administrator on or after the Effective Date with respect to the resolution, reconciliation and settlement of Disputed Claims, Distributions to Creditors, and commencement of litigation, as further described in Section 5.7 of the Plan as follows: (A) the Plan Administrator may select, in consultation with the Debtor and the Oversight Committee, (i) special counsel to the Plan Administrator to prosecute objections to Disputed Claims, which may be the Debtor's or the Creditors' Committee's pre-Effective Date counsel, (ii) special counsel to the Plan Administrator to commence and prosecute lawsuits and (iii) a financial advisor to advise the Plan Administrator with respect to the review and analysis of Disputed Claims; (B) when considering settlement of Claims objections or lawsuits, the Plan Administrator shall consult with the Oversight Committee regarding the merits, efficacy and reasonableness of such action, and, in the event the Oversight Committee and Plan Administrator cannot reach agreement on the Plan Administrator's proposed action, the Plan Administrator may seek Bankruptcy Court authorization for such action; (C) the Plan Administrator shall consult with the Oversight Committee on the status of Claims objections and lawsuits from time to time; (D) the members of the Oversight Committee shall be identified in the Confirmation Order and shall be reimbursed for all reasonable out-of-pocket expenses incurred in fulfilling their responsibilities under the Plan, which amounts shall be paid from the Post-Confirmation Reserve; and (E) the Oversight Committee shall be disbanded at such time as all Disputed Claims have been finally resolved, all Distributions to holders of Allowed General Unsecured Claims have been made and all Causes of Action have been settled or resolved.

### G. Establishment of Reserves and Funds

(a) American Express Reserve. On the Effective Date, the American Express Reserve shall be established by the Plan Administrator for distribution by the Plan Administrator in accordance with Section 4.1 of the Plan or as otherwise determined by order of the Bankruptcy Court.

(b) Post-Confirmation Reserve. On the Effective Date or as soon thereafter as is practicable, the Post-Confirmation Reserve shall be established by the Plan Administrator from the UC Funds. If the Plan Administrator determines that additional funding of the Post-Confirmation Reserve is required, from time to time following the Effective Date, such funding shall be made from the UC Funds. The Post-Confirmation Reserve shall be used to pay the Post-Confirmation Expenses, including, without limitation, costs and expenses of counsel or other advisors retained by the Debtor or the Plan Administrator, the sale of the Remaining Assets and

the prosecution of Causes of Action and Claims objections. Any amounts remaining in the Post-Confirmation Reserve after all Post-Confirmation Expenses are paid shall become available for Distribution to holders of Allowed General Unsecured Claims and the Allowed Subordinated Claims in the priority of payment provided for in accordance with the provisions of the Plan.

(c) <u>UC Funds</u>. As soon as practicable following the Effective Date, the UC Funds shall be established by the Plan Administrator, which shall be distributed in accordance with the terms of the Plan.

(d) <u>Subordinated Creditor Fund</u>. On the date upon which all General Unsecured Claims have been satisfied in full, or as soon thereafter as is reasonably practical, the Subordinated Creditor Fund shall be established by the Plan Administrator, which shall be distributed in accordance with the terms of the Plan.

(e) <u>Disputed Claims Reserve</u>. As soon as practicable following the Effective Date, the Disputed Claims Reserve shall be established by the Plan Administrator from the UC Funds in an amount equal to the Distribution amount to which holders of Disputed Claims would have otherwise been entitled but for the dispute; provided, however, that the Plan Administrator shall have no obligation to fund the Disputed Claims Reserve unless and until a Distribution occurs to holders of Allowed Claims. The Assets in the Disputed Claims Reserve shall be held separately from other Assets held by the Plan Administrator, subject to an allocable share of all expenses and obligations of the Estate, on account of Disputed Claims. The Plan Administrator shall remove funds from the Disputed Claims Reserve as Disputed Claims are resolved, which funds shall be distributed as provided in the Plan.

## H. **Plan Distributions**

Following the Effective Date, and subject to the establishment and funding of the Post-Confirmation Reserve as set forth above, and as set forth in greater detail in Article 4 of the Plan, Distributions shall be made by the Plan Administrator in accordance with Articles 2 and 4 of the Plan. An estimated disbursement analysis through January 2022 is attached hereto as **Exhibit C**.

## I. **Preservation and Abandonment of Records**

The Plan Administrator shall preserve all documents and files, including electronic data hosted on remote servers that are necessary to the prosecution of the Causes of Action and Claims resolution process (the "<u>Retained Information</u>"). After the Effective Date, the Debtor shall preserve the Retained Information until the date that is one (1) year following the closing of the Bankruptcy Case. On the Effective Date, the Plan Administrator shall be permitted to abandon (with or without destruction) any information that is not Retained Information.

## J. **General Disposition of Assets**

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of the Plan, as soon as is reasonably practicable following the Effective Date, the Plan Administrator shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Plan Administrator shall determine in his judgment in consultation with the Secured Creditors (to the extent any such Assets are collateral of the Secured Creditors).

## K. Administrative Claims Bar Date

Persons asserting an Administrative Expense) must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on or before the first Business Day after the thirtieth (30th) day after the Effective Date (the "Administrative Expense Claims Bar Date"). No payment or Distributions will be made on account of any Administrative Expense Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file and serve an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from asserting any such right to payment as against the Debtor and/or the Estate.

## L. Deadline for Filing Applications Seeking Payment of Professional Fee Claims

All parties seeking payment of Professional Fee Claims must file with the Bankruptcy Court a final application and/or an application for payment of reasonable fees and expenses under section 503(b) of the Bankruptcy Code, as applicable, on or before the first Business Day after the thirtieth (30th) day after the Effective Date (the "Fee Application Deadline"). Any Professional failing to file and serve such final application or 503(b) motion on or before the Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtor or the Estate.

## M. Execution of Documents to Effectuate Plan

From and after the Effective Date, the Debtor and the Plan Administrator shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan. Entry of the Confirmation Order shall authorize the Debtor and the Plan Administrator to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan.

## N. Disallowance of Claims without Further Order of the Court.

As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount and for which a proof of Claim has not been filed by the Creditor by the applicable Bar Date shall be deemed Disallowed and expunged. All Scheduled Claims that correspond to a proof of Claim filed by a particular Creditor by the applicable Bar Date shall be deemed to have been superseded by such later filed proof of Claim, and the Scheduled Claim, regardless of priority, shall be expunged from the Claims register; provided however, that such proofs of Claim shall be subject to objection in accordance with Section 9.10 of the Plan.

## O. Continued Existence of Debtor Until Closing of the Case

Following the Effective Date, the Debtor shall continue in existence for the purposes of, among other things, completing the liquidation of its Assets, winding up its affairs and filing appropriate tax returns and shall thereafter be dissolved at the discretion of the Plan Administrator. Upon the entry of an order closing the Bankruptcy Case, the Debtor shall be deemed dissolved for all purposes. No other actions or filings or payments shall be required in furtherance of such dissolution.

### P. **Post-Effective Date Reports and Fees**

Following the Effective Date and until the Case is closed, not less than once every one-hundred and eighty (180) days, the Plan Administrator shall be responsible for the filing of all post-Effective Date reports required during such periods with the U.S. Trustee regarding the liquidation or other administration of property subject to the Plan Administrator's control pursuant to the Plan, Distributions made by it, and other matters required to be included in such report, and shall pay from the Debtor's Estate all post-Effective Date fees charged or assessed against the Estate under 28 U.S.C. §1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717.

### Q. **Cancellation of Interests**

On the Effective Date, all existing Interests, shall, without any further action, be cancelled, annulled, and extinguished and any certificates representing such canceled, annulled, and extinguished Interests shall be null and void.

### R. **Creditors' Committee**

On the Effective Date, the Creditors' Committee shall be deemed to be dissolved and the members of the Creditors' Committee shall be released and discharged from all duties and obligations arising from or related to the Bankruptcy Case, provided, however, that the Creditors' Committee shall continue to exist, and the retention and employment of its professionals shall continue to be in effect after the Effective Date, for the purposes of filing fee applications of its Professionals, or reviewing and approving or filing objections to fee applications of Professionals for any periods prior to the Effective Date. The reasonable fees and expenses of the Professionals retained by the Creditors' Committee for the foregoing shall be reimbursed by the Debtor from the Post-Confirmation Reserve.

### S. **Insurance Preservation**

Nothing in the Plan shall diminish or impair the enforceability of any insurance policies that may cover Claims against the Debtor, its employees, its shareholders or any other Person.

### T. **Preservation of Causes of Action**

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtor or the Estate may have against any person or entity are preserved, including without limitation any and all Causes of Action the Debtor or the Estate or other appropriate party in interest may assert under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code.

## VI.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

All executory contracts and unexpired leases of the Debtor will be deemed rejected as of the Confirmation Date, unless a particular executory contract or unexpired lease (i) has previously been assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

Any party to an executory contract or unexpired lease that is rejected in accordance with Section 6.1 of the Plan shall file a proof of Claim for damages from such rejection no later than thirty (30) days after the Effective Date. The failure to timely file a proof of Claim shall be deemed a waiver of any claim in connection with the rejection of such contract or lease.

## VII. CONDITIONS PRECEDENT

### A. Conditions to Confirmation

The following conditions must be satisfied or otherwise waived by the Debtor in accordance with Section 7.3 of the Plan on or before the Confirmation Date:

(a) The Disclosure Statement Order shall have been entered and shall have become a Final Order; and

(b) The Confirmation Order to be entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Debtor, the Committee and Secured Creditors and shall contain provisions that, among other things: (i) authorize the implementation of the Plan in accordance with its terms; (ii) approve in all respects the other settlements, transactions, and agreements to be effectuated pursuant to the Plan; (iii) find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud; (iv) order that the Remaining Assets are vested in the Estate on the Effective Date, free and clear of all Claims, liens, Encumbrances and interests of any Entity except for the liens and security interests of the Secured Creditors; and (v) order that the Plan Administrator is authorized to take any and all action necessary or appropriate to perform his or her duties hereunder, including, but not limited to, exercising the rights of the Debtor under the License Agreement, collecting all Royalty Payments thereunder, and retaining ownership of and overseeing the Personally Identifiable Information, including by executing the Data Breach Protocol in the event of any breach of such Personally Identifiable Information known to the Plan Administrator.

### B. Conditions to Effective Date

The Effective Date shall not occur and no obligations under the Plan shall come into existence unless each of the following conditions is met or, alternatively, is waived in accordance with Section 7.3 of the Plan on or before the Effective Date:

(a) The Confirmation Order shall have been entered by the Bankruptcy Court, and no stay of its effectiveness shall have been issued within fourteen (14) days following the entry of the Confirmation Order; and

(b) The Effective Date Cash shall be sufficient to pay all Administrative Expense Claims and Professional Fee Claims up to the Estate Reserve, and fund the Post-Confirmation Reserve.

**C. Waiver of Conditions**

Each of the conditions precedent in Sections 7.1 and 7.2 of the Plan may be waived or modified without further Court approval, in whole or in part.

**VIII. INJUNCTIONS; STAYS; RELEASE; EXCULPATIONS**

**A. General Injunctions**

As set forth in Article 8 of the Plan, the following provisions shall apply and shall be fully set forth in the Confirmation Order.

1. **Injunctions Against Interference with Consummation or Implementation of Plan**

**All holders of Claims or Interests shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor or the Estate with the intent or effect of interfering with the consummation and implementation of the Plan and the transfers, payments or Distributions to be made hereunder.**

2. **Injunction Against Prosecution of Causes of Action**

**Except as otherwise specifically provided for by the Plan, as and from the Effective Date, all Persons shall be enjoined from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any Encumbrance of any kind; (iii) the commencement or continuation of any action, employment of process or act to collect, offset or recover any Claim or Cause of Action satisfied, released or enjoined under the Plan; and/or (iv) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor or the Estate to the fullest extent authorized or provided by the Bankruptcy Code.**

3. **No Bar To Claims Against Third Parties**

**Holders of Claims or Interests against the Debtor are not barred or otherwise enjoined by the Plan from pursuing any recovery against Persons that are not the Debtor.**

**B. All Distributions Received in Full and Final Satisfaction**

Except as otherwise set forth in the Plan, all payments and all Distributions to be made in accordance with the Plan on account of Claims (including Administrative Expense Claims) shall be received in full and final satisfaction, settlement and release of the Estate's obligations for such Claims as against the Debtor, its property and the Estate.

## C. No Modification of Res Judicata Effect

No provision of the Plan is intended or shall be construed to modify the *res judicata* effect of any order entered in the Bankruptcy Case, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

## D. Exculpation for Debtor and Estate Professionals

**To the extent permitted by section 1125(e) of the Bankruptcy Code, the Debtor, its shareholders, officers, directors, employees and professionals (including the Chief Restructuring Officer and professional firms and individuals within such firms), and the Creditors' Committee, its members (acting in such capacity), their respective officers, directors, employees and professionals (including professional firms and individuals within such firms) and the Secured Creditors, their shareholders, officers, directors, employees and professionals (including professional firms and individuals within such firms), shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the formulation, preparation, funding, dissemination, implementation, administration, confirmation or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Bankruptcy Case, except for (i) acts or omissions as a result of willful misconduct or gross negligence and (ii) liability for any debt owed to the United States Government, any state, city or municipality arising under (a) the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code") or any state, city or municipal tax code, (b) the environmental laws of the United States or any state, city or municipality, (c) laws regarding the regulation of securities administered by the SEC or (d) any criminal laws of the United States, any state, city or municipality. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any Claim or liability released pursuant to the Plan.**

## E. Exculpation for Plan Administrator, His Professionals and Oversight Committee.

**The Plan Administrator and his employees, attorneys, accountants, financial advisors, representatives and agents, and the Oversight Committee, each solely in such capacity, shall not have or incur any liability to any person or entity for any act or omission in connection with, or arising out of, the Plan or the property to be distributed under the Plan; provided however, that the foregoing exculpation shall not apply to acts or omissions in bad faith or as a result of recklessness, willful misconduct or gross negligence.**

**Release of Secured Creditors. As a result of extensive arms' length negotiations and in exchange for material concessions regarding the Secured Claims of the First Lien Creditor, including without limitation, a substantial reduction of the Secured Claims, the Debtor and its estate and the Committee and each of their respective agents and**

representatives (collectively, the "**Debtor Parties**") are deemed to have forever, unconditionally and irrevocably, waived, discharged and released the First Lien Creditor, HTV Industries, Inc. ("**HTV**") and their respective affiliates, subsidiaries, shareholders, members, agents, attorneys, financial advisors, consultants, officers, directors, and employees, of and from any and all Claims, counterclaims, causes of action, suits, defenses, damages, demands, challenges, setoff, recoupment, or other offset rights or rights of reduction, whether arising at law or in equity, whether known or unknown or hereafter becoming known, liquidated or unliquidated, contingent or fixed, of any kind or nature whatsoever, that the Debtor Parties ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever through and including the Effective Date, including, without limitation, any recharacterization, subordination, reduction, avoidance, "lender liability" or other Claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or otherwise, or under any other provision of applicable state or federal law, and any right or basis to challenge or object to the amount, validity, characterization, priority or enforceability of the Secured Claims, with the sole exception that the Plan Administrator may review and object to the amount of the General Unsecured Claims filed by Bhungalia and HTV in the Case and all rights of Bhungalia and HTV in connection therewith shall be reserved in full.

## IX.     PROCEDURES FOR DISTRIBUTIONS UNDER PLAN

Article 9 of the Plan establishes the procedures and guidelines for Distributions to be made to the terms of the Plan to the holders of Claims, including the timing, procedures and notice provisions related to same.  Distributions shall be made by the Plan Administrator as follows.

### A.  Payments in U.S. Dollars

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on a domestic bank selected by the Plan Administrator in accordance with the Plan or by wire transfer from a domestic bank, at the option of the Plan Administrator.  The Plan Administrator may use the services of a third party to aid in the Distributions required to be made under the Plan.

### B.  Distributions Only on Business Days

Notwithstanding the foregoing provisions, if any Distribution called for under the Plan is due on a day other than a Business Day, such Distribution shall instead be made on the next Business Day.

### C.  Unclaimed Distributions

Unclaimed Distributions (including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Plan Administrator as undeliverable to the addresses specified in the Claims Register, as it shall exist on the date such Distributions are made), shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court, and the

holder of such Claim(s) shall be removed from the Distribution schedules and expunged from the Claims register and shall receive no further Distributions under the Plan. Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of the Plan.

### D. Timing of Distributions on Disputed Claims Subsequently Allowed

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date that is at least fifteen (15) Business Days after such Claim is Allowed.

### E. No Payment or Distribution of Disputed Claims

Any contrary provision hereof or of the Plan notwithstanding, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim is Allowed by Final Order of the Bankruptcy Court. For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution. Holders of Disputed Claims shall be bound, obligated and governed in all respects by the Plan's provisions.

### F. Disputed Distribution

If a dispute arises as to the identity of a holder of an Allowed Claim who is to receive a Distribution, the Plan Administrator may, in lieu of making such Distribution to such holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

### G. Transmittal of Payments and Notices

All Distributions shall be made to the holder of a Claim by regular first-class mail, postage prepaid, in an envelope addressed to such holder at the address listed on its proof of Claim filed with the Claims Agent or Bankruptcy Court or, if no proof of Claim was filed, (i) at the address listed on the Debtor's Schedules, or (ii) at such address that a holder of a Claim provides to the Debtor and the Plan Administrator after the Effective Date in writing and files at least fifteen (15) Business Days prior to a Distribution Date. Neither the Debtor nor the Plan Administrator shall have any duty to ascertain the mailing address of any holder of a Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing. Payments made in accordance with the Plan shall be deemed made to the holder regardless of whether such holder actually receives the payment.

### H. Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings made on or before the Effective Date (the "Record Date") shall be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Record Date. The Debtor and the Plan Administrator shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making a Distribution with respect to any Claim, the Debtor and the Plan Administrator shall be entitled to recognize and deal for all purposes hereunder only with

the Person who is listed on the proof of Claim filed with respect to such Claim, on the Debtor's Schedules as the holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Record Date.

## I. **Claims Administration Responsibility**

(a) <u>Reservation of Rights</u>.   Unless a Claim is specifically Allowed prior to or after the Effective Date or under the Plan, the Plan Administrator reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, or Non-Tax Priority Claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.  The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Plan Administrator's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the holder of the Claim.

(b)   <u>Objections to Claims</u>.  The Plan Administrator may dispute, object to, compromise or otherwise resolve all Claims.  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than the Claims Objection Bar Date, which is one hundred twenty (120) days after the Effective Date, or, with respect to tax claims, one year after the Effective Date, provided that the Plan Administrator may request (and the Bankruptcy Court may grant) an extension of time by filing a motion with the Bankruptcy Court.

(c)   <u>Filing Objections</u>.  An objection to a Claim shall be deemed properly served on the claimant if the Debtor or Plan Administrator causes service of any such objection to be effected in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's proof of Claim at least thirty (30) days prior to the hearing thereon.

(d)   <u>Determination of Claims</u>.  Except as otherwise agreed by the Debtor, any Claim as to which a proof of Claim or motion or request for payment was timely filed in the Bankruptcy Case may be determined and liquidated after the Effective Date pursuant to (i) a Final Order, or (ii) applicable non-bankruptcy law.  Any Claim determined to be an Allowed Claim after the Effective Date shall be treated as an Allowed Claim in accordance with the Plan.

## J. **Disputed Claims**.

(a) Except to the extent the Court determines that a lesser amount is adequate, the Plan Administrator shall, on each Distribution Date, deposit in the Disputed Claims Reserve Cash equal to the Distributions that would have been made to holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the holder of such Claim has agreed in writing or, in the case where any such Claim is unliquidated and/or contingent, the greater of (i) $1, and (ii) such other amount as is reserved by order of the Bankruptcy Court made upon motion of the holder of such Claim.

(b) For purposes of effectuating the provisions of Section 9.10 of the Plan and the

Distributions to holders of Allowed Claims, the Court, on or prior to the Effective Date, or thereafter upon the request of any holder of a Claim or the Plan Administrator, may liquidate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under the Plan and for purposes of the Disputed Claims Reserve.

(c) When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holder of such Allowed Claim, in accordance with the provisions of the Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such holder would have been entitled if such holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

(d) In no event shall any holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for such Disputed Claim pursuant to Section 9.10 of the Plan. In no event shall the Debtor or the Plan Administrator have any responsibility or liability for any loss to or of any amount reserved under the Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence. In no event may any Creditor whose Disputed Claim is subsequently Allowed, pursue or recover from any other Creditor any funds received as Distributions under the Plan.

(e) To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Plan Administrator shall make, in accordance with the terms of the Plan, a Distribution of the excess amount reserved for such Disputed Claim in accordance with the Plan.

(f) The Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated with taxation.

(g) Except as expressly set forth in the Plan, or otherwise agreed to in writing or ordered by the Court, the Plan Administrator shall not have any duty to fund the Disputed Claims Reserve.

(h) The Plan Administrator shall pay, or cause to be paid, out of the funds held in the Disputed Claims Reserve, any tax imposed by any federal, state, or local taxing authority on the income generated by the funds or property held in the Disputed Claims Reserve. The Plan Administrator shall file, or cause to be filed, any tax or information return related to the Disputed Claims Reserve that is required by any federal, state, or local taxing authority.

### K. <u>No Payments of Fractional Cents or Distributions of Less Than Thirty-Five ($35) Dollars</u>

(a) Any contrary provision hereof or of the Plan notwithstanding, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with halfpennies or less being rounded down and fractions in excess of half of a penny

being rounded up.

(b)     Any contrary provision hereof or of the Plan notwithstanding, for purposes of administrative convenience, no Distribution of less than Thirty Five Dollars ($35) shall be made pursuant to the Plan.   Whenever any Distribution of less than Thirty Five Dollars ($35) under the Plan would otherwise be required, such funds will be retained by the Plan Administrator for the account of the recipient until such time that successive Distributions aggregate to Thirty Five ($35) Dollars, at which time such payment shall be made, and if successive Distributions do not ever reach Thirty Five ($35) in the aggregate, then such Distributions shall be returned to the UC Funds.

### L.  **Setoff and Recoupment**

Except as otherwise provided in the Plan, the Plan Administrator may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Debtor may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor of any right of setoff or recoupment against the holder of any Claim.

### M.  **Payment of Taxes on Distributions Received Pursuant to the Plan**

(a)     Any contrary provision hereof or of the Plan notwithstanding, as a precondition to payment of any Distribution to a Creditor under the Plan, unless included on the official proof of Claim form filed by such Creditor in this Bankruptcy Case, each Creditor shall provide a valid tax identification or social security number (the "Tax Information") for purposes of tax reporting by the Debtor.  All Entities that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

(b)     At such time as the Debtor or Plan Administrator believes that Distributions to a particular Class of Claims is likely, the Debtor or Plan Administrator shall request Tax Information in writing from the Creditors (the "Tax Information Request").  Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request shall forfeit all Distributions such Creditor may otherwise be entitled to under the Plan, and such forfeited funds will revert to the UC Funds to be disbursed in accordance with the terms and priorities established in the Plan.

### N.  **Compliance With Tax Withholding and Reporting Requirements**

With respect to all Distributions made under the Plan, the Debtor and Plan Administrator will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

## X. PLAN INTERPRETATION, CONFIRMATION AND VOTING

### A. Procedures Regarding Objections to Designation of Classes as Impaired or Unimpaired

In the event the designation of the treatment of a Class as impaired or unimpaired is objected to, the Bankruptcy Court shall determine the objection and voting shall be permitted or disregarded in accordance with the determination of the Bankruptcy Court.

### B. Withdrawal and Modification of Plan

The Plan may be withdrawn or modified by the Debtor at any time prior to the Confirmation Date. The Debtor may modify the Plan in any manner consistent with section 1127 of the Bankruptcy Code prior to substantial consummation thereof. Upon request by the Debtor, the Plan may be modified after substantial consummation with the approval of the Bankruptcy Court, provided that such modification does not affect the essential economic treatment of any Person that objects in writing to such modification.

### C. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or the Plan, the laws of the State of New York applicable to contracts executed in such State by residents thereof and to be performed entirely within such State shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan.

### D. Voting of Claims

Each holder of a Claim as of the Record Date in Classes 2 through 4 shall be entitled to vote to accept or reject the Plan. The Disclosure Statement Order shall govern the manner and procedures for casting of Ballots with the Voting Agent.

### E. Acceptance by Impaired Class

Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors shall have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### F. Presumed Acceptances of Plan

Classes 1A and 1C are unimpaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan.

**G. Presumed Rejections of Plan**

Class 5 is presumed to have rejected the Plan but may elect to accept the Plan.

**H. Cram Down**

The Debtor requests that, in the event that any impaired Class entitled to vote on the Plan accepts the Plan, the Bankruptcy Court confirm the Plan in accordance with the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan over the presumed rejection of Class 5 and/or the possible rejection of the Plan by any impaired Class entitled to vote on the Plan.

## XI. RETENTION OF JURISDICTION BY BANKRUPTCY COURT

From the Confirmation Date until entry of a final decree closing the Debtor's Bankruptcy Case (pursuant to 11 U.S.C. §350 and Bankruptcy Rule 3022), the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Bankruptcy Case for the following purposes:

(a) to hear and determine any and all objections to the allowance of any Claim or Administrative Expense Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtor to any Creditors, holders of Claims, or other parties in interest;

(b) to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

(c) to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d) to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Bankruptcy Court, including, but not limited to, Causes of Action brought by the Plan Administrator;

(e) to enforce and interpret the provisions of the Plan, the Disclosure Statement Order, the Confirmation Order, the License Approval Order and any other order of the Bankruptcy Court in the Bankruptcy Case;

(f) to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

(g) to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

(h) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and the intent of the Plan;

(i) to interpret and determine such other matters as the Confirmation Order may

provide for or as may be authorized under the Bankruptcy Code;

(j) to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated; and

(k) to hear and determine any disputes arising in connection with the License Agreement or the transactions contemplated thereby, the Personally Identifiable Information or any Data Breach Protocol, and to invoke the assistance of the Consumer Privacy Ombudsman to the extent deemed necessary or appropriate by the Bankruptcy Court.


## XII. CERTAIN TAX CONSEQUENCES OF THE PLAN

### A. General

**PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO FEDERAL INCOME TAX ISSUES IS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER FEDERAL INCOME TAX LAW. SUCH DESCRIPTION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN AND MAY BE VIEWED AS A MARKETING DOCUMENT BY THE INTERNAL REVENUE SERVICE. THIS DESCRIPTION IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.**

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW. EXCEPT AS PROVIDED BELOW, NO RULING HAS BEEN REQUESTED FROM THE IRS AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.**

This description does not cover all aspects of federal income taxation that may be

relevant to the Debtor or holders of Claims or Interests. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to holders of Claims and Interests in the Debtor. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtor or to holders of Claims or Interests.

## B. <u>Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally</u>

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder's Claim is Allowed or Disputed on the Effective Date, and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

### (i) Recognition of Gain or Loss

In general, a holder of an Allowed Claim or Interest should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized.

### (ii) Bad Debt or Worthless Security Deduction

A holder who receives in respect of an Allowed Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

## XIII.  CONFIRMATION OF PLAN – REQUIREMENTS

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the plan proponent disclose specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan, that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims or Interests which is impaired under the Plan. The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section

1129(a) have been met. The Debtor believes that the Plan meets all of these required elements. With respect to the so-called "feasibility" test (i.e., that the Plan is not likely to be followed by the need for further financial reorganization), the Plan provides for an orderly liquidation of the Debtor's assets and the Debtor believes that it will be able to consummate the Plan fully.

## A. **Absolute Priority Rule**

To satisfy the absolute priority rule, the Plan must provide that the holder of any Claim or Interest that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim or interest any property unless the Claims of the dissenting Class are paid in full.

The Debtor believes that the Plan satisfies the absolute priority rule. The Debtor further believes that all non-accepting impaired Classes will receive or retain payment or Distribution, as the case may be, on account of their Claims or Interests, sufficient to permit full satisfaction of such Claims before junior Classes receive or retain any property on account of such junior Claims.

## B. **Best Interest of Creditors Test; Liquidation Analysis**

Under the best interest of creditors test, the Plan is confirmable if, with respect to each impaired Class of Claims or Interests, each holder of an Allowed Claim or Allowed Interest in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders of each Class of Claims or Interests would receive if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets in a chapter 7 liquidation case. The amount that would be available for satisfaction of the Allowed Claims and Interests of the Debtor would consist of the proceeds resulting from the disposition of the assets of the Debtor augmented by the cash held by the Debtor at the time of the commencement of the chapter 7 case. Such amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Expense Claims and other priority Claims that might result from the chapter 7 case.

Here, the Debtor's major assets have been liquidated as of the date of this Disclosure Statement. The Debtor believes that a conversion of the Bankruptcy Case to chapter 7 would simply duplicate an orderly plan process, and that Creditors would be harmed by the delay and expense that would result.

To determine if the Plan, as proposed, is in the best interests of Creditors and holders of Interests, the present value of the Distribution likely to be made to each class in a liquidating case are compared with the present value of the Distribution to each impaired Class provided for by the Plan.

In applying the best interest test, it is possible that Claims in a chapter 7 case may not be classified in the same manner as provided for by the Plan. Priorities and order of Distribution of estate assets are established by the applicable provisions of chapter 7. Under those provisions, each class of Claims is paid in a descending order of priority. No junior classes of Claims are paid until all senior classes have received payment in full. In the event that available assets are insufficient to pay all members of such class in full, then each member of the class shares on a pro rata basis.

The Debtor believes that the primary advantage of the Plan over a chapter 7 liquidation is that Creditors will likely receive more under the Plan than they would in a chapter 7 case and receive their Distributions earlier. Costs would increase by the amount of the additional administrative expenses likely to be incurred in such a chapter 7 case, including the costs of time-consuming investigations and discovery. The process of other Claims resolution will proceed without the necessity for additional investigation by a chapter 7 trustee and its separate and new professionals, and the Plan offers the opportunity to avoid additional administrative costs and the resulting delay which would result from a chapter 7 liquidation. The Debtor therefore believes that the Plan will result in lower total administrative costs, and higher recoveries for Creditors than would the liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code. A liquidation analysis that demonstrates the lower recovery for creditors in a chapter 7 liquidation is annexed hereto as **Exhibit B**.

Thus, the Debtor believes the Plan satisfies the "best interests of creditors test", and, indeed, that the Plan is in the best interests of Creditors.

## XIV.  PROCEDURES FOR VOTING ON PLAN

As noted above, pursuant to the Bankruptcy Code, a plan groups various Claims and Interests into classes, each consisting of parties having similar legal rights in relation to a debtor. Each class may then be treated as either "impaired" or "unimpaired" under a plan. There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may not propose to alter the legal, equitable or contractual rights of the holder of the claim or interest. Second, all defaults (excluding those covered by section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated. Third, a plan may provide for the payment in full of the obligation to the holder of the claim or interest. If a class is unimpaired, then it is presumed to vote in favor of a plan.

An impaired class that would receive nothing under a plan is presumed to have rejected such a plan.

An impaired class that is proposed to receive any Distribution (whether in Cash, securities or other property) has the right to vote, as a class, to accept or reject the plan. A class of Creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received from members of such class, representing at least two-thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan. Section 1126(e) of the Bankruptcy Code provides that a Creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the Creditor's vote either to accept or reject a plan was not

solicited or cast in good faith or in compliance with the Bankruptcy Code. A plan under which any class of Claims is impaired may be confirmed by the Bankruptcy Court only if it has been accepted by at least one such class.

Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in the impaired Classes entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan. Voting instructions will accompany the Ballot.

Each Creditor should first carefully review this Disclosure Statement and the Plan. The Creditor should then complete the portions of the Ballot indicating the Class or Classes in which the Creditor's Claim falls and the total dollar amount of the Claim. If the Creditor's Claim falls into more than one Class, then the Creditor should list each Class and state the dollar amount of the Claim which belongs in each Class. It is critical that the Class(es) and amounts(s) of the Claim be correctly stated on the Ballot so that the Creditor's vote can be properly counted.

Next, the Creditor should mark in the space provided on the Ballot whether the Creditor wishes to accept or to reject the Plan. Please be sure to fill in the name of the Creditor for whom the Ballot is being filed. Finally, the Ballot must be signed by the Creditor, or by an officer, partner, or other authorized agent of the Creditor. Please note that the Debtor reserves the right to object to the allowance, designation of Class and/or allowable amount of any Claim set forth in a Ballot for purposes of voting and/or Distribution under the Plan.

Completed and signed Ballots should be returned by first class mail to the Voting Agent at the below address in the enclosed self-addressed return envelope:

> Choxi.com, Inc. Balloting
> c/o Rust Consulting/Omni Bankruptcy
> 5955 DeSoto Avenue, Suite 100
> Woodland Hills, CA 91367

Completed and signed Ballots may also be returned by overnight mail or hand delivery to the address above.

Completed Ballots should be returned as soon as possible, and in any event so that they are RECEIVED NO LATER THAN NOVEMBER 16, 2017 AT 4:00 P.M. ANY BALLOTS WHICH ARE RECEIVED BY THE VOTING AGENT AFTER NOVEMBER 16, 2017 AT 4:00 P.M. SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

## XV.  CONFIRMATION HEARING

The Confirmation Hearing will be held by the Honorable Shelley C. Chapman, United States Bankruptcy Judge, on December 12, 2017 at 2:00 p.m., in the United States Bankruptcy Court, Southern District Of New York, Courtroom 623, One Bowling Green, New York, New York 10004.  At that hearing, the Bankruptcy Court will decide whether the Plan should be confirmed and will hear and decide any and all objections to the Plan.  Any Creditor, or other party in interest who wishes to object to Confirmation of the Plan, or to the classification of Claims and Interests provided in the Plan, must, not later than 12:00 p.m. on November 20, 2017, file an objection with the Clerk's Office, United States Bankruptcy Court, Southern District Of New York, One Bowling Green, New York, New York 10004, and serve a copy of the objection on the following persons:

(a) counsel to the Debtor:

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Attn: Tracy L. Klestadt, Esq.
      Stephanie R. Sweeney, Esq.

(b) counsel to the Creditors' Committee:

FOX ROTHSCHILD LLP
100 Park Avenue, 15th Floor
New York, New York 10017
Attn: Paul Labov, Esq.

Any objections to the Plan which are not filed and served by the above date may not be considered by the Bankruptcy Court.  Any person or entity who files an objection to Confirmation of the Plan or to the classification of Claims and Interests provided in the Plan must also attend the Confirmation Hearing, either in person or through counsel.

If the Plan is confirmed, its provisions will bind the Estate and any and all entities, including all holders of Claims and Interests, whether or not the Claim or Interest of such claimant or interest holder is impaired under the Plan and whether or not the claimant or interest holder has, either individually or by a Class, voted to accept the Plan.

## XVI.  RECOMMENDATION

The Debtor believes that the Plan provides for the fair and equitable treatment of the Debtor's Creditors and therefore recommends that Creditors vote to accept the Plan.

Dated:  New York, New York
        October 9, 2017

CHOXI.COM, INC.


By: __*/s/ Eddy W. Friedfeld*_____
       Eddy W. Friedfeld
       Chief Restructuring Officer

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP


By: *_/s/ Tracy L. Klestadt_*_____
       Tracy L. Klestadt
       Stephanie R. Sweeney
200 West 41st Street, 17th Floor
New York, New York 10036
Tel:  (212) 972-3000
Fax: (212) 972-2245

*Attorneys for the Debtor and Debtor-in-Possession*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| CHOXI.COM, INC., a/k/a | : | Case No. 16-13131 (SCC) |
| NOMORERACK.COM, INC., | : |  |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

## CORRECTED PLAN OF LIQUIDATION OF CHOXI.COM, INC., A/K/A NOMORERACK.COM, INC. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Klestadt Winters Jureller
Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245

*Attorneys for the Debtor and Debtor in Possession*

Dated: New York, New York
      October 9, 2017

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARTICLE 1 – DEFINITIONS AND RULES OF INTERPRETATION .......................... 1

    A.    Definitions.......................................................................................... 1-9

    B.    Rules of Interpretation ................................................................. 9

ARTICLE 2 – PAYMENT OF CLAIMS NOT REQUIRED TO BE CLASSIFIED....... 10

    2.1. Claims Not Classified ..................................................................... 10

    2.2. Administrative Expense Claims ..................................................... 10

    2.3. Professional Fee Claims ................................................................. 10

    2.4. Priority Tax Claims ........................................................................ 11

ARTICLE 3 – CLASSIFICATION OF CLAIMS AND INTERESTS ........................... 11

    3.1. Criterion of Class ........................................................................... 11

    3.2. Class Categories ............................................................................. 11

ARTICLE 4 – TREATMENT OF CLASSES OF CLAIMS AND INTERESTS ............ 11

    4.1. Class 1A (Allowed Secured Claim of American Express) ............................ 12

    4.2. Class 1B (Allowed Secured Claim of the First Lien Creditor)...................... 12

    4.3. Class 1C (Allowed Secured Claim of the Second Lien Creditor) ................ 12

    4.4. Class 2 (Non-Tax Priority Claims) ................................................. 13

    4.5. Class 3 (General Unsecured Claims) .............................................. 13

    4.6  Class 4 (Allowed Subordinated Claims)…………………………………13

    4.7. Class 5 (Interests) ........................................................................... 13

ARTICLE 5 – MEANS OF IMPLEMENTATION OF THE PLAN ............................... 14

    5.1. Implementation of the Plan............................................................. 14

5.2. Powers and Obligations of the Plan Administrator........................................ 14

5.3. Plan Administrator Reporting ....................................................................... 15

5.4 Fees and Expenses of the Plan Administrator…………………....................15

5.5 Causes of Action…………………………………………..………………...15

5.6 Employment of Professionals by the Plan Administrator……………....…15

5.7 Oversight Committee…………………………………………..……………15

5.8 Establishment of Reserves and Funds…………………………………………16

    (a) American Express Reserve................................................................. 16

    (b) Post-Confirmation Reserve ............................................................... 16

    (c) UC Funds .......................................................................................... 16

    (d) Subordinated Creditor Fund.............................................................. 16

    (e) Disputed Claims Reserve .................................................................. 17

5.9. Plan Distributions ......................................................................................... 17

5.10. Preservation and Abandonment of Records ................................................ 17

5.11. General Disposition of Assets ..................................................................... 17

5.12. Administrative Expense Claims Bar Date ................................................... 17

5.13. Deadline for Filing Applications for Professional Fee Claims ................... 18

5.14. Execution of Documents to Effectuate Plan ............................................... 18

5.15. Disallowance of Claims without Further Order of the Court ...................... 18

5.16. Continued Existence of Debtor Until Closing of the Case ......................... 18

5.17. Post-Confirmation Reports and Fees .......................................................... 18

5.18. Cancellation of Interests ............................................................................. 19

5.19. Creditors' Committee .................................................................................. 19

5.20. Insurance Preservation ................................................................... 19

5.21 Preservation of Causes of Action…………………………………………..19

ARTICLE 6 – TREATMENT OF EXECUTORY CONTRACTS & UNEXPIRED
      LEASES ................................................................................................ 19

6.1. General Provisions ...................................................................... 19

6.2. Notice of Demand Rejection/Rejection Bar Date .......................... 20

ARTICLE 7 – CONDITIONS PRECEDENT; CONFIRMATION & EFFECTIVE
      DATE .................................................................................................... 20

7.1. Conditions Precedent to Confirmation of the Plan ....................... 20

7.2. Conditions Precedent to the Effective Date .................................. 20

7.3. Waiver of Conditions Precedent .................................................. 21

ARTICLE 8 – INJUNCTIONS; RELEASE; EXCULPATION ...................................... 21

8.1. General Injunctions ..................................................................... 21

      (a) Injunctions Against Interference with Consummation or
      Implementation of Plan ................................................................. 21

      (b) Plan Injunction ...................................................................... 21

      (c) No Bar to Claims Against Third Parties ............................................... 21

8.2. All Distributions Received in Full and Final Satisfaction ............................ 21

8.3. No Modification of Res Judicata Effect ........................................ 21

8.4. Exculpation for Debtor and Estate Professionals........................... 22

8.5. Exculpation for Plan Administrator and his Professionals and Oversight
Committee.................................................................................................. 22

8.6  Release of Secured Creditors…………..…………………………………...23

ARTICLE 9 – PROVISIONS GOVERNING DISTRIBUTIONS .................................. 23

9.1. Payment in U.S. Dollars .............................................................. 23

{00266836.11 / 1148-001 }

iv

9.2. Distributions Only on Business Days ........................................................ 23

9.3. Unclaimed Distributions .................................................................. 23

9.4. Timing of Distributions on Disputed Claims Subsequently Allowed .......... 24

9.5. No Payment or Distribution on Disputed Claims ......................................... 24

9.6. Disputed Distribution .................................................................... 24

9.7. Transmittal of Payments and Notices ......................................................... 24

9.8. Record Date for Distributions .......................................................... 24

9.9. Claims Administration Responsibility ........................................................ 25

    (a) Reservation of Rights ............................................................ 25

    (b) Objections to Claims ............................................................. 25

    (c) Filing Objections ................................................................ 25

    (d) Determination of Claims ......................................................... 25

9.10. Disputed Claims ....................................................................... 25

9.11. No Payments of Fractional Cents or Distributions of Less Than
Thirty-Five Dollars ....................................................................... 27

9.12. Setoff and Recoupment ................................................................ 27

9.13. Payment of Taxes on Distributions Received Pursuant to the Plan ............ 27

9.14. Compliance with Tax Withholding and Reporting Requirements .............. 28

ARTICLE 10 – PLAN INTERPRETATION, CONFIRMATION AND VOTING ........ 28

10.1. Procedures Regarding Objections to Designation of Classes as
Impaired or Unimpaired................................................................... 28

10.2. Withdrawal and Modification of Plan ......................................................... 28

10.3. Governing Law ......................................................................... 28

10.4. Voting of Claims ....................................................................... 28

10.5. Acceptance by Impaired Class ............................................................ 28

10.6. Presumed Acceptances of Plan ........................................................... 28

10.7. Presumed Rejections of Plan ............................................................. 29

ARTICLE 11 – RETENTION OF JURISDICTION BY BANKRUPTCY COURT ...... 29

ARTICLE 12 – MISCELLANEOUS PROVISIONS ........................................... 30

12.1. Headings ....................................................................................... 30

12.2. No Attorneys' Fees ......................................................................... 30

12.3. Notices .......................................................................................... 30

12.4. No Discharge ................................................................................. 30

12.5 Claims in Dollars. ........................................................................... 30

12.6 Binding Effect. ............................................................................... 31

# INTRODUCTION

Choxi.com, Inc. a/k/a Nomorerack.com, Inc. ("Choxi" or the "Debtor"), proposes this chapter 11 plan (the "Plan") pursuant to section 1121 of the Bankruptcy Code.

## ARTICLE 1 - DEFINITIONS AND RULES OF INTERPRETATION

### A.    Definitions

The following terms, when used in this Plan, or any subsequent amendments or modifications thereof, shall have the respective meanings hereinafter set forth and shall be equally applicable to the singular and plural of terms defined.

**1.1**    "Administrative Expense Claim" means a Claim for costs and expenses of administration allowed under sections 503(b) and 507(a)(1), including, without limitation, (a) any actual, necessary costs and expenses of preserving the Estate and winding down the Debtor's business during the Bankruptcy Case, (b) any indebtedness or obligations incurred or assumed by the Debtor in the ordinary course of business in connection with the conduct of its business during the Bankruptcy Case, (c) any costs and expenses for the management, maintenance, preservation, sale, or other disposition of any Assets, and (d) any fees or charges assessed against the Debtor's Estate under section 1930, chapter 123, Title 28, United States Code.

**1.2**    "Administrative Expense Claims Bar Date" shall have the meaning assigned to such term in Section 5.12 of the Plan.

**1.3**    "Allowed Administrative Expense Claim" means an Administrative Expense Claim, to the extent it is or has become an Allowed Claim.

**1.4**    "Allowed" means, with respect to a Claim against or Interest in the Debtor, a Claim against or Interest in the Debtor (i) proof of which was originally filed within the applicable period of limitation fixed by the Bankruptcy Court in accordance with Rule 3003(c)(3) of the Bankruptcy Rules, or (ii) if no proof of Claim or Interest has been timely filed, which has been or hereafter is listed by the Debtor in its Schedules as liquidated in an amount and not Disputed or contingent, as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, a Final Order, or the Claims Objection Bar Date, or as to which an objection has been interposed and such Claim or Interest has been allowed in whole or in part by a Final Order, or (iii) a Claim or interest that is allowed by final order of the Bankruptcy Court.  For purposes hereof, an "Allowed Claim" shall include any Claim arising from the recovery of property under sections 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code,  any Claim allowed under or pursuant to the terms of this Plan, or any Claim that has been allowed by a Final Order, provided, however, that (i) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder unless otherwise specified herein or by order of the Bankruptcy Court, (ii) "Allowed Claim" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Involuntary Petition Date; and (iii) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

**1.5** "<u>Allowed Secured Claim of the First Lien Creditor</u>" means the sum of $2,211,768.23, including prepetition interest and fees.

**1.6** "<u>Allowed Secured Claim of the Second Lien Creditor</u>" means the sum of $8,512.39.

**1.7** "Allowed Subordinated Claim" means the Subordinated Claims and the <u>Subordinated 2nd Lien Claim.</u>

**1.8** "<u>American Express</u>" means American Express Bank, FSB.

**1.9** "<u>American Express Reserve</u>" means a Cash reserve established by the Debtor pursuant to the Cash Collateral Order in the amount of $57,682.03 for distribution on account of the Allowed Secured Claim of American Express in accordance with Section 4.1 of this Plan or as otherwise determined by order of the Bankruptcy Court.

**1.10** "<u>Assets</u>" means any and all property of the Estate, including, without limitation, all property and other interests identified in section 541(a) of the Bankruptcy Code. Without limiting the foregoing, Assets shall include all of the Debtor's real, personal, tangible and intangible property, wherever located and whether acquired prior to or after the Involuntary Petition Date, including Cash, furniture, fixtures, equipment, artwork, intellectual property, Causes of Action (including Avoidance Actions), together with the proceeds and products, replacements and accessions thereof.

**1.11** "<u>Avoidance Action</u>" means any Causes of Action to avoid and recover a transfer of property of the Estate or an interest of the Debtor in property, including, without limitation, actions arising under sections 544, 545, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code and any other applicable federal, state or common law.

**1.12** "<u>Ballot</u>" means the form distributed to the holder of an impaired Claim on which it is to be indicated whether such holder accepts or rejects the Plan.

**1.13** "<u>Bankruptcy Case</u>" means the case concerning the Debtor initially commenced as an involuntary Chapter 7 case on the Involuntary Petition Date and thereafter commenced under Chapter 11 of the Bankruptcy Code on the Petition Date, administered under case number 16-13131 (SCC) in the United States Bankruptcy Court for the Southern District of New York.

**1.14** "<u>Bankruptcy Code</u>" means Title 11 of the United States Code, as amended, in effect and applicable to the Bankruptcy Case.

**1.15** "<u>Bankruptcy Court</u>" or "<u>Court</u>" means the United States Bankruptcy Court for the Southern District of New York wherein the Bankruptcy Case is pending.

**1.16** "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States, as amended, and any Local Rules of the Bankruptcy Court, as amended, in effect and applicable to the Debtor's Bankruptcy Case.

**1.17** "Bar Date" means March 3, 2017 at 5:00 p.m., the date established by the Bankruptcy Court as the deadline to file proofs of Claim, or with respect to Governmental Units, June 5, 2017 at 5:00 p.m., as applicable, unless the Bankruptcy Court has set a different date by which a specific Creditor must file a proof of Claim, in which case it means, for such specific Creditor, such different date set by the Court.

**1.18** "Bhungalia" means Bhungalia Family, LLC d/b/a Bhungalia, LLC.

**1.19** "Business Day" means any day other than a Saturday, Sunday or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

**1.20** "Cash" means legal tender of the United States of America.

**1.21** "Cash Collateral Order" means the *Stipulation and Order (i) Authorizing Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 4001 and (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363* dated March 6, 2017 and entered by the Court on March 21, 2017 [ECF Doc 104].

**1.22** "Causes of Action" means any and all Claims, rights, actions, chose in action, suits, causes of action, liens, judgments and damages belonging to the Debtor or its Estate and any and all liabilities, obligations, covenants, undertakings and debts owing to the Estate, of whatever nature and whenever arising, whether known or unknown, in law, equity or otherwise, including, without limitation, actions arising under sections 541 and 542 of the Bankruptcy Code and any other applicable federal, state or common law.

**1.23** "Chief Restructuring Officer" shall mean Eddy Friedfeld, as chief restructuring officer of the Debtor.

**1.24** "Claim" means, as defined in Bankruptcy Code section 101(5): (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.25** "Claims Objection Bar Date" means, unless otherwise extended by Order of the Court, the first Business Day that is 120 days after the Effective Date.

**1.26** "Claims Agent" means Rust Consulting/Omni Bankruptcy, which was appointed by the Bankruptcy Court to receive, maintain, docket and otherwise administer the proofs of Claim filed in the Bankruptcy Case.

**1.27** "Class" means a category of Claims or Interests described in Article 3 of the Plan.

**1.28** "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

**1.29** "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as the Plan may be amended by its terms and consistent with applicable law, and any findings of fact and conclusions of law contained in the Confirmation Order or a separate document entered substantially contemporaneously therewith, in form and substance reasonably satisfactory to the Debtor and the Committee.

**1.30** "<u>Consumer Privacy Ombudsman</u>" means Lucy L. Thomson, as consumer privacy ombudsman in the Bankruptcy Case, appointed by the U.S. Trustee pursuant to order of the Bankruptcy Court dated December 9, 2016.

**1.31** "<u>Creditor</u>" means any Person holding a Claim against the Debtor or, pursuant to section 102(2) of the Bankruptcy Code, against property of the Debtor, that arose or is deemed to have arisen on or prior to the Involuntary Petition Date, including, without limitation, a Claim against the Debtor of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

**1.32** "<u>Creditors' Committee</u>" or "<u>Committee</u>" means the official committee of unsecured creditors appointed by the U.S. Trustee to represent the interests of unsecured creditors in the Bankruptcy Case.

**1.33** "<u>Data Breach Protocol</u>" means the protocol to be followed on or after the Effective Date by the Plan Administrator in the event of a breach of the Personally Identifiable Information, which shall consist of delivering appropriate notice of any such breach to all affected customers in compliance with all federal and state data breach notification laws and, if applicable in the event of the termination of or a default under the License Agreement, overseeing the disposition of the Personally Identifiable Information to a subsequent licensee or purchaser or otherwise disposing of such Personally Identifiable Information as required under applicable federal and state data disposal laws.

**1.34** "<u>Debtor</u>" means Choxi.com, Inc. a/k/a Nomorerack.com, Inc., the Debtor in the Bankruptcy Case.

**1.35** "<u>Deficiency Claim</u>" means that portion of any Allowed Claim held by a Secured Creditor which exceeds the value of the Assets securing such Allowed Claim.

**1.36** "<u>Disallowed</u>" means, when referring to a Claim or Interest, a Claim (including a Scheduled Claim) or Interest, or any portion of a Claim or Interest, which has been disallowed or expunged by a Final Order.

**1.37** "<u>Disclosure Statement</u>" means the disclosure statement for the Plan and all exhibits annexed thereto or otherwise filed in connection therewith, approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code.

**1.38** "<u>Disclosure Statement Order</u>" means the Final Order of the Bankruptcy Court approving the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code.

**1.39** "<u>Disputed</u>" means, with respect to a Claim against or Interest in the Debtor, the extent to which the allowance of such Claim or Interest is the subject of a

timely objection, complaint or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn with prejudice or determined by a Final Order.

**1.40** "<u>Disputed Claims Reserve</u>" means the segregated account established consistent with Section 5.8(e) of the Plan.

**1.41** "<u>Distribution</u>" means any distribution made pursuant to the terms of this Plan.

**1.42** "<u>Distribution Date</u>" means any date on which a Distribution is made or to be made to holders of Allowed Claims under this Plan. The first Distribution shall occur as soon as practicable on or after the Effective Date. To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the Debtor shall reasonably determine is appropriate in light of (i) the amount of funds on hand; (ii) the amount and nature of Disputed Claims; (iii) the activities to be accomplished, including their anticipated duration and costs; (iv) the length of time since any prior Distribution; and (v) the costs of effecting any interim Distribution.

**1.43** "<u>Effective Date</u>" means the first Business Day after the entry of the Confirmation Order that the conditions to effectiveness of the Plan set forth in Section 7.2 of the Plan have been satisfied or otherwise waived.

**1.44** "<u>Effective Date Cash</u>" means all Cash held by or on behalf of the Debtor as of the Effective Date.

**1.45** "<u>Encumbrances</u>" means, collectively, any and all security interests, liens, pledges, Claims, levies, charges, escrows, encumbrances, options, rights of first refusal, transfer restrictions, conditional sale contracts, title retention contracts, mortgages, hypothecations, indentures, security agreements or other agreements, arrangements, contracts, commitments, understandings or obligations of any kind whatsoever, whether written or oral.

**1.46** "<u>Entity</u>" shall have the meaning assigned to such term in section 101(15) of the Bankruptcy Code.

**1.47** "<u>Estate</u>" means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code upon the Involuntary Petition Date.

**1.48** "<u>Estate Reserve</u>" means the aggregate sum of four hundred fifty thousand dollars ($450,000.00) derived from the proceeds of accounts receivable collected by the Debtor from Paysafe Merchant Services Corp. f/k/a NBX Merchant Services Corp. under a stipulation of settlement approved by the Bankruptcy Court by order dated April 26, 2017.

**1.49** "<u>Estate Monthly Reserve</u>" means ten thousand dollars ($10,000) of the Royalties per month for a period of seven (7) months commencing on the first full month following the Effective Date for an amount not to exceed in the aggregate seventy thousand dollars ($70,000).

**1.50** "Fee Application Deadline" shall have the meaning assigned to such term in Section 5.13 of the Plan.

**1.51** "Final Order" means an order or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; provided, however, if an appeal, or writ of certiorari, reargument or rehearing thereof has been filed or sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, further, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be but has not then been filed with respect to such order, shall not cause such order not to be a Final Order.

**1.52** "First Lien Creditor" means, collectively, TVII Corp., Bhungalia and Ronak Khichadia.

**1.53** "First Lien Creditor Supplemental Secured Claim" means the sum of seventy five thousand dollars ($75,000).

**1.54** "General Unsecured Claim" means any Unsecured Claim against the Debtor that is not an Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, or Non-Tax Priority Claim.

**1.55** "Governmental Unit" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

**1.56** "HTV" means HTV Industries, Inc.

**1.57** "Interest" means any ownership or related rights and interests of any Person in the Debtor.

**1.58** "Involuntary Petition Date" means November 10, 2016, the date on which certain creditors filed an involuntary petition against the Debtor under Chapter 7 of the Bankruptcy Code.

**1.59** "License" means an exclusive, worldwide, irrevocable license and right to use and exploit the Debtor's intellectual property Assets.

**1.60** "License Agreement" means the Exclusive License Agreement, dated as of February 7, 2017, between the Debtor and the Licensee, pursuant to which the Debtor granted the License to the Licensee.

**1.61** "License Approval Order" means that certain Final Order Approving License Agreement with J Club, Inc., dated as of February 9, 2017.

**1.62** "Licensee" means J Club, Inc., a Delaware corporation, which submitted the highest and best bid for the License.

**1.63** "<u>Non-Tax Priority Claim</u>" means a Claim, other than an Administrative Expense Claim or a Priority Tax Claim, which is entitled to priority in payment under sections 507(a)(1), (2) (3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.64** "<u>Order for Relief</u>" means the order of the Bankruptcy Court dated December 9, 2016 granting the Debtor relief under chapter 11 of the Bankruptcy Code effective as of the Petition Date.

**1.65** "<u>Oversight Committee</u>" shall have the meaning assigned to such term in Section 5.7 of the Plan.

**1.66** "<u>Person</u>" means any individual, corporation, partnership, association, joint venture, limited liability company, limited liability partnership, estate, trust, receiver, trustee, unincorporated organization or Governmental Unit or subdivision thereof or other Entity.

**1.67** "<u>Personally Identifiable Information</u>" means the Personally Identifiable Information (as that term is defined in section 101(41A) of the Bankruptcy code) licensed by the Debtor to the Licensee under the License Agreement.

**1.68** "<u>Petition Date</u>" means December 5, 2016, the date upon which the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and the effective date of the Order for Relief.

**1.69** "<u>Plan</u>" means this Plan and any exhibits annexed hereto or otherwise filed in connection with the Plan, and any documents delivered in connection herewith, as the same may be amended or modified from time to time by any duly authorized and permitted amendment or modification.

**1.70** "<u>Plan Administrator</u>" means the individual appointed as of the Effective Date to administer the Plan pursuant to Section 5.2, as shall be set forth in a Plan Supplement to be filed with the Bankruptcy Court prior to the Confirmation Hearing, subject to approval by the Bankruptcy Court pursuant to the Confirmation Order.

**1.71** "<u>Post-Confirmation Expenses</u>" means any administrative expenses, including all fees and expenses of the Plan Administrator and any Professionals retained by the Debtor or the Plan Administrator after the Effective Date.

**1.72** "<u>Post-Confirmation Reserve</u>" means a reserve established by the Plan Administrator funded at the discretion of the Plan Administrator from the UC Funds to fund all Post-Confirmation Expenses.

**1.73** "<u>Priority Tax Claim</u>" means a Claim or a portion of a Claim of a Governmental Unit against the Debtor which is entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.74** "<u>Professional Fee Claim</u>" means any Claim of a professional retained in the Bankruptcy Case pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise, for compensation or reimbursement of costs and expenses relating to services incurred prior to and including the Effective Date, whether fixed before or after the Effective Date, when and to the extent any such Claim is allowed by the Bankruptcy Court pursuant to sections 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

**1.75** "Professionals" means those professional persons, including lawyers, financial advisors, and accountants retained by the Debtor or the Creditors' Committee during the Bankruptcy Case.

**1.76** "Pro Rata" means, in connection with a particular Allowed Claim or Allowed Interest and in connection with any Distribution, the ratio between the amount of such Allowed Claim or Allowed Interest and the aggregate amount of all Allowed Claims or Allowed Interests in such Class or Classes entitled to such Distribution.

**1.77** "Record Date" shall have the meaning assigned to such term in Section 9.8 of this Plan.

**1.78** "Remaining Assets" means any and all Assets, properties, rights, interests and Claims of the Debtor and its Estate of whatever nature, whether tangible or intangible, legal or equitable, matured or unmatured, fixed or contingent, liquidated or unliquidated, including, without limitation, any Causes of Action, any and all Royalties received by or due or to become due to the Debtor under the License Agreement, and the Debtor's other rights under the License Agreement, as of the Effective Date, which Remaining Assets shall be administered by the Plan Administrator on and after the Effective Date.

**1.79** "Royalties" shall have the meaning assigned to such term in the License Agreement.

**1.80** "Scheduled Claim" means a Claim that is listed in the Debtor's Schedules.

**1.81** "Schedules" means the schedules of Assets and liabilities, schedules of executory contracts and unexpired leases, statement of financial affairs, and other schedules and statements filed by the Debtor pursuant to Federal Rule of Bankruptcy Procedure 1007, and any amendments thereto.

**1.82** "Second Lien Creditor" means, collectively, 9th LLC and N.D. Gems Inc.

**1.83** "Secured Claim" means a Claim secured by a "lien," as that term is defined in section 101(37) of the Bankruptcy Code, including, but not limited to, a judicial lien as that term is defined at section 101(36) of the Bankruptcy Code, against any property of the Estate, but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012 or as otherwise agreed to, of such Creditor's interest in the Debtor's interest in such property.

**1.84** "Secured Creditor" means the holder of a Secured Claim.

**1.85** "Subordinated Claims" means the Subordinated Bhungalia Claim, the Subordinated HTV Claim and the Subordinated 2nd Lien Claim.

**1.86** "Subordinated Bhungalia Claim" means $75,000.00 of the Allowed General Unsecured Claims of Bhungalia, which is subordinated pursuant to the terms of this Plan.

**1.87** "Subordinated HTV Claim" means $75,000.00 of the Allowed General Unsecured Claims of HTV, which is subordinated pursuant to the terms of this Plan.

**1.88** "Subordinated 2nd Lien Claim" means the first $1,500,000 of the Allowed Secured Claims of the Second Lien Creditor against the Debtor, which is voluntarily subordinated pursuant to the terms of the License Agreement.

**1.89** "Subordinated Creditor Fund" means all proceeds of the Remaining Assets held in the UC Funds, if any, after satisfaction in full of all General Unsecured Claims in accordance with the Plan less any reserves on account of Post-Confirmation Expenses.

**1.90** "Tax Information" shall have the meaning assigned to such term in Section 9.13(a) of this Plan.

**1.91** "Tax Information Request" shall have the meaning assigned to such term in Section 9.13(b) of the Plan.

**1.92** "UC Funds" means (a) the Estate Reserve and the Estate Monthly Reserve, (b) all proceeds of the Avoidance Actions and Causes of Action less any reserves on account of Post-Confirmation Expenses, plus (c) other Remaining Assets that are available after full and final satisfaction of the Allowed Secured Claim of the First Lien Creditor and the Allowed Secured Claim of the Second Lien Creditor.

**1.93** "U.S. Trustee" means any and all representatives and employees of the Office of the United States Trustee for the Southern District of New York.

**1.94** "Unclaimed Distribution" means any Distribution that remains unclaimed after ninety (90) days following any Distribution Date. Unclaimed Distributions shall include, without limitation: (i) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address; (ii) funds representing checks which have not been paid; and (iii) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a valid address.

**1.95** "Unsecured Claim" means any Claim which is not secured by an offset or "lien," as that term is defined in section 101(37) of the Bankruptcy Code, including, but not limited to, a "judicial lien" as that term is defined at section 101(36) of the Bankruptcy Code, against any property of the Estate, but only to the extent of the "value," as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012, or as otherwise agreed to, of such Creditor's interest in the Debtor's interest in such property.

**1.96** "Voting Agent" means Rust Consulting/Omni Bankruptcy, which has been retained by the Debtor to perform certain solicitation and other administrative services.

**B. Rules of Interpretation**

For purposes of this Plan: (a) where appropriate in the relevant context, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any references in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in

the Plan, any reference in the Plan to an existing document or appendix filed or to be filed means such document or appendix, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) unless otherwise specified herein, any reference to a Person as a holder of a Claim or Interest includes that Person's successors, assigns and affiliates; (e) unless otherwise specified, all references in the Plan to Sections and Articles are references to Sections and Articles of or to the Plan; (f) the words "herein", "hereto" and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the Plan. To the extent that the Plan is inconsistent with the Disclosure Statement, unless such document specifically states otherwise, the provisions of the Plan shall control.

## ARTICLE 2 - PAYMENT OF CLAIMS NOT REQUIRED TO BE CLASSIFIED

### 2.1     Claims Not Classified.

No classes are designated for Administrative Expense Claims, Professional Fee Claims and Priority Tax Claims.

### 2.2     Administrative Expense Claims.

All Allowed Administrative Expense Claims set forth in a budget approved by the First Lien and Second Lien Creditors shall be paid in full, in Cash, in such amounts as are incurred in the ordinary course of the liquidation of the Debtor, or in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's liquidation or (c) as may be agreed upon between the holder of any such Administrative Expense Claim and the Debtor. In the event there exists any Disputed Administrative Expense Claims on the Effective Date, the Debtor or the Plan Administrator shall at all times hold and maintain Cash in the Disputed Claims Reserve in an amount equal to all outstanding Disputed Administrative Expense Claims.

### 2.3     Professional Fee Claims.

The Plan Administrator shall pay all Professional Fee Claims in an amount not to exceed the Estate Reserve as soon as practicable after the later of the Effective Date or a Final Order has awarded such compensation and reimbursement of expenses pursuant to proper application to the Court in accordance with Section 5.13 hereof or such later date as may be agreed upon by the holder of any such Professional Fee Claim and the Debtor. All Professional Fee Claims in excess of the Estate Reserve shall be paid as soon as practicable from the UC Funds. In the event any Disputed Professional Fee Claims exist on the Distribution Date, the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to the pro rata share of all outstanding Disputed Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.

### 2.4　Priority Tax Claims.

Unless otherwise agreed to by the parties, each holder of an Allowed Priority Tax Claim will receive from the UC Funds regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim over a period ending not later than five (5) years after the Petition Date, which treatment is not less favorable than that provided to the General Unsecured Creditors, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. In the event any Disputed Priority Tax Claims exist on the Distribution Date, the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to all outstanding Disputed Priority Tax Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.

## ARTICLE 3 - CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1　Criterion of Class.

A Claim is in a particular Class only to the extent that the Claim qualifies within the description of that Class, and is in a different Class or Classes to the extent that the remainder of the Claim qualifies within the description of the different Class or Classes.

### 3.2　Class Categories.

The following Classes of Claims and Interests are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

| Class | Class Designation | Status/Voting Rights |
|---|---|---|
| Class 1A | Allowed Secured Claim of American Express | Unimpaired/Deemed to Accept |
| Class 1B | Allowed Secured Claim of the First Lien Creditor and the First Lien Creditor Supplemental Secured Claim | Impaired/Entitled to Vote |
| Class 1C | Allowed Secured Claim of the Second Lien Creditor | Unimpaired/Deemed to Accept |
| Class 2 | Non-Tax Priority Claims | Unimpaired/Deemed to Accept |
| Class 3 | General Unsecured Claims | Impaired/Entitled to Vote |
| Class 4 | Allowed Subordinated Claims | Impaired/ Deemed to Reject |
| Class 5 | Interests | Impaired/Deemed to Reject |

## ARTICLE 4 - TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

The following treatment of and consideration to be received by holders of Allowed Claims and Allowed Interests pursuant to this Plan shall be in full settlement, release and discharge of such Allowed Claims and Allowed Interests.

**4.1      Class 1A (Allowed Secured Claim of American Express).**

American Express shall receive on account of its Allowed Secured Claim, in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, (i) all of the American Express Reserve, (i) such other, less favorable treatment as may be agreed to in writing by American Express and the Debtor, or (iii) such other treatment as may be determined by order of the Bankruptcy Court. Any Deficiency Claim that may arise on account of the present lack of collateral or otherwise resulting from the aforesaid treatment shall be included in and treated as a Class 3 General Unsecured Claim. Except as otherwise determined by order of the Bankruptcy Court, the Secured Claim of American Express is Allowed in the amount of $57,682.03.

**4.2      Class 1B (Allowed Secured Claim of the First Lien Creditor and the First Lien Creditor Supplemental Secured Claim).**  The First Lien Creditor shall receive on account of its Allowed Secured Claim (i) on the Effective Date, or as soon thereafter as is reasonably practical, all of the Effective Date Cash net of the Estate Reserve after payment of the Allowed Administrative Expense Claims set forth in Cash Collateral budget approved by the  First Lien and Second  Lien Creditors, and (ii) within five (5) Business Days after receipt by the Plan Administrator, all of the proceeds of the Remaining Assets recovered from and after the Effective Date, including, without limitation, the Royalties, except for the Estate Monthly Reserve, and excluding the Avoidance Actions and Causes of Action, until the Allowed Secured Claim of the First Lien Creditor is paid in full, or (iii) such other, less favorable treatment as may be agreed to in writing by the First Lien Creditor and the Debtor.  In the event the Distributions to the Holders of Allowed General Unsecured Claims aggregate the sum of one million dollars ($1,000,000) (the "Threshold") or more, the First Lien Creditor shall receive fifty (50%) percent of the Royalties each month within five (5) business days after the Royalties are received commencing the month after the Threshold is reached until the First Lien Creditor Supplemental Secured Claim is paid in full.  Any Deficiency Claim that may arise on account of the present lack of collateral or otherwise resulting from the aforesaid treatment shall be included in and treated as a Class 3 General Unsecured Claim.  The Secured Claim of the First Lien Creditor is reduced and Allowed  as follows: the Allowed Secured Claim of the First Lien Creditor in the amount of $2,211,768.23[1], including prepetition interest and fees, and the First Lien Creditor Supplemental Secured Claim in the amount of $75,000.

**4.3      Class 1C (Allowed Secured Claim of the Second Lien Creditor).**

The Second Lien Creditor shall receive on account of its Allowed Secured Claim, after the Allowed Secured Claim of the First Lien Creditor is paid in full in accordance with Section 4.2 of the Plan, (i) within five (5) Business Days after receipt by the Plan Administrator, all of the proceeds of the Remaining Assets, including, without limitation, the Royalties, but except for the net proceeds from Avoidance Actions, until the Allowed

---

[1] On September 18, 2017 the Debtor made a payment of $700,000 on account of the Allowed Secured Claim of the First Lien Creditor. As a result, the total amount outstanding as of the filing of this Plan is $1,511,768.23.

Secured Claim of the Second Lien Creditor is paid in full; or (ii) such other, less favorable treatment as may be agreed to in writing by the Second Lien Creditor and the Debtor. The Subordinated 2nd Lien Claim shall be paid from any Remaining Assets after payment of the Class 3 General Unsecured Claim in accordance with Section 4.6 of this Plan. Any Deficiency Claim which may arise on account of the present lack of collateral or otherwise resulting from the aforesaid treatment shall be included in and treated as a Class 3 General Unsecured Claim. The Secured Claim of the Second Lien Creditor is Allowed in the amount of $8,512.39.

### 4.4 Class 2 (Non-Tax Priority Claims).

As soon as is reasonably practical after the Effective Date, in full satisfaction of such Allowed Non-Tax Priority Claim, each holder of an Allowed Non-Tax Priority Claim shall receive from the UC Funds (a) an amount in Cash equal to the Allowed amount of such Non-Tax Priority Claim, or (b) such other treatment as to which the Debtor and the holder of such Allowed Non-Tax Priority Claim shall have agreed upon in writing. In the event any Disputed Non-Tax Priority Claims exist on the Distribution Date, the Debtor or the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to all Disputed Non-Tax Priority Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.

### 4.5 Class 3 (General Unsecured Claims).

In full satisfaction of such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive one or more Distributions equal to its *Pro Rata* share of the UC Funds as such funds become available as is reasonably practical in the reasonable discretion of the Plan Administrator. In the event any Disputed General Unsecured Claims exist on a Distribution Date, the Plan Administrator shall hold and maintain Cash in the Disputed Claims Reserve in an amount equal to all outstanding Disputed General Unsecured Claims until such dispute is resolved consensually or by order of the Bankruptcy Court

### 4.6 Class 4 (Allowed Subordinated Claims).

On the date upon which all General Unsecured Claims have been satisfied in full, or as soon thereafter as is reasonably practical, in full satisfaction of such Allowed Subordinated Claims, the holders of the Allowed Subordinated Claims shall receive one or more *pro rata* Distributions from the Subordinated Creditor Fund in the aggregate amount of the lesser of (a) the Allowed amount of the Allowed Subordinated Claims and (b) the amount of the Subordinated Creditor Fund.

### 4.7 Class 5 (Interests).

No holder of an Interest shall be entitled to a Distribution under the Plan on account of such Interest. On the Effective Date, all Interests shall be cancelled and extinguished.

## ARTICLE 5 - MEANS OF IMPLEMENTATION OF THE PLAN

### 5.1    Implementation of the Plan.

The Plan will be implemented by the Plan Administrator in a manner consistent with the terms and conditions set forth in the Plan and the Confirmation Order.  The Plan Administrator shall take and assume the responsibility for the following actions from and after the Effective Date: (i) receive and liquidate the Remaining Assets, (ii) receive the Royalties from the Licensee as they become due under the License Agreement, (iii) maintain the Disputed Claims Reserve, (iv) prosecute, settle or resolve the Disputed Claims, (v) assert, prosecute or settle all Causes of Action and/or Avoidance Actions belonging to the Estate, (vi) make Distributions in accordance with the provisions of this Plan, (vii) assume responsibility for all rights, obligations and liabilities of the Debtor under the License Agreement and take any and all actions which the Debtor under the License Agreement is entitled to take, (viii) retain ownership of and oversee the Personally Identifiable Information, including by executing the Data Breach Protocol in the event of any breach of such Personally Identifiable Information known to the Plan Administrator, (ix) make payments related to Post-Confirmation Expenses from the Post-Confirmation Reserve, and (x) make any and all other actions not inconsistent with the terms of this Plan that are necessary or appropriate to effectuate the wind-up and liquidation of the Debtor and its Estate. The Plan Administrator shall succeed to all privileges and rights of the Debtor, including with respect to Causes of Action and Avoidance Actions, and shall own and be entitled to pursue any and all Causes of Action and/or Avoidance Actions belonging to the Debtor and seek any and all legal or equitable remedies available to the Debtor.  On the Effective Date, the Plan Administrator shall be deemed to be a representative of the Debtor's Estate within the meaning of section 1123(b)(3) of the Bankruptcy Code and a successor to the Debtor solely with respect to the Causes of Action and shall have those powers and duties set forth in Sections 323, 704(1), 704(2), 704(5), 704(9), 1106(a)(6) and 1106(a)(7) of the Bankruptcy Code.

### 5.2    Powers and Obligations of the Plan Administrator.

The Plan Administrator shall be the exclusive administrator of the assets of the Debtor's Estate for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The powers, rights and responsibilities of the Plan Administrator shall include the authority and responsibility to: (i) receive, manage, invest, supervise, and protect the Remaining Assets; (ii) pay taxes or other obligations incurred by the Estate; (iii) retain and compensate, without further order of the Bankruptcy Court, the services of professionals to advise and assist in the administration, prosecution and Distribution of the Remaining Assets; (iv) calculate and implement Distributions of the Remaining Assets; (v) prosecute, compromise and settle all Disputed Claims and Causes of Action and/or Avoidance Actions; (vi) pay Professional Fees of professionals retained in the Bankruptcy Case and Allowed pursuant to any order of the Court, whether such Professional Fees were incurred before or after the Effective Date; (vii) make Distributions in accordance with the provisions of this Plan; (viii) make payments related to Post-Confirmation Expenses from the Post-Confirmation Reserve in accordance with the provisions of this Plan; (ix) assume responsibility for all rights, obligations and

liabilities of the Debtor under the License Agreement and take any and all actions which the Debtor under the License Agreement is entitled to take; and (x) retain ownership of and oversee the Personally Identifiable Information, including by executing the Data Breach Protocol in the event of any breach of such Personally Identifiable Information known to the Plan Administrator.

### 5.3 Plan Administrator Reporting.

The Plan Administrator shall prepare and file with the Court, and serve upon the First Lien Creditor, such reports as are required pursuant to Section 5.17 hereof, including quarterly reports, beginning with the first full calendar quarter after the Effective Date, regarding the liquidation or other administration of the Remaining Assets, Royalties received from the Licensee under the License Agreement, Distributions made by the Plan Administrator, and the status of the prosecution or settlement of any Claims and Causes of Action. The Plan Administrator shall pay fees of the U.S. Trustee as provided in Section 5.17 hereof.

### 5.4 Fees and Expenses of the Plan Administrator.

Except as otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, the amount of any fees and expenses incurred by the Plan Administrator on or after the Effective Date (including, without limitation, taxes) and any compensation and expense reimbursement claims (including, without limitation, reasonable fees and expenses of counsel) of the Plan Administrator arising out of the liquidation of the Remaining Assets, the making of Distributions under the Plan, and the performance of any other duties given to it shall be paid from the Post-Confirmation Reserve.

### 5.5 Causes of Action.

During the Post-Confirmation Period, the Plan Administrator shall have the authority to assert, prosecute, and settle all Claims and Causes of Action that belong to the Debtor's Estate, and, in connection therewith, shall have the right to assert and enforce all defenses belonging to the Debtor and its Estate, including, without limitation, setoff, recoupment and any rights under Bankruptcy Code section 502(d). The Plan Administrator and the First Lien Creditor shall confer in good faith in connection with the prosecution, settlement and disposition of any recoveries from any tort Causes of Action that either of them may commence after the Effective Date against any of the former officers, directors, shareholders and/or investors of/in the Debtor.

### 5.6 Employment of Professionals by the Plan Administrator.

The Plan Administrator may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties hereunder and may compensate and reimburse the expenses of those professionals without further order of the Bankruptcy Court; provided, however, that any such compensation and reimbursement may be made only out of the Post-Confirmation Reserve.

### 5.7 Oversight Committee.

An Oversight Committee comprised of no more than three current members of the Creditors Committee (the "Oversight Committee") shall be appointed on the Effective

Date for the purpose of providing advice and consent to the Plan Administrator on or after the Effective Date with respect to the resolution, reconciliation and settlement of Disputed Claims, Distributions, and commencement of litigation, as further described in this Section 5.7 as follows: (A) the Plan Administrator may select, in consultation with the Debtor and the Oversight Committee, (i) special counsel to the Plan Administrator to prosecute objections to Disputed Claims, which may be the Debtor's pre-Effective Date counsel, (ii) special counsel to the Plan Administrator to commence and prosecute lawsuits and (iii) a financial advisor to advise the Plan Administrator with respect to the review and analysis of Disputed Claims; (B) when considering settlement of Claims objections or lawsuits, the Plan Administrator shall consult with the Oversight Committee regarding the merits, efficacy and reasonableness of such action, and, in the event the Oversight Committee and Plan Administrator cannot reach agreement on the Plan Administrator's proposed action, the Plan Administrator may seek Bankruptcy Court authorization for such action; (C) the Plan Administrator shall consult with the Oversight Committee on the status of Claims objections and lawsuits from time to time; (D) the members of the Oversight Committee shall be identified in the Confirmation Order and shall be reimbursed for all reasonable out-of-pocket expenses incurred in fulfilling their responsibilities under this Plan, which amounts shall be paid from the Post-Confirmation Reserve; and (E) the Oversight Committee shall be disbanded at such time as all Disputed Claims have been finally resolved, all Distributions to holders of Allowed General Unsecured Claims have been made and all Causes of Action have been settled or resolved.

### 5.8 <u>Establishment of Reserves and Funds.</u>

(a) <u>American Express Reserve</u>. On the Effective Date, the American Express Reserve shall be established by the Plan Administrator for distribution by the Plan Administrator in accordance with Section 4.1 of this Plan or as otherwise determined by order of the Bankruptcy Court.

(b) <u>Post-Confirmation Reserve</u>. On the Effective Date or as soon thereafter as is practicable, the Post-Confirmation Reserve shall be established by the Plan Administrator from the UC Funds. If the Plan Administrator determines that additional funding of the Post-Confirmation Reserve is required, from time to time following the Effective Date, such funding shall be made from the UC Funds. The Post-Confirmation Reserve shall be used to pay the Post-Confirmation Expenses, including, without limitation, costs and expenses of counsel or other advisors retained by the Debtor or the Plan Administrator, the sale of the Remaining Assets and the prosecution of Causes of Action and Claims objections. Any amounts remaining in the Post-Confirmation Reserve after all Post-Confirmation Expenses are paid shall become available for Distribution to holders of Allowed General Unsecured Claims and the Allowed Subordinated Claims in the priority of payment provided for in accordance with the provisions of the Plan.

(c) <u>UC Funds</u>. As soon as practicable following the Effective Date, the UC Funds shall be established by the Plan Administrator, which shall be distributed in accordance with the terms of the Plan.

(d) <u>Subordinated Creditor Fund</u>. On the date upon which all General Unsecured Claims have been satisfied in full, or as soon thereafter as is reasonably

practical, the Subordinated Creditor Fund shall be established by the Plan Administrator, which shall be distributed in accordance with the terms of the Plan.

(e) <u>Disputed Claims Reserve</u>. As soon as practicable following the Effective Date, the Disputed Claims Reserve shall be established by the Plan Administrator from the UC Funds in an amount equal to the Distribution amount to which holders of Disputed Claims would have otherwise been entitled but for the dispute; provided, however, that the Plan Administrator shall have no obligation to fund the Disputed Claims Reserve unless and until a Distribution occurs to holders of Allowed Claims. The Assets in the Disputed Claims Reserve shall be held separately from other Assets held by the Debtor, subject to an allocable share of all expenses and obligations of the Estate, on account of Disputed Claims. The Plan Administrator shall remove funds from the Disputed Claims Reserve as Disputed Claims are resolved, which funds shall be distributed as provided in the Plan.

### 5.9 Plan Distributions.

Following the Effective Date, and subject to the establishment and funding of the Post-Confirmation Reserve as set forth above, and as set forth in greater detail in Article 4 of the Plan, Distributions shall be made by the Plan Administrator in accordance with Articles 2 and 4. An estimated disbursement analysis through January 2022 is attached to the Disclosure Statement as Exhibit C.

### 5.10 Preservation and Abandonment of Records.

The Debtor shall preserve for the benefit of the Plan Administrator all documents and files, including electronic data hosted on remote servers that are necessary to the prosecution of the Causes of Action and Claims resolution process (the "<u>Retained Information</u>"). After the Effective Date, the Plan Administrator shall preserve the Retained Information until the date that is one (1) year following the closing of the Bankruptcy Case. On the Effective Date, the Debtor shall be permitted to abandon (with or without destruction) any information that is not Retained Information.

### 5.11 General Disposition of Assets.

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of the Plan, as soon as is reasonably practicable following the Effective Date, the Plan Administrator shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Plan Administrator shall determine in his judgment in consultation with the Secured Creditors (to the extent any such Assets are collateral of the Secured Creditors).

### 5.12 Administrative Expense Claims Bar Date.

Persons asserting an Administrative Expense Claim must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on or before the first Business Day after the thirtieth (30th) day after the Effective Date (the "<u>Administrative Expense Claims Bar Date</u>"). No payment or Distributions will be made on account of any Administrative Expense Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file

and serve an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from asserting any such right to payment as against the Debtor and/or the Estate.

### 5.13    Deadline for Filing Applications for Professional Fee Claims.

All parties seeking payment of Professional Fee Claims must file with the Bankruptcy Court a final application and/or an application for payment of reasonable fees and expenses under section 503(b) of the Bankruptcy Code, as applicable, on or before the first Business Day after the thirtieth (30th) day after the Effective Date (the "Fee Application Deadline"). Any Professional failing to file and serve all such final application or 503(b) motion on or before the Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtor or the Estate.

### 5.14    Execution of Documents to Effectuate Plan.

From and after the Effective Date, the Debtor and the Plan Administrator shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan. Entry of the Confirmation Order shall authorize the Debtor and the Plan Administrator to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan.

### 5.15    Disallowance of Claims without Further Order of the Court.

As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount and for which a proof of Claim has not been filed by the Creditor by the applicable Bar Date shall be deemed Disallowed and expunged. All Scheduled Claims that correspond to a proof of Claim filed by a particular Creditor by the applicable Bar Date shall be deemed to have been superseded by such later filed proof of Claim, and the Scheduled Claim, regardless of priority, shall be expunged from the Claims register; provided however, that such proofs of Claim shall be subject to objection in accordance with Section 9.10 hereof.

### 5.16    Continued Existence of Debtor Until Closing of the Case.

Following the Effective Date, the Debtor shall continue in existence for the purposes of, among other things, completing the liquidation of its Assets, winding up its affairs and filing appropriate tax returns and shall thereafter be dissolved at the discretion of the Plan Administrator. Upon the entry of an order closing the Bankruptcy Case, the Debtor shall be deemed dissolved for all purposes. No other actions or filings or payments shall be required in furtherance of such dissolution.

### 5.17    Post-Effective Date Reports and Fees.

Following the Effective Date and until the Case is closed, not less than once every one-hundred and eighty (180) days, the Plan Administrator shall be responsible for the filing of all post-Effective Date reports required during such periods with the U.S. Trustee regarding the liquidation or other administration of property under his control pursuant to the Plan, Distributions made by him, and other matters required to be included in such report, and shall pay from the Debtor's Estate all post-Effective Date

fees charged or assessed against the Estate under 28 U.S.C. §1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717.

### 5.18   Cancellation of Interests.

On the Effective Date, all existing Interests, shall, without any further action, be cancelled, annulled, and extinguished and any certificates representing such canceled, annulled, and extinguished Interests shall be null and void.

### 5.19   Creditors' Committee.

On the Effective Date, the Creditors' Committee shall be deemed to be dissolved and the members of the Creditors' Committee shall be released and discharged from all duties and obligations arising from or related to the Bankruptcy Case, provided, however, that the Creditors' Committee shall continue to exist, and the retention and employment of its professionals shall continue to be in effect after the Effective Date, for the purposes of filing fee applications of its Professionals, or reviewing and approving or filing objections to fee applications of Professionals for any periods prior to the Effective Date. The reasonable fees and expenses of the Professionals retained by the Creditors' Committee for the foregoing shall be reimbursed by the Debtor from the Post-Confirmation Reserve.

### 5.20   Insurance Preservation.

Nothing in this Plan shall diminish or impair the enforceability of any insurance policies that may cover Claims against the Debtor, its employees, its shareholders or any other Person.

### 5.21   Preservation of Causes of Action.

Except as otherwise provided in this Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtor or the Estate may have against any person or entity are preserved and transferred to the Plan Administrator on the Effective Date, including without limitation any and all Causes of Action the Debtor or the Estate or other appropriate party in interest may assert under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code.

## ARTICLE 6 - TREATMENT OF EXECUTORY CONTRACTS & UNEXPIRED LEASES

### 6.1   General Provisions.

All executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

**6.2** **Notice of Deemed Rejection/Rejection Bar Date**.

Any party to an executory contract or unexpired lease that is rejected in accordance with Section 6.1 shall file a proof of Claim for damages from such rejection no later than thirty (30) days after the Effective Date. The failure to timely file a proof of Claim shall be deemed a waiver of any Claim in connection with the rejection of such contract or lease.

## ARTICLE 7 - CONDITIONS PRECEDENT; CONFIRMATION & EFFECTIVE DATE

**7.1** **Conditions Precedent to Confirmation of the Plan**.

The following conditions must be satisfied or waived by the Debtor in accordance with Section 7.3 on or before the Confirmation Date:

(a) The Disclosure Statement Order shall have been entered and shall have become a Final Order; and

(b) The Confirmation Order to be entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Debtor, the Committee and Secured Creditors and shall contain provisions that, among other things: (i) authorize the implementation of the Plan in accordance with its terms; (ii) approve in all respects the other settlements, transactions, and agreements to be effectuated pursuant to the Plan; (iii) find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud; (iv) order that the Remaining Assets are transferred to the Plan Administrator on the Effective Date, free and clear of all Claims, liens, Encumbrances and interests of any Entity except for the liens and security interests of the Secured Creditors; and (v) order that the Plan Administrator is authorized to take any and all action necessary or appropriate to perform his duties hereunder, including, but not limited to, exercising the rights of the Debtor under the License Agreement, collecting all Royalties thereunder, and retaining ownership of and overseeing the Personally Identifiable Information, including by executing the Data Breach Protocol in the event of any breach of such Personally Identifiable Information known to the Plan Administrator.

**7.2** **Conditions Precedent to the Effective Date**.

The Effective Date shall not occur and no obligations under the Plan shall come into existence unless each of the following conditions is met or, alternatively, is waived in accordance with Section 7.3 hereof on or before the Effective Date:

(a) The Confirmation Order shall have been entered by the Bankruptcy Court, and no stay of its effectiveness shall have been issued within fourteen (14) days following the entry of the Confirmation Order; and

(b) The Effective Date Cash shall be sufficient to pay all Administrative Expense Claims, Professional Fee Claims up to the Estate Reserve, and fund the Post-Confirmation Reserve.

### 7.3 Waiver of Conditions Precedent.

Each of the conditions precedent in Sections 7.1 and 7.2 hereof may be waived or modified by the Debtor without further Court approval, in whole or in part.

## ARTICLE 8 - INJUNCTION; RELEASE; EXCULPATION

### 8.1 General Injunctions.

**The following provisions shall apply and shall be fully set forth in the Confirmation Order.**

**(a) Injunctions Against Interference with Consummation or Implementation of Plan. All holders of Claims or Interests shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor or the Estate with the intent or effect of interfering with the consummation or implementation of this Plan or the transfers, payments or Distributions to be made hereunder.**

**(b) Plan Injunction. Except as otherwise specifically provided for by this Plan, as and from the Effective Date, all Persons shall be enjoined from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any Encumbrance of any kind; (iii) the commencement or continuation of any action, employment of process or act to collect, offset or recover any Claim or Cause of Action satisfied, released or enjoined under this Plan; and/or (iv) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor or the Estate to the fullest extent authorized or provided by the Bankruptcy Code.**

**(c) No Bar to Claims Against Third Parties. Holders of Claims or Interests against the Debtor are not barred or otherwise enjoined by the Plan from pursuing any recovery against Persons that are not the Debtor.**

### 8.2 All Distributions Received in Full and Final Satisfaction.

Except as otherwise set forth herein, all payments and all Distributions to be made in accordance with the Plan on account of Claims (including Administrative Expense Claims) shall be received in full and final satisfaction, settlement and release of the Estate's obligations for such Claims as against the Debtor, its property and the Estate.

### 8.3 No Modification of Res Judicata Effect.

The provisions of this Article 8 are not intended, and shall not be construed, to modify the *res judicata* effect of any order entered in the Bankruptcy Case, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

**8.4    Exculpation for Debtor and Estate Professionals.**

To the extent permitted by section 1125(e) of the Bankruptcy Code, the Debtor, its shareholders, officers, directors, employees and professionals (including the Chief Restructuring Officer and professional firms and individuals within such firms), the Creditors' Committee, its members (acting in such capacity), their respective officers, directors, employees and professionals (including professional firms and individuals within such firms) and the Secured Creditors, their shareholders, officers, directors, employees and professionals (including professional firms and individuals within such firms), shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, funding, confirmation or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Bankruptcy Case, except for (i) acts or omissions as a result of willful misconduct or gross negligence and (ii) liability for any debt owed to the United States Government, any state, city or municipality arising under (a) the Internal Revenue Code or any state, city or municipal tax code, (b) the environmental laws of the United States or any state, city or municipality, (c) laws regarding the regulation of securities administered by the SEC or (d) any criminal laws of the United States, any state, city or municipality.   From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any Claim or liability released pursuant to the Plan.

**8.5    Exculpation for Plan Administrator.**

The Plan Administrator and his employees, attorneys, accountants, financial advisors, representatives and agents, each solely in such capacity, shall not have or incur any liability to any person or entity for any act or omission in connection with, or arising out of, the Plan or the property to be distributed under the Plan; provided however, that the foregoing exculpation shall not apply to acts or omissions in bad faith or as a result of recklessness, willful misconduct or gross negligence.

**8.6** **Release of Secured Creditors.**  **As a result of extensive arms' length negotiations and in exchange for material concessions regarding the Secured Claims of the First Lien Creditor, including without limitation, a substantial reduction of the Secured Claims, the Debtor and its estate and the Committee and each of their respective agents and representatives (collectively, the "Debtor Parties") are deemed to have forever, unconditionally and irrevocably, waived, discharged and released the First Lien Creditor, HTV and their respective affiliates, subsidiaries, shareholders, members, agents, attorneys, financial advisors, consultants, officers, directors, and employees, of and from any and all Claims, counterclaims, causes of action, suits, defenses, damages, demands, challenges, setoff, recoupment, or other offset rights or rights of reduction, whether arising at law or in equity, whether known or unknown or hereafter becoming known, liquidated or unliquidated, contingent or fixed, of any kind or nature whatsoever, that the Debtor Parties ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever through and including the Effective Date, including, without limitation, any recharacterization, subordination, reduction, avoidance, "lender liability" or other Claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or otherwise, or under any other provision of applicable state or federal law, and any right or basis to challenge or object to the amount, validity, characterization, priority or enforceability of the Secured Claims, with the sole exception that the Plan Administrator may review and object to the amount of the General Unsecured Claims filed by Bhungalia and HTV in the Case and all rights of Bhungalia and HTV in connection therewith shall be reserved in full.**

## ARTICLE 9 - PROVISIONS GOVERNING DISTRIBUTIONS

**9.1** **Payment in U.S. Dollars**.

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on a domestic bank selected by the Plan Administrator in accordance with the Plan or by wire transfer from a domestic bank, at the option of the Plan Administrator.  The Plan Administrator may use the services of a third party to aid in the Distributions required to be made under this Plan.

**9.2** **Distributions Only on Business Days**.

Notwithstanding the foregoing provisions, if any Distribution called for under this Plan is due on a day other than a Business Day, such Distribution shall instead be made the next Business Day.

**9.3** **Unclaimed Distributions**.

Unclaimed Distributions (including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Plan Administrator as undeliverable to the addresses specified in the Claims Register, as it shall exist on the date such Distributions are made), shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court, and the holder of such Claim(s) shall be removed from the Distribution schedules and expunged from the Claims register and shall receive no

further Distributions under the Plan.  Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of this Plan.

### 9.4 Timing of Distributions on Disputed Claims Subsequently Allowed.

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date that is at least fifteen (15) Business Days after such Claim is Allowed.

### 9.5 No Payment or Distribution on Disputed Claims.

Any contrary provision hereof notwithstanding, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim is allowed by Final Order of the Bankruptcy Court.  For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution. Holders of Disputed Claims shall be bound, obligated and governed in all respects by this Plan.

### 9.6 Disputed Distribution.

If a dispute arises as to the identity of a holder of an Allowed Claim who is to receive a Distribution, the Plan Administrator may, in lieu of making such Distribution to such holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

### 9.7 Transmittal of Payments and Notices.

All Distributions shall be made to the holder of a Claim by regular first-class mail, postage prepaid, in an envelope addressed to such holder at the address listed on its proof of Claim filed with the Claims Agent or Bankruptcy Court or, if no proof of Claim was filed, (i) at the address listed on the Debtor's Schedules, or (ii) at such address that a holder of a Claim provides to the Debtor and the Plan Administrator after the Effective Date in writing and files at least fifteen (15) Business Days prior to a Distribution Date. Neither the Debtor nor the Plan Administrator shall have any duty to ascertain the mailing address of any holder of a Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing.  Payments made in accordance with the provisions of this Section shall be deemed made to the holder regardless of whether such holder actually receives the payment.

### 9.8 Record Date for Distributions.

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings made on or before the Effective Date (the "Record Date") shall be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Record Date.  The Debtor and the Plan Administrator shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making a Distribution with respect to any Claim, the Debtor and the Plan Administrator shall be entitled to recognize and deal for all purposes hereunder only with the Person who is

listed on the proof of Claim filed with respect to such Claim, on the Debtor's Schedules as the holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Record Date.

### 9.9 Claims Administration Responsibility.

(a) Reservation of Rights. Unless a Claim is specifically Allowed prior to or after the Effective Date or under the Plan, the Plan Administrator reserves any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, or Non-Tax Priority Claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Plan Administrator's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the holder of the Claim.

(b) Objections to Claims. The Plan Administrator may dispute, object to, compromise or otherwise resolve all Claims. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than the Claims Objection Bar Date, which is one hundred twenty (120) days after the Effective Date, provided that the Plan Administrator may request (and the Bankruptcy Court may grant) an extension of time by filing a motion with the Bankruptcy Court.

(c) Filing Objections. An objection to a Claim shall be deemed properly served on the claimant if the Debtor or Plan Administrator causes service of any such objection to be effected in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's proof of Claim at least thirty (30) days prior to the hearing thereon.

(d) Determination of Claims. Except as otherwise agreed by the Debtor, any Claim as to which a proof of Claim or motion or request for payment was timely filed in the Bankruptcy Case may be determined and liquidated after the Effective Date pursuant to (i) a Final Order of the Bankruptcy Court, or (ii) applicable non-bankruptcy law. Any Claim determined to be an Allowed Claim after the Effective Date pursuant to this Section shall be treated as an Allowed Claim in accordance with this Plan.

### 9.10 Disputed Claims.

(a) Except to the extent the Court determines that a lesser amount is adequate, the Plan Administrator shall, on each Distribution Date, deposit in the Disputed Claims Reserve Cash equal to the Distributions that would have been made to holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the holder of such Claim has agreed in writing or, in the case where any such Claim is unliquidated and/or contingent, the greater of (i) $1, and (ii) such other

amount as is reserved by order of the Bankruptcy Court made upon motion of the holder of such Claim.

(b) For purposes of effectuating the provisions of this Section 9.10 and the Distributions to holders of Allowed Claims, the Court, on or prior to the Effective Date, or thereafter upon the request of any holder of a Claim or the Plan Administrator, may liquidate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under this Plan and for purposes of the Disputed Claims Reserve.

(c) When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holder of such Allowed Claim, in accordance with the provisions of this Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such holder would have been entitled if such holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

(d) In no event shall any holder of any Disputed Claim be entitled to receive (under this Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for such Disputed Claim pursuant to this Section 9.10. In no event shall the Debtor or the Plan Administrator have any responsibility or liability for any loss to or of any amount reserved under this Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence. In no event may any Creditor whose Disputed Claim is subsequently Allowed, pursue or recover from any other Creditor any funds received as Distributions under the Plan.

(e) To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Plan Administrator shall make, in accordance with the terms of this Plan, a Distribution of the excess amount reserved for such Disputed Claim in accordance with the Plan.

(f) The Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated with taxation.

(g) Except as expressly set forth in the Plan, or otherwise agreed to in writing or ordered by the Court, the Debtor shall not have any duty to fund the Disputed Claims Reserve.

(h) The Plan Administrator shall pay, or cause to be paid, out of the funds held in the Disputed Claims Reserve, any tax imposed by any federal, state, or local taxing authority on the income generated by the funds or property held in the Disputed Claims Reserve. The Plan Administrator shall file, or cause to be filed, any tax or information return related to the Disputed Claims Reserve that is required by any federal, state, or local taxing authority.

**9.11    No Payments of Fractional Cents or Distributions of Less Than Thirty-Five Dollars**.

(a)    Any contrary provision hereof notwithstanding, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan.   Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with halfpennies or less being rounded down and fractions in excess of half of a penny being rounded up.

(b)    Any contrary provision hereof notwithstanding, for purposes of administrative convenience, no Distribution of less than Thirty Five Dollars ($35) shall be made pursuant to the Plan.  Whenever any Distribution of less than Thirty Five Dollars ($35) under the Plan would otherwise be required, such funds will be retained by the Plan Administrator for the account of the recipient until such time that successive Distributions aggregate to Thirty Five ($35) Dollars, at which time such payment shall be made, and if successive Distributions do not ever reach Thirty Five ($35) in the aggregate, then such Distributions shall be returned to the UC Funds.

**9.12    Setoff and Recoupment**.  Except as otherwise provided in the Plan, the Plan Administrator may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Debtor may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Plan Administrator or the Debtor of any right of setoff or recoupment against the holder of any Claim.

**9.13    Payment of Taxes on Distributions Received Pursuant to the Plan**.

(a)    Any contrary provision hereof notwithstanding, as a precondition to payment of any Distribution to a Creditor under this Plan, unless included on the official proof of Claim form filed by such Creditor in this Bankruptcy Case, each Creditor shall provide a valid tax identification or social security number (collectively the "Tax Information") for purposes of tax reporting by the Debtor.  All Entities that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

(b)    At such time as the Debtor or Plan Administrator believes that Distributions to a particular Class of Claims is likely, the Debtor or Plan Administrator shall request Tax Information in writing from the Creditors (the "Tax Information Request").  Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request shall forfeit all Distributions such Creditor may otherwise be entitled to under this Plan, and such forfeited funds will revert to the Estate to be disbursed in accordance with the terms and priorities established in this Plan.

### 9.14 Compliance With Tax Withholding and Reporting Requirements.

With respect to all Distributions made under the Plan, the Debtor and Plan Administrator will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

## ARTICLE 10 - PLAN INTERPRETATION, CONFIRMATION AND VOTING

### 10.1 Procedures Regarding Objections to Designation of Classes as Impaired or Unimpaired.

In the event the designation of the treatment of a Class as impaired or unimpaired is objected to, the Bankruptcy Court shall determine the objection, and voting shall be permitted or disregarded in accordance with the determination of the Bankruptcy Court.

### 10.2 Withdrawal and Modification of Plan.

This Plan may be withdrawn or modified by the Debtor at any time prior to the Confirmation Date. The Debtor may modify the Plan in any manner consistent with section 1127 of the Bankruptcy Code prior to substantial consummation thereof. Upon request by the Debtor, the Plan may be modified after substantial consummation with the approval of the Bankruptcy Court, provided that such modification does not affect the essential economic treatment of any Person that objects in writing to such modification.

### 10.3 Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or the Plan, the laws of the State of New York applicable to contracts executed in such State by residents thereof and to be performed entirely within such State shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with this Plan.

### 10.4 Voting of Claims.

Each holder of a Claim as of the Record Date in Classes 2 through 4 shall be entitled to vote to accept or reject the Plan. The Disclosure Statement Order shall govern the manner and procedures for casting Ballots with the Voting Agent.

### 10.5 Acceptance by Impaired Class.

Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors shall have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 10.6 Presumed Acceptances of Plan.

Classes 1A, 1B and 1C are unimpaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan.

**10.7** **Presumed Rejections of Plan**.

Class 5 is presumed to have rejected the Plan but may elect to accept the Plan.

## ARTICLE 11 - RETENTION OF JURISDICTION BY BANKRUPTCY COURT

**11.1** From the Confirmation Date until entry of a final decree closing the Bankruptcy Case (pursuant to 11 U.S.C. §350 and Bankruptcy Rule 3022), the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Bankruptcy Case for the following purposes:

(a) to hear and determine any and all objections to the allowance of any Claim or Administrative Expense Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtor or the Plan Administrator to any Creditors, holders of Claims, or other parties in interest;

(b) to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

(c) to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d) to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Bankruptcy Court, including, but not limited to, Causes of Action brought by the Plan Administrator;

(e) to enforce and interpret the provisions of this Plan, the Disclosure Statement Order, the Confirmation Order, the License Approval Order and any other order of the Bankruptcy Court in the Bankruptcy Case;

(f) to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

(g) to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

(h) to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or in the Confirmation Order as may be necessary to carry out the purposes and the intent of this Plan;

(i) to interpret and determine such other matters as the Confirmation Order may provide for or as may be authorized under the Bankruptcy Code;

(j) to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated; and

(k) to hear and determine any disputes arising in connection with the License Agreement or the transactions contemplated thereby, the Personally Identifiable

Information or any Data Breach Protocol, and to invoke the assistance of the Consumer Privacy Ombudsman to the extent deemed necessary or appropriate by the Bankruptcy Court.

## ARTICLE 12 - MISCELLANEOUS PROVISIONS

### 12.1    **Headings**.

Headings are utilized in this Plan for the convenience of reference only and shall not constitute a part of this Plan for any other purpose.

### 12.2    **No Attorneys' Fees**.

No attorneys' fees with respect to any Claim or Interest shall be payable under the Plan, except as expressly specified herein or Allowed by a Final Order of the Bankruptcy Court.

### 12.3    **Notices**.

Except as otherwise specified in the Plan, all notices in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing. All communications shall be deemed sent if sent to the Debtor and the Creditors' Committee at the following addresses:

If to the Debtor:

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Attn: Tracy L. Klestadt, Esq.
        Stephanie R. Sweeney, Esq.

If to the Creditors' Committee:

FOX ROTHSCHILD LLP
100 Park Avenue, 15th Floor
New York, New York 10017
Attn: Paul Labov, Esq.

### 12.4    **No Discharge**.

The Debtor shall not receive a discharge under the Plan pursuant to section 1121(d)(3) of the Bankruptcy Code.

### 12.5    **Claims In Dollars**.

Any Claims asserted in foreign currencies shall be converted to United States Dollars in accordance with the prevailing exchange rates published by the Wall Street Journal on the Confirmation Date.

**12.6**    **Binding Effect**.

The rights, benefits, and obligations of any Person named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person (including, but not limited to, any trustee appointed for the Debtor under chapter 7 or 11 of the Bankruptcy Code). The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Debtor's Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

Dated: New York, New York
     October 9, 2017

                    CHOXI.COM, INC.

                    By: */s/ Eddy W. Friedfeld*
                       Eddy W. Friedfeld
                       Chief Restructuring Officer

                    KLESTADT WINTERS JURELLER
                    SOUTHARD & STEVENS, LLP

                    By: */s/ Tracy L. Klestadt*
                       Tracy L. Klestadt
                       Stephanie R. Sweeney
                    200 West 41st Street, 17th Floor,
                    New York, New York 10036
                    Tel: (212) 972-3000
                    Fax: (212) 972-2245

                    *Attorneys for the Debtor and Debtor-in-Possession*

# EXHIBIT B

**Choxi.com, Inc.**
**Liquidation Analysis as of November 30, 2017 modifed per the footnotes**

| | November 30, 2017 Book Value | | Estimated Value Low % | Estimated Value High % | Estimated Value Low Amount | Estimated Value High Amount | Estimated Recovery Low % | Estimated Recovery High % |
|---|---|---|---|---|---|---|---|---|
| **PROCEEDS FROM LIQUIDATION** | | | | | | | | |
| **Assets** | | | | | | | | |
| Cash | $ 576,976 | [1] | 100.0% | 100.0% | $ 576,976 | $ 576,976 | | |
| Customer List/Website | 2,515 | [2] | | | UNKNOWN | UNKNOWN | | |
| **Potential Additional Source of Proceeds** | | | | | | | | |
| Avoidance Actions and other Causes of Actions | UNKNOWN | | UNKNOWN | UNKNOWN | UNKNOWN | UNKNOWN | | |
| **GROSS LIQUIDATION PROCEEDS AVAILABLE FOR DISTRIBUTION** | $ 579,491 | | | | $ 576,976 | $ 576,976 | | |
| **ESTIMATED CLAIMS** | | | | | | | | |
| **Chapter 7 Trustee Fees** | 3% | | | | $ 17,309 | $ 17,309 | 100.0% | 100.0% |
| **Net Liquidation Proceeds Available to Carve-Out** | | | | | $ 559,667 | $ 559,667 | | |
| **Carve-Out** | | | | | | | | |
| Allowed Secured Claim of American Express | $ 57,682 | [3] | | | $ 57,682 | $ 57,682 | 100.0% | 100.0% |
| Professional Fee Claims, net of retainers | 450,000 | [3] | | | 450,000 | 450,000 | 100.0% | 100.0% |
| **Net Liquidation Proceeds Available to Allowed Secured Claim of the First Lien Creditor** | | | | | $ 51,985 | $ 51,985 | | |
| **Allowed Secured Claim of the First Lien Creditor** | $ 2,211,768 | [3] | | | $ 51,985 | $ 51,985 | 2.4% | 2.4% |
| **Net Liquidation Proceeds Available to Allowed Secured Claim of the Second Lien Creditor** | | | | | $ - | $ - | | |
| **Allowed Secured Claim of the Second Lien Creditor** | $ 8,512 | [3] | | | $ - | $ - | 0.0% | 0.0% |
| **Net Liquidation Proceeds Available to Remaining Claims** | | | | | $ - | $ - | | |
| **Remaining Claims** | | | | | | | | |
| Professional Fee Claims, net of retainers and Cave-out | $ 454,072 | [3] | | | $ - | $ - | 0.0% | 0.0% |
| Administrative Expense Claims (other than professional fees and expenses) | 58,366 | [3] | | | - | - | 0.0% | 0.0% |
| Non-Tax Priority Claims | 118,027 | [3] | | | - | - | 0.0% | 0.0% |
| Priority Tax Claims | 617,502 | [3] | | | - | - | 0.0% | 0.0% |
| General Unsecured Claims | 33,000,000 | [3] | | | - | - | 0.0% | 0.0% |
| First Lien Creditor Supplemental Secured Claim | 75,000 | [3] | | | - | - | 0.0% | 0.0% |
| Allowed Subordinated Claims | 1,650,000 | [3] | | | - | - | 0.0% | 0.0% |

**Notes:**

[1] Includes estimates for royalties received through November 2017 and payment of all Admin claims as they come due.

[2] Agrees to August 31, 2017 MOR.

[3] Agrees to amounts identified in the Plan and Disclosure Statement.

# EXHIBIT C

**Choxi.com, Inc.**
**Estimated Disbursement Analysis through end of License**
**Agreement**

| Item | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Cash Balance** | $ 516,976 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Receipts | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| **Gross Available Cash** | $ 576,976 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| **Disbursements** | | | | | | | | | | | | | | | |
| **Administrative and Professional Fee Claims Disbursements** | $ (443,866) | $ (10,000) | $ (10,000) | $ (10,000) | $ (10,000) | $ (10,000) | $ (10,000) | $ (10,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Secured Claim Disbursements** | | | | | | | | | | | | | | | |
| Allowed Secured Claim of American Express | $ (57,682) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Allowed Secured Claim of the First Lien Creditors | (50,429) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) |
| Allowed Secured Claim of the Second Lien Creditors | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Secured Claim Disbursements** | $ (108,111) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) |
| **Priority Claim Disbursements** | | | | | | | | | | | | | | | |
| Non-Tax Priority Claims | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Priority Tax Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Priority Claim Disbursements** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Post-Confirmation Reserve** | $ (25,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **General Unsecured Claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **First Lien Creditor Supplemental Secured Claim** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Allowed Subordinated Claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Disbursements** | $ (576,976) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) |
| **Net Available Cash** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Choxi.com, Inc.**
**Estimated Disbursement Analysis through end of License**
**Agreement**

| Item | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Cash Balance** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 35,000 | $ - | $ - |
| Receipts | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 50,000 | 50,000 | 50,000 |
| **Gross Available Cash** | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 85,000 | $ 50,000 | $ 50,000 |
| **Disbursements** | | | | | | | | | | | | | | | |
| **Administrative and Professional Fee Claims Disbursements** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (70,148) | $ (50,000) | $ (50,000) |
| **Secured Claim Disbursements** | | | | | | | | | | | | | | | |
| Allowed Secured Claim of American Express | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Allowed Secured Claim of the First Lien Creditors | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (25,000) | (6,339) | - | - |
| Allowed Secured Claim of the Second Lien Creditors | - | - | - | - | - | - | - | - | - | - | - | - | (8,512) | - | - |
| **Total Secured Claim Disbursements** | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (25,000) | $ (14,852) | $ - | $ - |
| **Priority Claim Disbursements** | | | | | | | | | | | | | | | |
| Non-Tax Priority Claims | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Priority Tax Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Priority Claim Disbursements** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Post-Confirmation Reserve** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **General Unsecured Claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **First Lien Creditor Supplemental Secured Claim** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Allowed Subordinated Claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Disbursements** | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (60,000) | $ (25,000) | $ (85,000) | $ (50,000) | $ (50,000) |
| **Net Available Cash** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 35,000 | $ - | $ - |

**Choxi.com, Inc.**
**Estimated Disbursement Analysis through end of License**
**Agreement**

| Item | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Cash Balance** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Receipts | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| **Gross Available Cash** | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 |
| **Disbursements** | | | | | | | | | | | | | | | |
| **Administrative and Professional Fee Claims Disbursements** | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (38,924) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Secured Claim Disbursements** | | | | | | | | | | | | | | | |
| Allowed Secured Claim of American Express | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Allowed Secured Claim of the First Lien Creditors | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Allowed Secured Claim of the Second Lien Creditors | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Secured Claim Disbursements** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Priority Claim Disbursements** | | | | | | | | | | | | | | | |
| Non-Tax Priority Claims | $ - | $ - | $ - | $ (11,076) | $ (50,000) | $ (50,000) | $ (6,951) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Priority Tax Claims | - | - | - | - | - | - | (43,049) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | |
| **Total Priority Claim Disbursements** | $ - | $ - | $ - | $ (11,076) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) |
| **Post-Confirmation Reserve** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **General Unsecured Claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **First Lien Creditor Supplemental Secured Claim** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Allowed Subordinated Claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Disbursements** | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) |
| **Net Available Cash** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Choxi.com, Inc.**
**Estimated Disbursement Analysis through end of License Agreement**

| Item | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Total Disbursed | Notes |
|---|---|---|---|---|---|---|---|---|
| **Opening Cash Balance** | $ - | $ - | $ - | $ - | $ - | $ - | $ 516,976 | |
| Receipts | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 2,820,000 | Estimates based on Minimum Guarantee as per the License Agreement. |
| **Gross Available Cash** | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 3,336,976 | |
| | | | | | | | | |
| **Disbursements** | | | | | | | | |
| **Administrative and Professional Fee Claims Disbursements** | $ - | $ - | $ - | $ - | $ (25,547) | $ (13,953) | $ (962,438) | |
| | | | | | | | | |
| **Secured Claim Disbursements** | | | | | | | | |
| Allowed Secured Claim of American Express | $ - | $ - | $ - | $ - | $ - | $ - | $ (57,682) | |
| Allowed Secured Claim of the First Lien Creditors | - | - | - | - | - | - | (1,511,768) | |
| Allowed Secured Claim of the Second Lien Creditors | - | - | - | - | - | - | (8,512) | |
| **Total Secured Claim Disbursements** | $ - | $ - | $ - | $ - | $ - | $ - | $ (1,577,963) | |
| | | | | | | | | |
| **Priority Claim Disbursements** | | | | | | | | |
| Non-Tax Priority Claims | $ - | $ - | $ - | $ - | $ - | $ - | (118,027) | For purposes of this analysis, the disbursement amounts shown are based on the filed claims, actual disbursements will be based on the amount of allowed claims. The Debtor disputes the claims in this class. |
| Priority Tax Claims | (50,000) | (50,000) | (50,000) | (50,000) | (24,453) | - | (617,502) | For purposes of this analysis, the disbursement amounts shown are based on the filed claims, actual disbursements will be based on the amount of allowed claims. The Debtor disputes the claims in this class. |
| **Total Priority Claim Disbursements** | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (24,453) | $ - | $ (735,529) | |
| **Post-Confirmation Reserve** | $ - | $ - | $ - | $ - | $ - | $ - | $ (25,000) | |
| **General Unsecured Claims** | $ - | $ - | $ - | $ - | $ - | $ (36,047) | $ (36,047) | |
| **First Lien Creditor Supplemental Secured Claim** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| **Allowed Subordinated Claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| **Total Disbursements** | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (50,000) | $ (3,336,976) | |
| **Net Available Cash** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |